IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FAIR ISAAC CORPORATION, | |
| Plaintiff, | Case No. 17-cv-08318 |
| v. | |
| TRANS UNION LLC, | **JURY DEMAND** |
| Defendant. | |

## REDACTED COMPLAINT

Fair Isaac Corporation ("FICO") brings this complaint against Trans Union LLC ("TransUnion") for breach of contract, copyright infringement, conversion and unjust enrichment. As set forth in more detail below, TransUnion has failed to pay millions of dollars in royalties owed under the license agreements between the parties. Further, TransUnion has engaged in the unauthorized use of FICO's industry leading proprietary algorithms and scoring software used to generate consumer credit scores, in violation of the parties' license agreements, federal copyright law and common law. Through this intentional course of conduct, TransUnion has unjustly enriched itself, to the detriment of FICO, its business partner for over 30 years.

## I. THE PARTIES

1. FICO is a Delaware corporation, with its principal place of business in San Jose, California.

2. TransUnion is a Delaware limited liability company, with its principal place of business in Chicago, Illinois.

1

## II.    JURISDICTION

3.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338(a) (copyright infringement). The Court has supplemental jurisdiction over FICO's state law claims pursuant to 28 U.S.C. § 1367.

4.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(b). The Court has personal jurisdiction over TransUnion because TransUnion's principal place of business is in this district and some or all of the events giving rise to the claims occurred in this district.

## III.    FACTUAL BACKGROUND

### A.    Credit Scoring

5.    The most important aspect of a consumer's financial profile is his or her credit score. FICO pioneered the credit score industry in the 1950s. FICO has developed proprietary algorithms and copyright-protected software, which – when applied to credit data from a credit bureau like Trans Union – can be used to produce a credit score.

6.    A credit score reflects a consumer's creditworthiness and quantifies the risk that a consumer will fail to repay a credit obligation. Companies in various industries use credit scores for different purposes, including to evaluate applicants for new credit, to prescreen candidates for marketing programs, and to manage existing accounts.

7.    A credit score is the product of two inputs: (1) aggregated credit data, which consists of a consumer's record of borrowing and repayment as reported to a particular credit bureau, such as TransUnion; and (2) a credit scoring algorithm. In general, a software program applies the algorithm to the aggregated credit data, which results in a credit score.

**B.    FICO Scores**

8.    FICO developed the first-ever credit scoring model in 1958. In 1985, FICO developed the first versions of its credit bureau-based credit scores, which were used to "prescreen" credit applicants. This was followed by later versions of credit scores developed by FICO, which potential creditors used for loan origination, account management, and prescreening purposes.

9.    Credit scores calculated using FICO's proprietary algorithms and copyright-protected software ("FICO Scores") are the industry leader and a fixture of consumer lending in the United States. To produce a FICO® Score, one of FICO's proprietary scoring algorithms (sometimes referred to as an "analytic") is applied to a consumer's aggregated credit data using FICO's copyright-protected software, producing a score typically in a range between 300 and 850. Under this model, consumers are rank-ordered according to the likelihood that they will repay their credit obligations. Higher FICO Scores correspond to lower levels of risk.

10.    Each of the three major credit bureaus – TransUnion, Equifax and Experian – have different aggregated credit data for any individual consumer. Further, FICO has developed specific algorithms tailored to the aggregated credit data held by the three different credit bureaus. FICO has also developed specific software for each of the three major credit bureaus. For over 30 years, credit bureaus like TransUnion have benefited tremendously from FICO's innovation and have enjoyed significant commercial success through the distribution and sale of FICO® Scores generated using FICO's proprietary algorithms and software. For example, in 2016 alone, lenders and others purchased more than 11 billion FICO Scores.

11.    Today, in addition to potential creditors, consumers themselves have the ability to receive their own FICO® Scores. For example, in 2016, through the FICO® Score Open Access program, more than 195 million consumer accounts in the United States received free access to a

3

FICO Score through various financial institutions. Consumers also receive their FICO Scores when purchasing products through websites such as www.myfico.com.

12.     The core FICO® Score, the most recent version of which is FICO® Score 9, remains to this day the most common FICO Score used by potential creditors.[1] In addition to the core FICO Score, FICO has developed industry-specific scores such as FICO® Scores for auto loans ("FICO Auto Scores"), FICO® Scores for bankcards ("FICO Bankcard Scores"), FICO® Scores for mortgages ("FICO Mortgage Scores"), FICO® Scores for installment loans ("FICO Installment Scores"), and FICO® Scores for personal finance ("FICO Personal Finance Scores") (collectively, "FICO Industry Scores").[2]

13.     In 1992, FICO developed proprietary scoring algorithms that calculated FICO Scores specific to the insurance industry ("FICO Insurance Scores").

14.     So-called "end users" (*e.g.*, financial institutions or insurance companies) ("End Users" or "Subscribers") request and purchase FICO® Scores for the following four primary purposes: (a) account origination and approval; (b) account management for existing accounts; (c) prescreening potential customers for pre-approved credit or insurance solicitations; and (d) off-line archive scores used by creditors for various non-production purposes. These four categories are discussed in more detail below.

C.      **FICO's Partnership With TransUnion**

15.     In 1989, FICO and TransUnion entered into a license agreement (hereinafter, "Classic Agreement").[3] Under the Classic Agreement, FICO and TransUnion agreed to "jointly develop produce, market, service, and maintain services. . . utilizing Trans Union's proprietary

---

[1] Historically, the core FICO Score was referred to as the "Classic" score.
[2] Historically, the core FICO Score and FICO Industry Scores produced with TransUnion's aggregated credit data were referred to as "Empirica" scores.
[3] All references to the "Classic Agreement" include the amendments and addenda to the Classic Agreement.

credit information data base and its data processing facilities and [FICO's] proprietary credit scoring technology and its expertise in credit scoring software design." Classic Agreement § 1.03. The parties amended the Classic Agreement many times. Until 2015, the Classic Agreement governed TransUnion's use of both the core FICO® Score and the FICO® Industry Scores.

16. In addition, over the years, the parties entered into several agreements relating to other FICO® Scores, including, but not limited to: (a) a December 10, 1993 Prescreen Bankcard Revenue Score Agreement ("Revenue Agreement"); (b) an August 25, 1997 Agreement for Bankruptcy Score Service ("Bankruptcy Agreement"); and (c) a July 25, 2000 Agreement for Precision Credit Risk Score Services ("NextGen Agreement") (collectively, "Additional Score Agreements").[4]

17. Under the Classic Agreement and the Additional Score Agreements, FICO agreed that TransUnion could use or distribute FICO® Scores for certain limited purposes, primarily relating to: (a) on-line account origination; (b) off-line account management; (c) off-line prescreen services; and (d) off-line archive scores used by creditors for various non-production purposes.

18. In 1992, FICO entered into a license agreement with TransUnion specific to the FICO® Insurance Scores (the "Insurance Agreement").[5] The Insurance Agreement was amended by the parties, including through an amendment made effective September 30, 2005 ("Insurance Amendment"). Under the Insurance Agreement, FICO agreed that TransUnion could use or distribute FICO Insurance Scores for certain limited purposes, which generally tracked the

---

[4] All references to the "Additional Score Agreements" include the amendments and addenda to the Additional Score Agreements.
[5] All references to the "Insurance Agreement" include the amendments thereto.

permitted uses under the Classic Agreement but with certain variations to reflect the underwriting and management of insurance policies.

19.     In 2015, the parties restated their overall relationship and superseded the Classic Agreement, the Additional Score Agreements, the Insurance Agreement, and most[6] of the amendments and addenda to those agreements by entering into the January 21, 2015 Analytic and Data License Agreement ("2015 Agreement").

20.     Under the Classic Agreement, the Additional Score Agreements, the Insurance Agreement and the 2015 Agreement, the parties agreed that TransUnion would bill and collect fees for these services from TransUnion's End Users, and, in turn, remit agreed-to royalty payments to FICO. As part of its royalty obligation, TransUnion is required to submit monthly written reports reflecting the number of FICO® Scores (and the specific types of FICO Scores) for which TransUnion owes FICO royalties, by End User. *See, e.g.*, Classic Agreement §§ 3.02(A)(7), (B)(3) & (C)(3); Insurance Agreement § 3.8; 2015 Agreement § 9.5.

21.     TransUnion is further required to keep and maintain records as necessary to allow FICO to verify or otherwise audit TransUnion's usage reports and fee collections. *See, e.g.*, Classic Agreement §§ 3.02(A)(5), (B)(4) & (C)(4), 4.02; NextGen Agreement § 10.3; Revenue Agreement § 5.01; Bankruptcy Agreement § 10.3; Insurance Agreement § 3.7; 2015 Agreement §§ 9.6 & 9.15.

22.     Given that most of the revenue owed to FICO under the parties' agreements derives from the services TransUnion provides to its End Users, FICO relies on TransUnion to keep accurate books and records to ensure that FICO is receiving the amounts to which it is entitled under the parties' agreements, and that FICO can verify the same by conducting an examination of those books and records.

---

[6] Some amendments to the Classic Agreement were expressly preserved in Section 13 of the 2015 Agreement.

*On-Line Score Service*

23. The first category of FICO® Score service provided by TransUnion is the distribution to creditors and others of FICO Scores generated on a real-time basis ("On-Line Score Service"). Creditors and others use FICO Scores delivered through the On-Line Score Service for various purposes, including to assist in deciding whether to approve or decline a consumer credit account application, and, if approved, the terms of service (*e.g.*, the interest rate).

*Account Review Score Service*

24. A second category of FICO® Score service provided by TransUnion is the distribution of FICO Scores generated "off-line," which are used by creditors for purposes of managing existing credit accounts ("Account Review Score Service"). These scores are used by existing creditors for various purposes, including to assist in deciding potential changes in credit limits, credit reissue, and determining the types of collection action to apply to an account.

*Prescreen Score Service*

25. A third category of FICO® Score service provided by TransUnion is the use of FICO Scores generated "off-line" to deliver a list of names to End Users for the purpose of making credit solicitations ("Prescreen Score Service"). In other words, End Users use the Prescreen Score Service to receive a list of consumers to target as part of a pre-approved credit solicitation campaign. As one example, a credit card provider may use the Prescreen Score Service to receive a list of consumers meeting various pre-defined criteria (*e.g.*, a FICO Score above a certain threshold) and then offer that group of consumers a pre-approved credit card.

*Archive Score Service*

26. A fourth category of FICO® Score service provided by TransUnion is the distribution of FICO Scores generated "off-line" using archived credit data, which are used by

creditors for various non-production purposes ("Archive Score Service"). These scores are used by creditors on a depersonalized basis for limited permitted purposes, including the validation of the effectiveness of FICO Scores on a creditor's portfolio, comparisons of FICO Scores to other scores, evaluations of the value of FICO Scores as an internal component of custom models, and establishing FICO Score cut-offs and strategies as they relate to a creditor's portfolio.

*Prospect Database Use*

27.     Over time, End Users desired more sophisticated methods for identifying target groups of consumers for pre-approved credit solicitations when receiving a list of names through the Prescreen Score Service. As part of this evolution, FICO and TransUnion entered into a July 21, 2000 addendum ("Prospect Database Addendum"), which permitted TransUnion to sell to End Users the right to maintain a database consisting of, among other data, certain types of FICO® Scores, which could be "used only for modeling and analysis in connection with the End User's prescreen solicitations executed to acquire new accounts" ("Prospect Database"). Rather than pay a royalty for each FICO Score generated or delivered – as with the On-Line Score Service and Account Review Score Service[7] – the royalty for FICO Scores sold to an End User for use in a Prospect Database is a fixed amount paid on an annual basis for each type of FICO Score. In Exhibit 1 to the Prospect Database Addendum, the parties agreed that TransUnion would pay an annual royalty for each type of FICO Score included in each Prospect Database.

28.     The Prospect Database Addendum modified only certain expressly identified agreements, including the Classic Agreement, the Revenue Agreement, the Bankruptcy Agreement and the NextGen Agreement. *See* Prospect Database Addendum § 1. The Prospect Database Addendum did not amend the Insurance Agreement. Consistent with the express

---

[7] While TransUnion is generally required to pay royalties for each FICO Score calculated as part of its On-Line Score Service and Account Review Score Service, for the Prescreen Score Service, TransUnion pays royalties only where a prospective consumer is actually solicited by an End User.

language identifying the amended agreements, Exhibit 1 to the Prospect Database Addendum did not include the Insurance Score in its royalty fee schedule. Thus, while the Prospect Database Addendum permitted TransUnion to provide FICO® Scores generated under the Classic Agreement and Additional Score Agreements to End Users for purposes of maintaining a Prospect Database, the addendum did not permit the use of FICO® Insurance Scores as part of a Prospect Database.

29.     Prospect Databases are extremely valuable to End Users. Through the use of Prospect Databases, End Users can gain additional access to and use of large amounts of data (including FICO® Scores), in order to create a much more refined and targeted set of criteria for prescreen lists, and in order to better identify customers to target in marketing campaigns. Prescreen lists generated through the use of Prospect Databases are significantly enhanced, as compared to prescreen lists generated without the benefit of the analytical use of a Prospect Database. Put simply, Prospect Databases permit End Users to conduct more effective and cost-efficient mass marketing campaigns.

30.     In March 2010, the parties executed an amendment that modified the definition of Prospect Database ("March 2010 Amendment"). This modification was made at the specific request of TransUnion and based upon TransUnion's representation that the definition would more accurately reflect the types of prescreening analytical uses made by TransUnion's End Users. Specifically, TransUnion represented to FICO that the only two categories of prescreening analytical uses were as described (and expressly defined) in Sections 2.4.1 and 2.4.2 of the March 2010 Amendment and TransUnion was not permitting End Users to use FICO® Scores for any other analytical purposes related to prescreening strategies. The Prospect

Database provisions of the March 2010 Amendment were further amended by the parties in May 2010 ("May 2010 Amendment").

31.     In order to protect FICO's proprietary algorithms and scoring software, the March 2010 Amendment made clear that TransUnion could provide FICO® Scores for analytical purposes related to an End User's prescreening strategies only as outlined in Sections 2.4.1 or 2.4.2 of the Amendment or as otherwise permitted under the parties' agreements. Any other analytical use was prohibited. Specifically, TransUnion covenanted as follows:

> TransUnion agrees that it *shall not, and shall not authorize its agents to, use or make any Fair Isaac Scores available to End Users for use, for analytical purpose srelated [sic] to an End User's prescreening strategies except, as described under Section 2.4.1 or 2.4.2 above...or as otherwise expressly permitted under the Scoring Agreements or in this Section 2.4.3.*

March 2010 Amendment § 2.4.3, as further amended by the May 2010 Amendment (emphasis added).[8]

32.     The 2015 Agreement's provisions track Sections 2.4.1, 2.4.2 and 2.4.3 of the March 2010 Amendment with respect to the definition of Prospect Database and the prohibition against TransUnion making FICO® Scores available to End Users for analytical purposes in connection with prescreening other than as expressly permitted under Section 9 of the 2015 Agreement. 2015 Agreement § 9.11.

**D.     End User and Reseller Agreements**

33.     As noted above, in general, TransUnion distributes FICO® Scores directly to End Users.

34.     Under the Classic Agreement, Additional Score Agreements, Insurance Agreement and 2015 Agreement, when distributing FICO® Scores to End Users, TransUnion is

---

[8] References in Section 2.4.3 to the PreScore Agreement have been omitted because that agreement governs only FICO Scores (including FICO Scores in Prospect Databases) sold directly by FICO to End Users and for which FICO collects fees directly from the End Users.

required to enter into written agreements with those End Users that contain certain minimum terms and conditions restricting the use of FICO Scores ("End User Agreements"). *See, e.g.*, 2015 Agreement, Exhibit C (Minimum End User Agreement Terms); Insurance Amendment, Exhibit D (Fair Isaac Insurance Risk Score Subscriber Agreements).

35.     In addition to the distribution of FICO® Scores directly to End Users, TransUnion also has certain rights to distribute FICO Scores indirectly through "Resellers," which are essentially distributors of FICO Scores to multiple End Users.

36.     With respect to Resellers, the Classic Agreement, Additional Score Agreements, Insurance Agreement and 2015 Agreement generally required that TransUnion's agreements with Resellers ("Reseller Agreements") contain certain terms, consistent with the restrictions on TransUnion's use and the overall understanding and relationship between FICO and TransUnion. *See, e.g.*, March 2010 Amendment, § 2.2 and Exhibit A; Insurance Agreement, § 3.13 and Exhibit H; 2015 Agreement § 11.2. The restrictions required for Reseller Agreements were generally more stringent as compared to those required for End User Agreements. For example:

    a.      Prior to 2015, for the FICO® Insurance Score, TransUnion was required to receive advance written consent from FICO for any distribution of FICO Insurance Scores to Resellers. Insurance Agreement §§ 3.13, 3.9.1.

    b.      Under the 2015 Agreement, with certain exceptions, TransUnion could not distribute FICO® Scores to Resellers for the Prescreen Score Service. 2015 Agreement § 11.2.

### E.     FICO's Copyright-Protected Software Used To Produce FICO Scores

37.     As noted above, a FICO® Score – whether it is produced as part of (a) the On-Line Score Service; (b) the Account Review Score Service; (c) the Prescreen Score Service; (d) the Archive Score Service; (e) a Prospect Database; or (f) otherwise – is generated by applying a FICO scoring algorithm to a credit bureau's aggregated credit data using a scoring software module (collectively, "Software Modules").

38.     The Software Modules are computer programs that are prepared based on detailed, highly proprietary instructions, referred to by the parties as "Structured Specifications." FICO has prepared the Structured Specifications for all Software Modules. Early on, TransUnion wrote the source code for the Software Modules based on FICO's Structured Specifications. Presently, and at least since 2008, FICO has written the source code for the Software Modules based on FICO's Structured Specifications.

39.     Under the May 1, 2008 Scoring Software Addendum to the Classic Agreement (hereinafter, "Scoring Software Addendum"), the parties agreed that FICO held sole ownership of the Software Modules developed under that agreement, including, but not limited to, all intellectual property rights.

40.     In the 2015 Agreement, when the parties restated the terms of their overall relationship, they agreed that FICO solely owned all intellectual property rights in the Software Modules, including Software Modules developed prior to 2015 and Software Modules to be developed in the future.

41.     Over the years, FICO has invested millions in the Software Modules, designing and developing Software Modules specific to the three major credit bureaus (including TransUnion) and specific to different categories of FICO® Scores. The Software Modules are highly proprietary and extremely valuable business assets of FICO. In order to protect its investment, FICO made clear in the Scoring Software Addendum that TransUnion could use FICO's Scoring Software "solely as permitted under the [Classic] Agreement." Scoring Software Addendum § 2.03; *see also id.* § 2.05 ("TU shall operate the Scoring Software solely as permitted by the [Classic] Agreement and this [Scoring Software] Addendum."). Any other use

was prohibited. The 2015 Agreement contains similar provisions. *See, e.g.*, 2015 Agreement §§ 8.1-8.2.

42.     FICO has applied for and received federal copyright registrations for the Software Modules as follows:

| Software Module | Copyright Registration Number |
| --- | --- |
| Scoring Software - FICO Score 8 based on TransUnion Data | TX 8-425-137 |
| Scoring Software - FICO Bankcard Score 8 based on TransUnion Data | TX 8-425-130 |
| Scoring Software - FICO Auto Score 8 based on TransUnion Data | TX 8-425-132 |
| Scoring Software - FICO Mortgage Score 8 based on TransUnion Data | TX 8-425-134 |
| Scoring Software - FICO Score 9 based on TransUnion Data | TX 8-423-776 |
| Scoring Software - FICO Bankcard Score 9 based on TransUnion Data | TX 8-423-782 |
| Scoring Software - FICO Auto Score 9 based on TransUnion Data | TX 8-423-780 |
| Scoring Software - FICO Auto Score 9 XT based on TU CreditVision Data | TX 8-423-992 |
| Scoring Software - FICO Score 95 based on TransUnion Data | TXu 2-054-760 |
| Scoring Software - FICO Score 98 based on TransUnion Data | TXu 2-054-796 |
| Scoring Software - FICO Score 4 based on TransUnion Data | TXu 2-054-766 |
| Scoring Software - FICO Insurance Risk Score based on TransUnion Data | TXu 2-055-040 |
| Scoring Software - FICO Score NG1 based on TransUnion Data | TXu 2-054-770 |
| Scoring Software - FICO Score NG2 based on TransUnion Data | TXu 2-054-790 |
| Scoring Software - FICO Bankruptcy Risk Score 1.0 based on TransUnion Data | TXu 2-054-768 |
| Scoring Software - FICO Bankruptcy Risk Score 2.0 based on TransUnion Data | TXu 2-054-763 |
| Scoring Software - FICO Bankcard Revenue Score 3.0 based on TransUnion Data | TXu 2-054-795 |

**F.     FICO's 2015 Audit**

43.     Under the Classic Agreement, the Additional Score Agreements, the Insurance Agreement and the 2015 Agreement, FICO has the right to engage an independent certified auditor to conduct an examination of TransUnion's records, including its use of FICO® Scores and compliance with the terms of the parties' agreements.

44.     In 2015, FICO engaged an independent certified auditor ("Auditor") to review TransUnion's compliance with the parties' agreements ("2015 Audit").

45.     The 2015 Audit was performed in accordance with the Statement on Standards for Consulting Services issued by the American Institute of Public Accountants ("AICPA").

46.     Prior to the commencement of the 2015 Audit, in a letter agreement dated March 6, 2015 ("Audit Scope Letter"), FICO and TransUnion agreed on specific data that TransUnion would make available to the Auditor. The minimum data TransUnion agreed to make available included a twelve-month sample of data from its production systems. However, despite the clear terms of the Audit Scope Letter, TransUnion informed the Auditor at the outset of the 2015 Audit that, with respect to its production systems that track the batch (or "off-line") distribution of FICO® Scores, TransUnion had retained *only one month* of the data it had agreed to retain for inspection.

47.     In October 2015, the Auditor issued its findings, which were subject to several scope limitations due to incomplete or missing data.

48.     Nevertheless, despite the incomplete or missing data, FICO learned through the 2015 Audit that, since at least 2011, TransUnion has significantly underreported the number of FICO® Scores it has used or distributed through the (a) On-Line Score Service; (b) Account Review Score Service; (c) Archive Score Service; and (d) Prescreen Score Service, resulting in a substantial underpayment of royalty amounts required under the parties' agreements.

49.     Further, FICO learned that, since at least 2011, TransUnion has systematically underreported to FICO the number of Prospect Databases that include FICO® Scores, resulting in an underpayment of the annual royalty required for each type of FICO Score used in each Prospect Database, as required under the parties' agreements.

50.     In total, according to the 2015 Audit, TransUnion owes FICO millions of dollars in additional royalty payments and fees, for the 2011-13 time period alone.

**G.     TransUnion's Failure To Maintain Proper Records And To Provide Accurate Reporting**

51.     TransUnion is required to adhere to certain recordkeeping requirements under the Classic Agreement, the Additional Score Agreements, the Insurance Agreement and the 2015 Agreement. *See, e.g.,* Classic Agreement §§ 3.02(A)(5), (B)(4) & (C)(4), 4.02; NextGen Agreement § 10.3; Revenue Agreement § 5.01; Bankruptcy Agreement § 10.3; Insurance Agreement § 3.7; 2015 Agreement §§ 9.6 & 9.15.

52.     Specifically, TransUnion is required to keep and maintain records as necessary to allow FICO to adequately audit or otherwise verify that the royalty fees TransUnion remits to FICO are consistent with TransUnion's obligations under the parties' agreements.

53.     In addition, TransUnion is required to submit to FICO written monthly reports ("Monthly Usage Summary Reports") that document, in detail, the number of FICO® Scores (and the specific types of FICO Scores) for which TransUnion owes FICO royalties, by End User. This further allows FICO to verify the accuracy of the royalty fee amounts TransUnion remits to FICO every month. *See, e.g.,* Classic Agreement §§ 3.02(A)(7), (B)(3) & (C)(3); Insurance Agreement § 3.8; Prospect Database Addendum § 2.3; 2015 Agreement § 9.5.

54.     TransUnion's transparency and FICO's ability to verify the royalty fees is essential because FICO relies on TransUnion to remit the proper amounts owed under the parties' agreements. Given that these revenues derive primarily from TransUnion's distribution of FICO® Scores to End Users without the operational or other involvement of FICO, FICO currently has no means to independently verify TransUnion's compliance with the parties' agreements outside TransUnion's books and records.

55.     During the course of the 2015 Audit, FICO discovered that TransUnion's recordkeeping was woefully deficient.  FICO further learned that the Monthly Usage Summary Reports TransUnion submitted to FICO – which FICO relied upon to verify the accuracy of the royalties TransUnion remitted – were grossly inaccurate.

**H.      TransUnion's Failure To Remit Royalties As Required Under The Parties' Agreements**

56.     Despite the significant benefits TransUnion has enjoyed through its partnership with FICO, TransUnion has engaged in a course of conduct designed to deny FICO royalties rightfully owed to it under the parties' agreements.

57.     Initially, since at least 2011, TransUnion has systematically underpaid royalties owed to FICO for FICO® Scores generated for the On-Line Score Service, the Account Review Score Service, the Archive Score Service, and the Prescreen Score Service.

58.     TransUnion has also significantly underpaid royalties owed to FICO for FICO® Scores used in Prospect Databases.  For example, during the 2011-13 time period, TransUnion reported to FICO that Subscribers were using a total of two types of FICO Scores in only two Prospect Databases.  But in reality, TransUnion Subscribers maintained at least fifteen types of FICO Scores in at least fifteen Prospect Databases during that time period, resulting in a significant underpayment to FICO.  This conduct has continued through the present.

59.     This was not an oversight.  TransUnion knew full well these Prospect Databases existed.  Indeed, *TransUnion was sending its Subscribers invoices charging the Subscribers for the use of these Prospect Databases*.  As noted above, these Prospect Databases are extremely valuable to TransUnion's Subscribers. Subscribers apply analytical tools to, and make other valuable analytical use of, the data contained in the Prospect Databases in order to modify and refine prescreening criteria, and in order to come up with an enhanced and much more

16

highly correlated target consumer base (as compared to prescreen lists generated without the benefit of analytical use of a Prospect Database). The result is significantly more effective and cost-efficient marketing campaigns.

60.     When FICO confronted TransUnion regarding these Prospect Databases, TransUnion claimed the databases fell outside the definitions of "Prospect Database" set forth in Sections 2.4.1 and 2.4.2. While FICO disagreed with TransUnion's position, even if correct, TransUnion's contention is unavailing. In Section 2.4.3, the parties *expressly* agreed that TransUnion was prohibited from providing FICO® Scores to End Users for analytical purposes outside the permitted uses in Sections 2.4.1 and 2.4.2, or as otherwise expressly permitted under the parties' agreements. *See also* 2015 Agreement § 9.11. FICO insisted on Section 2.4.3 in the March 2010 Amendment (and Section 9.11 in the 2015 Agreement) to foreclose precisely this type of gamesmanship. Thus, even if TransUnion's usage fell outside the definitions in Sections 2.4.1 or 2.4.2 – in the alternative, if necessary – TransUnion's conduct is unauthorized and violates Section 2.4.3 of the Classic Agreement and Section 9.11 of the 2015 Agreement.

61.     In engaging in this course of conduct, TransUnion used the Software Modules.

62.     On information and belief, TransUnion has failed to remit millions of dollars in unpaid royalties for the categories of use described above.

**I.      TransUnion's Unauthorized Use Of FICO Scores And/Or Score Changes As Part Of TransUnion's "Triggers" Processes**

63.     Consistent with its failure to remit royalties owed for (a) the On-Line Score Service; (b) the Account Review Score Service; (c) the Archive Score Service; (d) the Prescreen Score Service; and (e) Prospect Databases – along with its unauthorized use of FICO® Scores – TransUnion has also engaged in the unauthorized use of FICO Scores as part of an activity known as "Triggers."

64. Under Section 1 of the May 2010 Amendment, the parties defined "Triggers" as "monitoring the daily changes of a population of consumers for certain consumer credit file (or other data such as consumer scores) attributes or changes (collectively, the "Selection Triggering Criteria") and then periodically (e.g., daily, weekly, etc.) providing the Subscriber with scores and/or other information on those Consumers whose attributes or changes match or otherwise meet the Selection Triggering Criteria." Section 1 of the 2015 Agreement contains an equivalent definition of "Triggers".

65. Under Section 2.3 of the May 2010 Amendment, FICO and TransUnion agreed that:

> *Without the prior written approval of Fair Isaac, Trans Union shall not use Fair Isaac Scores and/or Fair Isaac Score changes for any other purpose related to Trans Union's Triggers processes, including as part of the Selection Triggering Criteria in Trans Union's Triggers processes provided to Subscribers,* except that Trans Union shall have the right to use Scores in Trans Union's Internal Testing and Processing performed for efficiency in the append process described above.

2015 Agreement § 9.9 (emphasis added). Section 9.9 of the 2015 Agreement contains an equivalent prohibition on TransUnion's use of FICO® Scores and/or FICO Score changes as part of TransUnion's Triggers process.

66. TransUnion has used FICO® Scores and/or FICO Score changes as part of TransUnion's Triggers process, in direct violation of the parties' agreements. Specifically, TransUnion has used FICO Scores and/or changes in FICO Scores as "Selection Triggering Criteria" in its "Triggers processes provided to Subscribers," including, but not limited to, in services provided to ███████████████████ a TransUnion Subscriber.

67. Specifically, following the 2015 Audit, FICO discovered that TransUnion had included the use of FICO® Scores as part of ██████ Selection Triggering Criteria despite the clear prohibition against doing so.

18

68.     Initially, TransUnion repeatedly denied this use.     Ultimately, however, TransUnion admitted it had permitted ▮▮▮▮▮ to use FICO® Scores and/or changes in FICO Scores as part of ▮▮▮▮▮ "Selection Triggering Criteria."

69.     In engaging in this course of conduct, TransUnion used the Software Modules, including by copying the code.

70.     Here again, TransUnion's conduct has enriched itself and its Subscribers, to the detriment of FICO.

**J.      Unauthorized Distribution Of FICO Scores To Resellers**

71.     As noted above, under the parties' agreements, TransUnion could distribute FICO® Scores to Resellers for only certain expressly authorized purposes, which were generally more restrictive as compared to authorized purposes for TransUnion's distribution directly to End Users.

72.     TransUnion has violated the restrictions on its distribution of FICO® Scores to Resellers in numerous ways, including, but not limited to, the following:

    a.      Failing to obtain FICO's advance written consent prior to distributing FICO® Insurance Scores to Resellers; and

    b.      Distributing FICO® Scores to Resellers for the Prescreen Score Service.

**K.      Dispute Resolution Process**

73.     The Classic Agreement, Additional Score Agreements and Insurance Agreement provide specific procedures for the parties to follow in the event of a dispute. *See* May 14, 2010 Scoring Agreement Amendment ("May 2010 Amendment") at §§ 2.7 & 2.7.1.     Specifically, in the event the parties' respective Market and Accounting Teams cannot resolve a dispute, the parties are required to escalate the dispute to the Policy Committee. *Id.* at § 2.7. If the Policy Committee is unable to resolve the dispute, then the parties are obligated to refer the dispute to

their respective Chief Executive Officers ("CEOs"). Section 2.7.1 of the May 2010 Amendment requires the CEOs to prepare and exchange memoranda "stating the issues in dispute and each other's relative position on the merits, summarizing the negotiations which have taken place and attaching relevant documents." The CEOs are also required to meet in person or by phone call as soon as practicable, but in no event later than 14 days after the matter has been referred to them.[9] *Id.* § 2.7.1.

74.     On September 6, 2017, FICO's CEO sent TransUnion's CEO a memorandum outlining all the outstanding issues in dispute between the parties, as required by the terms of the May 2010 Amendment. Specifically, FICO's CEO raised the Auditor's findings that, since 2011, TransUnion had underreported FICO® Scores delivered to End Users and the number of Prospect Databases using FICO Scores. FICO's CEO also raised the issue of TransUnion using FICO Scores and/or FICO Score changes for purposes related to TransUnion's Triggers processes. After outlining the parties' negotiations to date, FICO's CEO requested that TransUnion's CEO make himself available to discuss the outstanding dispute between the parties and proposed a conference call on September 15, 2017.

75.     Counsel for TransUnion's CEO contacted FICO's CEO on September 7, 2017, in response to the September 6, 2017 memo. TransUnion's CEO and FICO's CEO then had a telephone call on September 21, 2017 to discuss the dispute, as required under the May 2010 Amendment. TransUnion, however, never sent FICO a written response to the September 6, 2017 memo, as required under the May 2010 Amendment.

76.     FICO has fully performed under the dispute resolution procedures of the May 2010 Amendment and the 2015 Agreement, and is authorized to file the instant suit.

---

[9] The 2015 Agreement also contains a dispute resolution provision but only requires the parties to escalate a dispute to the Policy Committee, not to the parties' CEOs. 2015 Agreement § 18.3.

## COUNT I:  BREACH OF CONTRACT – FAILURE TO PAY ROYALTIES

77.     The allegations in paragraphs 1-76 are incorporated as if set forth fully herein.

78.     FICO has valid and enforceable contracts with TransUnion.  FICO has performed its obligations under the parties' agreements.

79.     TransUnion was contractually obligated to pay FICO royalties for all FICO® Scores included in Prospect Databases.  TransUnion was also contractually obligated to pay royalties for all other uses of FICO Scores pursuant to the Classic Agreement, the Additional Score Agreements, the Insurance Agreement, and the 2015 Agreement.

80.     TransUnion breached these obligations by systematically violating and circumventing its contractual obligations by, among other things, failing to remit royalty payments, as required under the parties' agreements.

81.     As a result, FICO has suffered, and will continue to suffer, damages.

## COUNT II:  BREACH OF CONTRACT – UNAUTHORIZED USE AND DISTRIBUTION OF FICO SCORES

82.     The allegations in paragraphs 1-76 are incorporated as if set forth fully herein.

83.     FICO has valid and enforceable contracts with TransUnion.  FICO has performed its obligations under the parties' agreements.

84.     TransUnion was contractually obligated to use and distribute FICO® Scores only as authorized by the parties' agreements, including, but not limited to, the Classic Agreement, the Additional Score Agreements, the Insurance Agreement, the Prospect Database Addendum, and the 2015 Agreement.

85.     TransUnion intentionally breached these obligations, including, but not limited to, the following conduct:

        a.     TransUnion provided FICO® Scores to End Users and/or Resellers for purposes not authorized under the parties' agreements; and

21

        b.     TransUnion used FICO® Scores and/or FICO Score changes as part of TransUnion's Trigger processes.

86.     Pleading further, and in the alternative if necessary, TransUnion further intentionally breached these obligations by providing FICO® Scores to Resellers and/or End Users for analytical use as part of the End User's prescreening strategies (a) outside the Prospect Database definitions in Sections 2.4.1 and 2.4.2 of the Prospect Database Addendum and Section 9.11 of the 2015 Agreement; and/or (b) otherwise without express authorization under the parties' agreements.

87.     As a result, FICO has suffered, and will continue to suffer, damages.

## COUNT III: BREACH OF CONTRACT – UNAUTHORIZED USE OF SOFTWARE

88.     The allegations in paragraphs 1-76 are incorporated as if set forth fully herein.

89.     FICO has valid and enforceable contracts with TransUnion. FICO has performed its obligations under the parties' agreements.

90.     Under the Classic Agreement, the Additional Score Agreements, the Insurance Agreement, the Scoring Software Addendum, and the 2015 Agreement, TransUnion was permitted to use the Software Modules only as expressly authorized in the parties' agreements.

91.     TransUnion breached these obligations by using the Software Modules in ways that were not authorized under the parties' agreements, including, but not limited to, the following conduct:

        a.     TransUnion used the Software Modules to provide FICO® Scores to Resellers for purposes not authorized under the parties' agreements; and

        b.     TransUnion used the Software Modules to calculate FICO® Scores and/or FICO Score changes used in TransUnion's Trigger processes, specifically, as "Selection Triggering Criteria" in "Triggers processes provided to Subscribers."

92.     Pleading further, and in the alternative if necessary, TransUnion further breached these obligations by using the Software Modules to provide FICO® Scores to Resellers and/or

End Users for analytical use as part of the End User's prescreening strategies (a) outside the Prospect Database definitions in Sections 2.4.1 and 2.4.2 of the Prospect Database Addendum and Section 9.11 of the 2015 Agreement; and/or (b) otherwise without express authorization under the parties' agreements.

93.    As a result, FICO has suffered, and will continue to suffer, damages.

### COUNT IV: BREACH OF CONTRACT – RECORDKEEPING PROVISIONS

94.    The allegations in paragraphs 1-76 are incorporated as if set forth fully herein.

95.    FICO has valid and enforceable contracts with TransUnion. FICO has performed its obligations under the parties' agreements.

96.    TransUnion was contractually obligated to keep and maintain sales and distribution records as necessary to allow FICO to verify or otherwise audit TransUnion's usage reports and fee collections, pursuant to the Classic Agreement, the Prospect Database Addendum, the Additional Score Agreements, the Insurance Agreement, and the 2015 Agreement.

97.    TransUnion breached this obligation and others by failing to keep or maintain such records.

98.    As a result, FICO has suffered, and will continue to suffer, damages.

### COUNT V: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

99.    The allegations in paragraphs 1-76 are incorporated as if set forth fully herein.

100.    Under the agreements set forth above, TransUnion owed FICO a duty of good faith and fair dealing.

101.    TransUnion breached the implied duty of good faith and fair dealing by intentionally and knowingly making numerous false representations to FICO in bad faith, including, but not limited to, the following:

a.    In or about May 2009, TransUnion told FICO that it was not using FICO® Insurance Scores in providing Prospect Database services to End Users.

b.    During the parties' negotiations surrounding the March 2010 Amendment, TransUnion represented to FICO that it was not permitting End Users to use FICO® Scores for analytical purposes relating to End User prescreening strategies, except as set forth in the definitional Sections 2.4.1 and 2.4.2 in the March 2010 Amendment.

102.    Further, TransUnion intentionally and in bad faith failed to remit royalty amounts owed to FICO.

103.    Further, TransUnion intentionally and in bad faith repeatedly engaged in the unauthorized use of FICO® Scores and the Software Modules.

104.    Further, TransUnion intentionally and in bad faith failed to keep and maintain records as necessary to allow FICO to verify or otherwise audit TransUnion's usage reports and fee collections.

105.    As a result, FICO has suffered, and will continue to suffer, damages.

## COUNT VI: COPYRIGHT INFRINGEMENT

106.    The allegations in paragraphs 1-76 are incorporated as if set forth fully herein.

107.    The Software Modules are the subject of valid, registered copyrights from the Copyright Office.

108.    FICO is the sole owner of all right, title, and interest in and to the copyrights in the Software Modules.

109.    TransUnion has infringed FICO's copyrights by, among other things, making unauthorized copies of the Software Modules, including protectable elements thereof, in using and/or deploying the Software Modules to produce FICO® Scores in ways that were not

authorized under the parties' agreements (including, but not limited to, the Classic Agreement, the Additional Scores Agreements, the Insurance Agreement and the 2015 Agreement) – through, without limitation, the following conduct:

        a.    TransUnion used and/or deployed the Software Modules to provide FICO® Scores to Resellers for purposes not authorized under the parties' agreements; and

        b.    TransUnion used and/or deployed the Software Modules to calculate FICO® Scores and/or FICO Score changes used in TransUnion's Trigger processes.

110.    Pleading further, and in the alternative if necessary, TransUnion has further infringed FICO's copyrights by using and/or deploying the Software Modules to provide FICO® Scores to Resellers and/or End Users for analytical use as part of the End User's prescreening strategies (a) outside the Prospect Database definitions in Sections 2.4.1 and 2.4.2 of the Prospect Database Addendum and Section 9.11 of the 2015 Agreement; and/or (b) otherwise without express authorization under the parties' agreements.

111.    Each of these uses exceeded the scope of TransUnion's rights to use the Software Modules under the parties' agreements.

112.    As a result of TransUnion's infringement, FICO has suffered, and will continue to suffer, substantial injury, loss, and damages to its ownership rights in the copyrighted Software Modules, and TransUnion has unlawfully derived, and will continue to derive, income and profits from the infringing acts.

## COUNT VII: CONVERSION OF FICO SCORES AND SOFTWARE MODULES

113.    The allegations in paragraphs 1-76 are incorporated as if set forth fully herein.

114.    TransUnion's unauthorized use of FICO® Scores – including, but not limited to, the provision of FICO Scores to Resellers and/or End Users for analytical use as part of the End User's prescreening strategies and use of FICO Scores and/or FICO Score changes as part of TransUnion's Trigger processes, outside the permitted uses set forth in the Classic Agreement,

the Additional Score Agreements, the Insurance Agreement and the 2015 Agreement – constitutes conversion on the part of TransUnion.

115.   TransUnion's provision of FICO® Scores to Resellers for purposes not authorized under the parties' agreements, constitutes conversion on the part of TransUnion.

116.   TransUnion's unauthorized use of the Software Modules, outside the permitted uses set forth in the Classic Agreement, the Additional Score Agreements, the Insurance Agreement, the Scoring Software Addendum and the 2015 Agreement, constitutes conversion on the part of TransUnion.

117.   As a result, FICO has suffered, and will continue to suffer, damages.

118.   At all times, TransUnion has acted in bad faith, oppressively and maliciously toward FICO, with intent to injure FICO, thereby entitling FICO to punitive damages against TransUnion.

## COUNT VIII:  UNJUST ENRICHMENT

119.   The allegations in paragraphs 1-76 are incorporated as if set forth fully herein.

120.   By using FICO® Scores and the Software Modules in unauthorized ways, TransUnion has received the benefit of the use of FICO Scores and the Software Modules, thereby deriving substantial income and profits.

121.   TransUnion accepted these benefits but has failed to provide sufficient compensation to FICO for the same.

122.   TransUnion has been unjustly enriched by this conduct, to the detriment of FICO

123.   As a result, FICO has suffered, and will continue to suffer, damages.

## PRAYER FOR RELIEF

124.    Based on TransUnion's breaches of the license agreements, violations of federal copyright law and violations of common law, FICO is entitled to:

    a.    a monetary award in an amount to be determined at trial, including, but not limited to, the following:

        (i)    Unpaid royalties;

        (ii)    Disgorgement of TransUnion's profits from its unauthorized use of FICO® Scores and the Software Modules;

        (iii)    Costs associated with FICO's audit;

        (iv)    FICO's damages;

        (v)    Punitive damages based on TransUnion's bad faith, oppressive and malicious conduct toward FICO; and

        (vi)    Interest, including, but not limited to, pre-judgment interest, statutory interest and contractual interest pursuant to the parties' respective agreements cited herein (*e.g.*, without limitation, the NextGen Agreement § 13.8; Bankruptcy Agreement § 7.7.4; 2015 Agreement § 9.4).

    b.    any other legal or equitable relief that the Court may find appropriate, including, but not limited to, preliminary and permanent injunctive relief enjoining TransUnion from making unauthorized copies of the Software Modules or otherwise directly or indirectly infringing any of FICO's copyrighted works pursuant to 17 U.S.C. § 502, and an order from the Court requiring the impoundment and destruction of all unauthorized copies of the Software Modules pursuant to 17 U.S.C. § 503.

## CONCLUSION

125.    As set forth above, TransUnion has failed to pay FICO millions of dollars in royalties owed to FICO. Further, TransUnion has engaged in the unauthorized use of FICO® Scores and the Software Modules, unjustly enriching itself to the detriment of FICO. Based on this conduct, FICO is entitled to unpaid royalties, its damages, its audit costs, disgorgement of TransUnion's profits realized from its wrongful conduct, punitive damages, interest, and any other legal or equitable relief that the Court may find appropriate.

Dated: December 20, 2017                 Respectfully submitted,

Michael A. Olsen
J. Gregory Deis
Natalie F. Wayne
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
molsen@mayerbrown.com
gdeis@mayerbrown.com
nwayne@mayerbrown.com

*Attorneys for Plaintiff*