**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| FAIR ISAAC CORPORATION,<br><br>       *Plaintiff*,<br> v.<br><br>TRANS UNION LLC,<br><br>       *Defendant*. | 1:17-cv-08318<br><br>Judge Sharon Johnson Coleman<br>Magistrate Judge Young B. Kim<br><br>**JURY DEMAND** |
| TRANS UNION LLC,<br><br>       *Counterclaim-Plaintiff*,<br><br> v.<br><br>FAIR ISAAC CORPORATION,<br><br>       *Counterclaim-Defendant*. | |

## TRANS UNION LLC'S REDACTED COUNTERCLAIMS

Counterclaim-Plaintiff Trans Union LLC ("TransUnion"), by and through its undersigned counsel, states as follows:

1. TransUnion seeks treble damages and injunctive relief to redress injuries to competition in the national market for credit scores caused by the Fair Isaac Corporation ("Fair Isaac"). Fair Isaac has maintained a monopoly share in excess of 70% of the market for credit scores through conduct that has suppressed competition, stymied innovation, limited access to credit for millions of Americans, raised prices on the distributors and users of credit scores, and resulted in hundreds of millions of dollars in annual revenues for Fair Isaac, all in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10. Fair Isaac's false and misleading marketing and advertising campaigns to maintain and

1

expand its monopoly have also violated Section 43(A) of the Lanham Act, 15 U.S.C. § 1125(a), the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, and the Illinois Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1.

2.      Fair Isaac's FICO credit scores have dominated the market for nearly three decades. Fair Isaac executives have bragged that their FICO scores are "the 800-pound gorilla" in the market for credit scores, "deeply embedded in the system in North America," and have "maintained a 90-plus percent market share for at least 13 years." Fair Isaac advertises that its FICO scores are used for 90% of all lending decisions in the United States, and that Fair Isaac sells four times more FICO scores per year than McDonald's sells hamburgers worldwide.

3.      TransUnion is a credit reporting agency that collects, standardizes, and distributes information on consumer credit activity. TransUnion sells lenders, financial institutions, and other businesses credit reports and credit scores – including Fair Isaac's FICO scores – that are used to make decisions about whether and on what terms to extend credit to American consumers. TransUnion sells those credit reports and credit scores to businesses in every state, including Illinois and California. For decades, TransUnion and the other credit reporting agencies have had no choice but to enter into agreements with Fair Isaac to distribute Fair Isaac's dominant FICO scores. Fair Isaac has used these distribution agreements to place anti-competitive restrictions on the credit reporting agencies' ability to develop or distribute competing credit scores; prohibited TransUnion and the other agencies from individually negotiating royalty prices for access to FICO scores (because Fair Isaac has insisted that no agency may have a lower royalty price unless all agencies have a lower royalty price); charged discriminatory and prohibitively high royalty prices for FICO scores if TransUnion or another

credit reporting agency bundles a competing score with the FICO score; and increased the royalty prices that must be paid by TransUnion and the other credit reporting agencies.

4.      In 2006, VantageScore Solutions, LLC ("VantageScore"), an independent joint venture of TransUnion and two other credit reporting agencies, launched a competing credit score known as VantageScore. From the outset, VantageScore was competitively priced, highly predictive, and scored millions more Americans than Fair Isaac's FICO products. Today, by making full use of the credit reporting agencies' consumer data, including rental and utility payments, VantageScore is capable of providing credit scores to an additional 30 million Americans. If VantageScore were widely adopted by lenders, millions more creditworthy Americans would have the opportunity to apply for a home mortgage, car loan, or credit card, and obtain credit at lower cost.

5.      Rather than compete on the merits with VantageScore, Fair Isaac has engaged in a pattern of anti-competitive conduct over the course of more than a decade to discourage the adoption of VantageScore and preserve its own monopoly. Fair Isaac has abused its monopoly power to impose onerous contractual terms on TransUnion designed to prevent TransUnion from successfully marketing and selling VantageScore as an alternative to FICO scores, and has waged a disparaging public relations and advertising campaign to create fear, uncertainty, and doubt about VantageScore's viability and reliability with lenders and consumers.

6.      Through its exclusionary conduct, Fair Isaac has succeeded in preventing the substantial sales growth that VantageScore would have achieved though competition on the merits. Having suppressed competition, Fair Isaac has been able to increase prices for its FICO products. If it were not for Fair Isaac's suppression of competition, VantageScore would have

thrived and won substantial market share through its innovative product, and would have reduced the price paid by TransUnion for FICO products.

7.      Fair Isaac's anti-competitive conduct has harmed TransUnion, not only as a supplier of VantageScore, but also as a direct purchaser (or licensee) of Fair Isaac's FICO products, which it also supplies to its customers. TransUnion estimates that its actual damages, before trebling, exceed ten million dollars.

8.      Fair Isaac's anti-competitive conduct has harmed competition in the market for credit scores, as well as businesses and consumers who have had their freedom of choice restricted and/or had their access to credit limited by archaic and outdated FICO scores. Opening the market for credit scores to competition is essential to spurring innovation so that credit scores are more accurate and more predictive, fairly priced, and score the tens of millions of creditworthy Americans who have been denied access to credit.

9.      In addition, Fair Isaac has made bad faith use of its current contract with TransUnion. Fair Isaac has repeatedly breached its implied duty of good faith and fair dealing by unilaterally and unreasonably imposing non-negotiated terms and conditions on TransUnion through its annual royalty schedules. And, Fair Isaac took advantage of a mistake in a contract with TransUnion – a mistake it knew or should have known about before the contract was executed – to insist that TransUnion pay Fair Isaac millions of dollars more than the parties had bargained for.

### I.      PARTIES, JURISDICTION, AND VENUE

10.     TransUnion is a Delaware limited liability company, with its principal place of business at 555 West Adams Street, Chicago, Illinois 60661.

11.     Fair Isaac is a Delaware corporation, with its principal place of business at 181 Metro Drive, Suite 700, San Jose, California, 95110.

4

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

13.     Counterclaim-Defendant Fair Isaac is subject to the personal jurisdiction of this Court because, among other reasons, it regularly transacts business within the State of Illinois and has consented to the personal jurisdiction of this Court by initiating this action.

14.     Venue is proper in this District pursuant to, among other statutes, Section 12 of the Clayton Act, 15 U.S.C. § 22 and under 28 U.S.C. § 1391(b) and (c). Fair Isaac regularly transacts business within this District and a substantial portion of the affected interstate trade and commerce described in these Counterclaims were carried out in this District.

15.     Fair Isaac markets its products across state lines and receives substantial payments across state lines. Fair Isaac's business activities that are the subject of these Counterclaims are within the law of, and have substantially affected, interstate trade and commerce.

## II.     CREDIT SCORES IN THE UNITED STATES

### A.     Credit Scores

16.     Credit scores are the most widely used indicators of consumers' creditworthiness in the United States. Lenders, financial institutions, and other businesses rely on credit scores to decide whether and on what terms to extend credit to consumers. A consumer's credit score can determine whether he or she will be able to get a mortgage, credit card, auto loan, or other credit product and the rate that he or she will pay.

17.     Credit scores are typically three-digit numbers that are designed to assess credit risk. Higher scores generally indicate that a consumer poses less credit risk. Credit scores are produced using credit scoring systems that apply a credit scoring algorithm to a consumer credit

report. Credit scores are usually accompanied by "reason codes," which inform the lender about the reasons that contributed most significantly to reducing a particular consumer's credit score.

18.     Credit reporting agencies (also called "credit bureaus") – which include TransUnion, Equifax, and Experian – collect and supply aggregated consumer credit data in the form of consumer reports as permitted under the Fair Credit Reporting Act, 15 U.S.C. § 1681. The credit reporting agencies expend substantial resources to maintain sophisticated databases of consumer credit data and compete with one another to provide the most comprehensive, timely, and accurate information on consumers' financial behavior. The credit reporting agencies continuously gather credit and financial data about consumers from creditors, government entities, public records, collection agencies, and other third parties, and compile this information into a "credit file." The credit reporting agencies sell credit reports, which include information gathered from a consumer's credit file, to businesses and consumers.

19.     While credit scores are sold together with credit reports, credit reports are different from credit scores and can be sold independently. A credit report is a statement that has detailed information about a consumer's credit activity and current credit situation. A consumer's credit report might, for example, include information about that consumer's history of mortgage payments, credit card balances, credit card payments, and credit inquiries. A credit score takes the detailed information in a credit report and turns it into a single three-digit number.

### B.      The Market For Credit Scores In The United States

20.     The market for credit scores in the United States is a distinct product market for antitrust purposes. The lenders, financial institutions, and other businesses that use credit scores to assess creditworthiness and make decisions about whether and on what terms to extend credit to consumers do not consider credit reports, or any other information about borrowers, to be a

substitute for credit scores. Consumers also purchase their credit scores to better understand their own creditworthiness and how they likely will be viewed by potential lenders.

21.     The United States is a relevant geographic market in which credit scores are provided. The restraints on competition contained in Fair Isaac's contracts relate to the provision of credit scores to financial institutions and consumers throughout the United States.

22.     The market for credit scores in the United States encompasses two distinct submarkets: (1) the submarket for supplying credit scores to lenders, financial institutions, and other businesses for risk management decisions (the "business-to-business" or "B2B" market); and (2) the submarket for supplying credit scores directly to consumers to monitor their own credit records (the "business-to-consumer" or "B2C" market).

23.     The customers in the B2B market, which include lenders and financial institutions, are a distinct and recognizable group of purchasers of credit scores that use credit scores differently than consumers in the B2C market. Lenders, financial institutions, and other businesses generally buy the credit scores transactionally (one score at a time) or in batches (of multiple individuals) in order to identify qualified borrowers to whom a preapproved credit offer will be extended ("pre-screening"), make lending decisions ("lending"), or review the risk associated with existing borrowers for purposes such as extending additional credit or changing other account terms ("account management"). Consumers, in contrast, typically purchase one score at a time – their own – to manage their credit, protect their identity, or assess their likelihood of obtaining credit. In other words, customers in the B2B submarket purchase scores to use them to sell or manage another credit risk product whereas consumers in the B2C submarket purchase the scores as an end-product. Because of the significant differences between

the ways credit scores are used in the B2B and B2C submarkets, credit scores can be priced differently in these two submarkets.

24.     While the B2B market is a mature market that has existed for decades, the B2C market is relatively new and growing as more consumers become interested in credit monitoring and identity protection. Today, American consumers have signed up for over 160 million credit monitoring or identity protection accounts from businesses such as Capital One, Credit Karma, and LifeLock, and many of those accounts include access to the consumer's credit score.

25.     Overwhelmingly, the credit risk scoring industry, industry analysts, policy analysts, and investors recognize the B2B submarket as a separate economic entity from the B2C submarket. Fair Isaac regularly acknowledges that the B2B submarket is a separate economic entity from the B2C submarket. For example, in its 2016 10-K, Fair Isaac distinguished between its "business-to-business scoring solutions and services" and "business-to-consumer scoring solutions and services including myFICO solutions for consumers."

26.     Both the national market for credit scores and the B2B submarket are characterized by significant barriers to entry. Customers, particularly lenders and financial institutions, encounter significant "switching costs" if they adopt a new credit score – regardless of whether it is an updated version of the score they already use or an entirely new brand of credit score. These switching costs arise because employees have to be trained in the properties and characteristics of a new score; lenders must ensure that the new score will be adequately predictive of the creditworthiness of their own customer base; lenders often conduct extensive, costly, and time-consuming validation tests to determine whether the new score is cost-effective; and lenders may need to invest in updating their internal systems to ensure technical compatibility between those systems and a new score. These switching costs are so substantial

8

that firms often decide not to switch even if a new score is cheaper or more predictive than the old score. In March 2006, then-CEO of Fair Isaac Thomas Grudnowski told *American Banker* that switching to a new credit score "is really, really hard, and you have to have a really, really good reason to do it."

27.     Network effects also characterize the credit scoring market. As more banks and consumers use a particular type of credit score, that credit score becomes a *de facto* "industry standard." For example, in the mortgage and auto loan industries the consistent use of particular credit scores facilitates the bundling of large groups of mortgage and auto loans from different originators into securities that can be sold to investors. Because of the consistent use of a single type of credit score, marketing materials for these securities can include data on the average and stratified credit scores of the borrowers associated with the underlying loans.

### C.     Fair Isaac Has A Monopoly In The Market For Credit Scores

28.     Fair Isaac has maintained a monopoly over the market for credit scores in the United States for roughly three decades, largely through the dominance of its FICO product line, which includes many different types of FICO scores.

29.     Introduced in the 1980's, Fair Isaac's "FICO Classic" credit scores are the best known and most widely used in the United States. FICO Classic is a tri-bureau-enabled scoring system, which means that it can be used with all three credit reporting agencies' data and allows lenders, financial institutions, and other business to shift their business across all three credit reporting agencies by lowering switching costs. Being able to shift business between the credit reporting agencies allows lenders to negotiate better pricing and to deal with the particular credit reporting agencies that have suitable data regarding the characteristics of individual borrowers or market segments. FICO Classic applies an algorithm to each credit reporting agency's data and generates a score between 300 and 850 that purports to give an indication of the individual's

credit risk. It also generates a set of "reason codes" that explain the reasons the consumer has not been assigned the maximum score.

30.    Fair Isaac brazenly advertises its dominance in the market for credit scores, and in particular, its stronghold on the larger and more mature B2B submarket. On its public website, Fair Isaac advertises that 10 billion FICO scores are sold each year, which is four times the number of hamburgers that McDonald's sells worldwide each year; 27.4 million FICO scores are sold every day, which is over twice the number of cups of coffee Starbucks sells worldwide in a day; and 90% of all lending decisions in the United States rely on FICO scores. For example, the following graphic appeared on Fair Isaac's website as of January 10, 2018:



Similarly, in its 2016 10-K, Fair Isaac described its "FICO Scores" as "the standard measure in the U.S. of consumer credit risk" and reported that "FICO Scores are used . . . by nearly all of the major banks, credit card organizations, mortgage lenders, and auto loan originators."

31.    The use of FICO scores is particularly entrenched among mortgage lenders because the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") have mandated the use of Classic FICO scores for 12

years. Fannie Mae and Freddie Mac buy mortgages from lenders and either hold these mortgages in their portfolios or package the loans into mortgage-backed securities ("MBS") that may be sold. Because lenders use the cash raised by selling mortgages to Fannie Mae and Freddie Mac to engage in further lending, these entities' purchases help ensure that individuals and families that buy homes and investors that purchase apartment buildings and other multifamily dwellings have a continuous, stable supply of credit available to them. Fannie Mae and Freddie Mac require banks and mortgage lenders to acquire and use Classic FICO scores when available in order to sell mortgage loans to Fannie Mae and Freddie Mac.

32.     Fair Isaac representatives have described Fair Isaac's FICO score as "the 800-pound gorilla" in the market for credit scores and bragged about Fair Isaac's market share. For example, in November 2017, at the JPMorgan Ultimate Services Investor Conference, Fair Isaac's CFO and Executive Vice President Michael Pung stated that the FICO scoring system "is the most widely used credit scoring system here in the U.S.," "[v]irtually every major lender in the U.S. [uses] the FICO Score for some sort of credit lending decision," and Fair Isaac has "maintained a 90-plus percent market share for at least the [last] 13 years."

33.     Fair Isaac representatives have also recognized that FICO scores have benefited from the network effects created by the widespread use of FICO scores in many industries. For example, in November 2011, then-CEO of Fair Isaac Mark Greene explained that the "network effect" of "FICO Scores . . . being sort of the standard language" and "having everybody . . . standardize on a FICO Score, that's magic."

34.     Fair Isaac's monopoly in the market for credit scores has given it considerable power to control prices, particularly in the mature B2B submarket. Fair Isaac's CEO Will

Lansing has noted that in the B2B submarket for credit scores Fair Isaac has "quite a bit of discretion in whether we want our margins to be higher or lower or where they are."

        **D.**      **Attempts To Compete Have Not Affected Fair Isaac's Monopoly In The Market For Credit Scores**

35.     In March 2006, VantageScore introduced the VantageScore credit score and credit scoring system. VantageScore is the most promising competitor to FICO scores in both the B2B and B2C submarkets.

36.     Before 2006, credit scores other than Fair Isaac's FICO scores existed, but failed to gain substantial market share and challenge Fair Isaac's dominance in the market for credit scores. Each of the credit reporting agencies had its own proprietary "in-house" credit scores: TransUnion had "TransRisk," Experian had "ScorexPlus" (designed for lenders) and "Plus" (designed for consumers), and Equifax had "ERS." These "in-house" credit scores were single-bureau scores that reflected only the consumer information from one credit reporting agency. VantageScore offered customers the first tri-bureau-enabled alternative to FICO scores.

37.     From the time it was first released in 2006, VantageScore scored millions more consumers than the FICO scoring systems. Whereas Fair Isaac's FICO scoring systems would not generate a score if a consumer had not used credit in more than six months or if a credit account was less than six months old, VantageScore calculated scores for consumers that had not used credit for up to two years. It also reached more consumers by using utility and telecommunications payment histories when reported to the credit rating agencies.

38.     Today, VantageScore scores 30 million more Americans than traditional FICO scoring systems. Fair Isaac's outdated FICO Classic credit scoring systems – which are still used by many mortgage lenders – exclude many creditworthy Americans that VantageScore can reliably score. About one-quarter of American adults – some 65 million people – do not have a

traditional FICO score. VantageScore is capable of reducing the number of adults without a credit score by almost half. Ten million of those newly scored individuals are "prime" borrowers that should be attractive to traditional lenders.

39.     Without a credit score, it is difficult or impossible to apply for or successfully obtain a mortgage, car loan, or reasonable interest rates on personal lines of credit. Not having a credit score can also have drastic effects outside of the credit market. For example, credit scores are increasingly used by landlords.

40.     Those excluded by Fair Isaac's traditional FICO scoring systems – who face an increased risk of being denied access to credit in the form of credit cards, auto and home loans, and apartment housing – include disproportionate numbers of low-income and minority consumers. Indeed, one advocacy group focused on making it possible for people with limited incomes, especially people of color, to achieve financial security, has observed: "Black and Hispanic individuals are . . . significantly more likely than white individuals to be credit invisible" – meaning that they have "no established credit history" – or "unscored" – meaning that they "lack[] sufficient or recent enough credit history to be given a [FICO] credit score." VantageScore calculates a score for 9.5 million Hispanic and Black consumers who do not have a FICO score, including 2.7 million minority consumers who should be considered "prime" borrowers.

41.     Despite the advantages of using VantageScore, Fair Isaac continues to have a monopoly in the market for credit scores. In February 2013, at a Morgan Stanley Conference, Fair Isaac's CEO Will Lansing explained that despite the existence of VantageScore, "there [is] not that much competition around our scores business" because "FICO scores are very much part of the fabric of the banking industry" and "really deeply imbedded." Mr. Lansing claimed that

because "Fannie and Freddie have mandated that FICO scores have to be used as part of mortgage originations," Fair Isaac is "in very low risk territory."

### III.     FAIR ISAAC'S EXCLUSIONARY ACTS AND OTHER ILLEGAL CONDUCT TO MAINTAIN AND EXPAND ITS MONOPOLY

42.     Fair Isaac has used its monopoly power to coordinate a multi-faceted campaign to eliminate competition from VantageScore. Fair Isaac has been explicit that this is its goal. In April 2015, Mr. Lansing informed investors on a quarterly earnings conference call that Fair Isaac's strategic goal was to ensure that "the entire industry adopts FICO scores instead of [other] scores." To achieve this goal, Fair Isaac has imposed anti-competitive agreements on TransUnion and the other credit reporting agencies to prevent the credit reporting agencies from developing or selling alternative credit scores that could be seamlessly integrated into many lenders' systems or used interchangeably with FICO scores, and engaged in a pricing scheme to effectively foreclose lenders from choosing to use FICO scores in their B2B business and VantageScore in their B2C business. At the same time, Fair Isaac has waged a media campaign against VantageScore and made false and misleading statements in order to sow fear, uncertainty, and doubt about VantageScore's reliability. The result has been to damage competition in the market for credit scores, to increase prices for TransUnion, the other credit reporting agencies, and the users of credit scores, and to limit access to credit for millions of Americans.

### A.     Fair Isaac Has Imposed Anti-Competitive Contract Terms On The Credit Reporting Agencies That Restrict Their Ability To Compete And Sell VantageScore

43.     In January 2015, Fair Isaac and TransUnion entered into a contract, the Analytic and Data License Agreement ("ADLA"). With TransUnion's prior contracts with Fair Isaac set to expire on December 31, 2014, Fair Isaac demanded that the parties enter into a new contract

rather than renewing their existing contracts. Fair Isaac represented to TransUnion that TransUnion's two major competitors, Experian and Equifax, had already agreed to materially similar new contracts with Fair Isaac. If TransUnion did not agree to the terms demanded by Fair Isaac, it would lose substantial business from customers that depend on FICO scores. If it were not for Fair Isaac's monopoly and market power in the market for credit scores, TransUnion would not have accepted many of the terms in the ADLA.

> **1. Fair Isaac Has Restricted The Credit Reporting Agencies' Ability To Develop Or Sell Other Credit Scores Compatible With Customers' Existing Systems**

44.    Section 12.5 of the ADLA, which is labeled "No Equivalent Products," provides that TransUnion may not "internally develop" a credit scoring system that is "aligned to the odds-to-score relationship of any Fair Isaac Analytic" or uses more than a limited number of reason codes that "match" reason codes used by any Fair Isaac Analytic. Section 12.5 of the ADLA further prohibits TransUnion from distributing "any competing analytic" (i.e., credit scoring system) that is aligned with FICO scores or uses too many of the same reason codes, and it expressly names Vantage Score Solutions LLC as a developer of such a scoring system that may not be distributed if VantageScore were to offer an "Equivalent Product."

45.    For example, if a VantageScore product used a 700 score to indicate a less-than-five-percent risk of credit delinquency, and if a 700 FICO score also indicated the same risk of delinquency, then Section 12.5 prevents TransUnion from distributing the competing VantageScore product. Similarly, if a VantageScore product used reason codes that match 20% of the reason codes used by FICO scoring systems, Section 12.5 prohibits TransUnion from distributing the product.

46.    While Section 12.5 is narrower than the provision that Fair Isaac initially proposed, it effectively prevents TransUnion from selling an alternative to FICO's credit scores

that would be compatible with many businesses' systems, models, and processes and allow lenders to have a legitimate choice between using FICO scores and an alternative score. Many lenders have spent substantial effort and resources to develop systems, models, and processes that are designed for FICO scores. Lenders' systems, models, and processes are tailored to FICO's odds-to-score relationship (i.e., each given score has a given ratio of non-defaulting consumers to defaulting consumers), and reason codes (the particular reasons cited for increased risk of default). For example, a bank's software might be designed to accept one or more FICO scores and reason codes, combine this information with data it collects internally, and automatically produce a lending decision.

47. Section 12.5 protects Fair Isaac's monopoly and not its intellectual property. The odds-to-score relationship is an arbitrary mapping between risk and score, and does not reflect protectable intellectual property. Similarly, the reasons that may not be used by an "Equivalent Product" were not invented by Fair Isaac but reflect well-established industry best practices for lending.

48. In its media and advertising materials, Fair Isaac has argued that the VantageScore products that TransUnion distributes are flawed because they have different odds-to-score relationships and different reason codes than FICO products. In a "Truth Squad" blog post on its public website, Fair Isaac argues that a "clean swap-out" of FICO scores for VantageScores will not work for lenders because the "FICO Score and VantageScore . . . do not share the same odds-to-score relationship, meaning that the risk at a given score is different." Fair Isaac also claims that comparing VantageScores to FICO scores is "confusing" and that a lender that attempts to use both types of scores may make "poor lending and investment decisions" because of the "important differences" in the odds-to-score relationship.

49.     On information and belief, Fair Isaac has imposed a similar or identical "No Equivalent Products" term on Equifax and Experian. By imposing a "No Equivalent Products" term on TransUnion, Equifax, and Experian, Fair Isaac has sought to block all three credit reporting agencies from offering alternative VantageScore products that would allow lenders to easily switch from FICO scores to VantageScore without incurring the cost of redesigning their lending programs and systems, or to use VantageScore alongside or interchangeably with FICO scores.

**2.      Fair Isaac Has Engaged In A Pricing Scheme To Unlawfully Leverage Its Monopoly Power And Foreclose Competition From VantageScore In The Credit Score Market**

50.     Section 9.2 of the ADLA, labeled "Dynamic Royalty Schedule," provides that "once every twelve (12) months during the Term, Fair Isaac shall have the right to replace the Royalty Schedule by providing a new royalty schedule to TransUnion in writing." While this provision gives Fair Isaac the right to adjust prices, it does not give Fair Isaac the power to introduce new contract terms, royalty categories, or definitions. Fair Isaac has abused and exploited this provision in 2015, 2016, and 2017 by not only raising prices, but also introducing entirely new and non-negotiated contract terms, royalty categories, and definitions.

51.     In 2015, Fair Isaac unilaterally imposed a new "Pre-Qualification" royalty category. In a footnote to the current royalty schedule, Fair Isaac defines "Pre-Qualification" to "mean an End User's qualification of a potential consumer customer for an End User's own internal lending offering" and distinguishes between: (1) lenders that use FICO scores for "Pre-Qualification" without providing any credit score or credit data to consumers, and (2) lenders that use FICO scores for "Pre-Qualification" and also provide credit scores or credit data to consumers "in connection" with the "Pre-Qualification." Certain large banks and lenders offer consumer customers opportunities to apply to qualify for credit opportunities (e.g., a credit card

or loan) and, at the same time, receive their personal credit score. The offer of a free credit score to a consumer can entice consumers to apply for credit opportunities.

52.    The royalty price associated with a FICO score used for "Pre-Qualification" depends on whether other credit scores or credit data are provided to consumers. If a lender purchases a FICO score for use in "Pre-Qualification" and does not provide any credit score or credit data to the consumer "in connection" with the "Pre-Qualification," there is one per-score royalty rate. If the lender purchases a FICO score for use in "Pre-Qualification" and provides a VantageScore (or any other credit score) to the consumer "in connection" with the "Pre-Qualification," there is a different per-score royalty rate that is ███████ higher – a penalty rate.

53.    The penalty rate can be avoided in one of two ways, both of which involve purchasing exclusively FICO scores. First, the lender could purchase a FICO score for use in "Pre-Qualification" and provide no credit score or credit data to the consumer. Second, the lender could purchase a bundled FICO product from Fair Isaac. Fair Isaac offers bundled products to lenders that combine the use of scores by lenders (in the B2B market) with the provision of scores to consumers (in the B2C market).

54.    There is no legitimate business justification for the penalty rate Fair Isaac demands for FICO scores when the lender also purchases a VantageScore (or any other competing credit score) to disclose to consumers. The transparent purpose of the "Pre-Qualification" royalty category is to drive all TransUnion customers engaging in "Pre-Qualification" to purchase exclusively FICO scores and make it cost-prohibitive for TransUnion customers engaging in "Pre-Qualification" to purchase VantageScore for disclosure to consumers. This scheme has been effective and no TransUnion customer has opted to pay the penalty rate.

18

55.    On information and belief, Fair Isaac's contracts with Equifax and Experian include a similar or identical "Dynamic Royalty Schedule" provision and Fair Isaac has imposed a similar or identical "Pre-Qualification" royalty category on Equifax and Experian. Through the "Pre-Qualification" royalty category, Fair Isaac has leveraged its entrenched monopoly power in the larger B2B market to exclude competitors from the emerging B2C market. Fair Isaac's royalties effectively foreclose the credit reporting agencies from selling lenders FICO scores for use in the B2B market and VantageScore for use in the B2C market, and drives lenders to buy exclusively Fair Isaac's FICO scores. As a consequence of Fair Isaac's imposition of the "Pre-Qualification" royalty category, TransUnion has lost sales of VantageScore to major banks for use in the B2C market.

56.    Fair Isaac's use of the "Pre-Qualification" royalty category is consistent with the company's publicly stated strategy of leveraging Fair Isaac's power in the B2B submarket to ensure its dominance in the B2C submarket. Because Fair Isaac has long dominated the B2B submarket, Fair Isaac executives have acknowledged that it is "very hard" to grow Fair Isaac's B2B business and that the company aspires to grow sales of FICO scores in the B2C submarket. For example, Fair Isaac CFO and EVP Michael Pung noted that it is Fair Isaac's goal "*to expand the market share we had with the banks into the consumer offerings*."

57.    Fair Isaac executives have explained that Fair Isaac has developed several programs designed to use Fair Isaac's power in the B2B submarket to grow its business in the B2C submarket. One of these programs is Fair Isaac's "Open Access" program. Through Fair Isaac's Open Access program, Fair Isaac sells a bundled product: lenders that purchase FICO scores for account management can provide those FICO scores to consumer customers for no additional cost. To prevent TransUnion from raising prices on FICO scores provided through the

Open Access program so that it can sell VantageScore for a competitive price in the B2C market, Fair Isaac has imposed a low cap on the prices that TransUnion may charge for distributing bundles of FICO scores through Fair Isaac's Open Access program. This restriction is found in Section 6.8 and Exhibit F of the ADLA.

58.     Fair Isaac has had considerable success with this strategy. Fair Isaac executives have stated that Fair Isaac has "been dramatically expanding the use of the FICO score on the consumer side" and that growth of Fair Isaac's B2C business has fueled annual revenue growth of around 10% for Fair Isaac's scoring business. Mr. Pung has stated that Fair Isaac's "consumer offering" has "become the fastest growing product in the suite" and "every incremental dollar of revenue that's generated in this part of our Scores business is at a 100% margin."

### 3.     Fair Isaac Has Imposed Contract Provisions That Allow It To Extract Monopoly Prices

59.     Section 9.16 of the ADLA, which is labeled "Level Playing Field," requires that the prices that are made available to TransUnion be made available to the other credit reporting agencies. Taken together, Section 9.2 ("Dynamic Royalty Schedule") and Section 9.16 ("Level Playing Field") enable Fair Isaac to unilaterally increase the royalty prices it charges TransUnion for FICO scores. On information and belief, Fair Isaac's contracts with Equifax and Experian include similar or identical "Level Playing Field" and "Dynamic Royalty Schedule" provisions.

60.     Fair Isaac has used the "Level Playing Field" and "Dynamic Royalty Schedule" provisions in its contracts with the credit reporting agencies to extract monopoly prices from all three credit reporting agencies and their customers and prevent any credit reporting agency from negotiating lower royalty prices than the others. For example, in 2017, less than a month after the Director of the Federal Housing Finance Agency ("FHFA") announced that Fannie Mae and Freddie Mac would continue requiring the use of Fair Isaac's FICO Classic products in

connection with their mortgage programs through at least 2019, Fair Isaac increased the price of FICO scores used for "Mortgage" by ▮▮▮▮▮▮▮ (depending on the quantity of scores purchased). On information and belief, Fair Isaac imposed the same pricing increase on each agency. Fair Isaac's pricing increase has likely raised costs not only for the credit reporting agencies, but also for banks, mortgage lenders, and – ultimately – ordinary consumers seeking mortgage loans.

### 4. Fair Isaac Has Abused Its Discretion To Impose New Royalty Categories Unreasonably And In Bad Faith

61.     When Fair Isaac and TransUnion were negotiating the ADLA, TransUnion never understood or contemplated that Section 9.2 ("Dynamic Royalty Schedule"), which allows annual pricing adjustments, would give Fair Isaac the power to introduce new terms, royalty categories, or definitions. TransUnion would not have agreed to a provision that would allow Fair Isaac to unilaterally amend the contract without consulting or negotiating with TransUnion. In fact, Section 18.4 explicitly provides that neither party has the power to unilaterally amend the contract. That provision states that the ADLA may only be "amended, supplemented or modified by an agreement in writing by a duly authorized officer of each Party."

62.     Even assuming Section 9.2 grants Fair Isaac some discretion to unilaterally introduce new terms, royalty categories, or definitions, Fair Isaac has abused that discretion in bad faith by introducing new terms, royalty categories, or definitions, and then refusing to negotiate with TransUnion concerning those terms, royalty categories, or definitions or clarify their meaning when requested. Fair Isaac's unwillingness to work with TransUnion to arrive at agreed-upon explanations as to how new royalty categories function is a bad faith strategy designed to preserve Fair Isaac's ability to misconstrue or find purported ambiguities with respect to these royalty categories in future audits of TransUnion.

63.     In 2015, Fair Isaac introduced a new "Pre-Qualification" royalty category. "Pre-Qualification" is nowhere defined in the ADLA. In a footnote, Fair Isaac unilaterally imposed its own definition of "Pre-Qualification" and a paragraph-long explanation of how the "Pre-Qualification" royalty category operates, which has changed over time. Fair Isaac has rebuffed TransUnion's good faith attempts to engage with Fair Isaac to arrive at an agreed-upon explanation of the how the "Pre-Qualification" royalty category operates, and in particular, define precisely when a credit score is disclosed "in connection" with "Pre-Qualification."

64.     Similarly, in 2017, Fair Isaac introduced a new "Mortgage" royalty category. "Mortgage" is nowhere defined in the ADLA. Fair Isaac offered no definition of "Mortgage." Fair Isaac has rebuffed TransUnion's good faith attempts to engage with Fair Isaac to arrive at an agreed-upon explanation of when the "Mortgage" royalty category applies.

### B.     Fair Isaac's Campaign To Create Fear, Uncertainty, And Doubt About VantageScore With Lenders And Consumers

65.     Fair Isaac has waged an aggressive public relations and advertising campaign to spread false statements, convey false impressions, and mislead lenders and consumers about the qualities and characteristics of FICO scores and VantageScore. In advertisements, letters, and blog posts, Fair Isaac has disparaged VantageScore by calling it a "Fako" score, falsely claimed that VantageScore is an unreliable measure of creditworthiness, and misrepresented the information considered by VantageScore's credit scoring system.

66.     Recently, on December 12, 2017, Fair Isaac took out a full-page advertisement in the *Wall Street Journal* addressed to "Lenders, Policymakers and Consumer Advocates" that disparaged VantageScore without identifying it by name. The advertisement contrasted Fair Isaac, which "is not owned by the credit bureaus" and whose FICO scores have been used "by lenders and securitization investors for decades," with an alternative credit score, which is

22

"owned by the credit bureaus," is less reliable than FICO scores in evaluating credit risk, and fails to use "sound practices" or "science-based credit evaluation." To anyone familiar with the market for credit scores, the advertisement unambiguously conveys the false message that VantageScore is "Weakening scoring standards, [and] harm[ing] consumers, and the lending system."

67.     The *Wall Street Journal* advertisement directed readers to "Learn more at FICO.com/independent," a Fair Isaac-owned website that connects visitors to articles and blog posts that disparage VantageScore by name. One such blog post asserts: "Despite claims by VantageScore, weakening the minimum scoring criteria will not empower millions of low-risk mortgage credit seekers."

68.     Shortly after running the *Wall Street Journal* advertisement, Fair Isaac sent a letter to lenders and others stating that Fair Isaac was "launching a campaign to counter" VantageScore's credit scores, enclosing the *Wall Street Journal* advertisement, and encouraging the recipient to visit FICO.com/independent. The letter makes the false and misleading claim that using VantageScore instead of FICO Classic scores for mortgage lending would not benefit consumers by taking into account their "telco and utility payment data" because "the longstanding FICO Score models integrated into Fannie Mae and Freddie Mac *already* incorporate this very data." On information and belief, the FICO Classic scores that Fannie Mae and Freddie Mac use do not consider a history of timely utility, cable, or phone bill payments in calculating scores unless the consumer also has traditional lines of credit that have been active for at least six months. In contrast, VantageScore considers utility, cable, and phone bill payments in calculating scores regardless of whether the consumer also has traditional lines of credit. As a result, on information and belief, a consumer with a history of timely utility, cable,

23

and phone bill payments, but no traditional lines of credit, will have a VantageScore, but not a FICO Classic score. Moreover, the implication that FICO Classic scoring systems provide credit scores for as many consumers as VantageScore is false and misleading. VantageScore provides credit scores for millions of American consumers that are not scored by FICO Classic scoring systems.

69.     Also during December 2017, Mr. Lansing was quoted in the *Financial Times* disparaging VantageScore as a "Fako" score. Mr. Lansing accused JPMorgan Chase and Capital One of confusing consumers about their creditworthiness by distributing VantageScore because VantageScore is not used by the banks for lending decisions. Mr. Lansing's statement is false and misleading because it suggests that VantageScore is never used for lending decisions. In fact, many lenders do use VantageScore for lending decisions, including 20 of the top-25 financial institutions.

70.     Fair Isaac's public website includes numerous posts disparaging VantageScore and making false or misleading statements about VantageScore's features. For example, one blog post claims that "Research results consistently showed that scoring models relying solely on sparse or old credit data were weak and did a poor job forecasting future performance." This statement is false and misleading because it conveys the false message that VantageScore's scoring model is "weak" and does a "poor job forecasting future performance" because it considers a consumer's full credit history even if the consumer has not used a traditional credit line in the last six months. In fact, studies have shown that VantageScore is strongly predictive.

71.     Another blog post claims that whereas "FICO Score 9 differentiates medical from non-medical collections," "VantageScore does not." This statement conveys the false message that VantageScore does not differentiate medical from non-medical collections. In fact,

VantageScore 3.0 was the first credit scoring system to address medical debt. VantageScore 4.0, the most recent version of VantageScore, which was announced in April 2017, distinguishes medical collection accounts from non-medical collection accounts and penalizes medical collections less than non-medical ones.

72.     Fair Isaac's campaign against VantageScore is not new. Over a decade ago, just months after the launch of VantageScore, Fair Isaac filed a meritless lawsuit against TransUnion, Equifax, Experian, and VantageScore in the United States District Court for the District of Minnesota. Fair Isaac's numerous claims included a claim that the development of VantageScore violated the antitrust laws and a claim that the development of VantageScore constituted trademark infringement. In its prayer for relief, Fair Isaac sought nothing less than the end of VantageScore: it requested that the "Defendants be ordered to dissolve VantageScore."

73.     All of Fair Isaac's claims failed, and in fact, the jury concluded that Fair Isaac was the wrongdoer. In support of its trademark infringement claim, Fair Isaac had alleged that VantageScore's use of a scoring range of 501-990 constituted trademark infringement because it was similar to FICO's scoring range of 300-850. The credit reporting agencies and VantageScore counterclaimed for fraud on the United States Patent and Trademark Office ("PTO"), alleging that Fair Isaac had misrepresented to the PTO that only FICO used the 300-850 score range. The jury concluded that Fair Isaac had committed fraud on the PTO by making false statements as part of its application to register the score range of 300-850 as a trademark.

74.     The public statements described in the foregoing paragraphs were transmitted to and seen by a substantial number of businesses and consumers in California and Illinois.

### C.      Fair Isaac's Anti-Competitive Conduct Harms Competition And Consumers

75.     Fair Isaac's campaign of exclusionary conduct to maintain and expand its monopoly has harmed and continues to harm participants in the market for credit scores. Fair Isaac's unlawful conduct has foreclosed competition in both the B2B and B2C submarkets of the credit risk scoring market by foreclosing opportunities for the credit reporting agencies to sell VantageScore. If allowed to continue, Fair Isaac's conduct will ultimately force VantageScore, its primary competitor, out of the market entirely, and deprive the credit reporting agencies of the ability to sell VantageScores to customers. In turn, Fair Isaac will be able to impose even higher prices and more onerous terms on the credit reporting agencies, resulting in higher costs for the businesses and consumers that use credit scores, including businesses and consumers in California and Illinois.

76.     Fair Isaac's conduct has reduced choice for the credit reporting agencies, lenders, and consumers, including lenders and consumers in California and Illinois. The anti-competitive terms that Fair Isaac has imposed on TransUnion and the other credit reporting agencies have frustrated their ability to sell VantageScore at competitive prices or sell competing credit scores (from VantageScore or any other competitor) that could be seamlessly integrated into lenders' existing processes and systems. And, Fair Isaac's media and advertising campaign against VantageScore has been successful in sowing fear, uncertainty, and doubt about VantageScore in the marketplace. Media sources, financial blogs, and consumers have absorbed Fair Isaac's message that VantageScore is a "Fako" score merely because it is not a FICO score. For example, thebalance.com – a website devoted to personal finance issues – posted in February 2017: "If you purchased your credit score anywhere but MyFICO.com, then it's a Fako score."

26

And a recent survey conducted by VantageScore revealed that the number of consumers that knew that they had more than one credit score *declined* in 2017.

77.     As a direct and proximate result of Fair Isaac's exclusionary and anti-competitive conduct, TransUnion has lost and will continue to lose revenue and profits. As a seller of VantageScore, TransUnion has lost revenue and profits from the sales of VantageScore that it would have been able to make if it were not for Fair Isaac's conduct. As a buyer (or direct licensee) of Fair Isaac's FICO products, TransUnion has been harmed by Fair Isaac's supracompetitive royalty prices. TransUnion has been injured in an amount that cannot now be quantified, but which, on information and belief, exceeds ten million dollars.

## IV.     FAIR ISAAC'S UNJUST REFUSAL TO CORRECT A MISTAKE IN THE PARTIES' CONTRACT

### A.     Special Pricing Letters

78.     From time to time, Fair Isaac and TransUnion have entered into special pricing letters ("SPLs"). SPLs are generally two- or three-page letter agreements that set forth a unique set of terms and conditions and pricing for a particular TransUnion customer. Fair Isaac and TransUnion typically negotiate SPLs only for large customers – lenders, banks, and other businesses – that purchase large quantities of scores. On average, Fair Isaac and TransUnion negotiate approximately ■ SPLs per year. To request an SPL from Fair Isaac, TransUnion is required to fill out a form explaining its request. Fair Isaac then drafts the SPL, assigns the SPL a control number, and sends it to TransUnion for signing.

### B.     The 2011 SPL

79.     In September 2011, Fair Isaac and TransUnion entered into an SPL that established royalty prices for the customer identified in paragraph 66 of Fair Isaac's complaint in this action (the "2011 SPL"). The 2011 SPL entitled TransUnion to pay a lower royalty price for

FICO "Account Management Scores delivered to [the customer] in connection with its ongoing production of the Account Management Triggers program processing" (the "Triggers Program") "as long as [the customer] utilizes Account Management Scores from TransUnion." The 2011 SPL was assigned a control number by Fair Isaac: LR # 1661393. The 2011 SPL had no expiration date.

80.     From 2011 until 2014, TransUnion sold FICO scores to its customer for use in its Triggers Program pursuant to the 2011 SPL. During that period, TransUnion provided Fair Isaac with a monthly spreadsheet reporting all royalty payments. Those spreadsheets listed the end user, the royalty rate, the quantity of FICO scores sold, and if applicable, an SPL control number. In every monthly royalty report transmitted from TransUnion to Fair Isaac from 2011 to 2014, the entry for this customer listed its SPL control number – LR # 1661393 – and the royalty rate was consistent with the rate applicable under the 2011 SPL.

### C.     The 2015 ADLA

81.     Fair Isaac provided the initial draft of the ADLA, which would replace over 50 existing agreements on October 3, 2014, less than three months before those agreements were to expire. Although the short time between that date and expiration created immense time pressure, Fair Isaac refused to grant TransUnion even short-term extensions on the existing agreements until the very end of the process.

82.     Late into the negotiation of the ADLA, working against a looming deadline, TransUnion asked Fair Isaac to include a provision stating that all active SPLs would remain in effect after execution of the ADLA. Fair Isaac refused. Instead, it proposed – and, with no alternative, TransUnion agreed – that active SPLs that would remain in effect after the ADLA would be listed in an exhibit to the contract. TransUnion intended to include all operative SPLs in the exhibit, and Fair Isaac knew that that was TransUnion's intention.

83.     Although Fair Isaac drafts and tracks all SPLs by control number, Fair Isaac did not assist in compiling the list of the SPLs to be appended to the ADLA. TransUnion drafted the list of SPLs, which would become Exhibit G to the ADLA. TransUnion intended to include all active SPLs in its list, but inadvertently left the 2011 SPL off the list.

84.     TransUnion transmitted the list of SPLs that would become Exhibit G to Fair Isaac on December 16, 2014. Fair Isaac accepted TransUnion's list without modification; it did not challenge or reject the inclusion of any SPL on TransUnion's list. In fact, Fair Isaac expressly agreed that all SPLs on the draft Exhibit G would remain in effect. Because Fair Isaac drafted and tracked all SPLs, Fair Isaac knew or could have known with reasonable diligence that the 2011 SPL was missing from the list. Yet, Fair Isaac said nothing. As a result, the final Exhibit G did not include the 2011 SPL.

85.     For five months after the ADLA went into effect in January 2015, TransUnion continued to pay Fair Isaac as normal for FICO scores supplied to its customer under the terms of the 2011 SPL. Each month, TransUnion sent Fair Isaac a royalty report that included an entry for TransUnion's customer that listed the control number for the 2011 SPL – LR # 1661393 – and the royalty rate that applied under the 2011 SPL. For five months, Fair Isaac received TransUnion's royalty reports and accepted TransUnion's payments without comment. Fair Isaac's silence led TransUnion to continue to operate under the belief that the 2011 SPL remained in effect; indeed, that was Fair Isaac's intent.

86.     On or around June 24, 2015, Fair Isaac notified TransUnion that the 2011 SPL was not listed in Exhibit G, it was taking the position that the 2011 SPL was no longer valid in light of the ADLA and, as a result, TransUnion not only owed Fair Isaac substantial back royalties for the period since the ADLA went into effect, but would have to pay the standard

royalty rate for FICO scores sold to its customer going forward. If TransUnion had to pay the standard royalty rate for FICO scores sold to this customer instead of the rate that applied under the 2011 SPL – which, by the SPL's terms, would apply as long as the parties did not renegotiate the agreement – it would cost TransUnion ████████████████████. Fair Isaac eventually agreed to apply the 2011 SPL's royalty rate to TransUnion's future sales to its customer.

87.    TransUnion responded that the omission of the 2011 SPL from Exhibit G was a mutual oversight that should be corrected. Fair Isaac did not dispute that the omission of the 2011 SPL was contrary to the parties' intent or deny that the parties have the ability to correct mistakes in drafting. Instead, Fair Isaac insisted that it could not provide any "concession" to TransUnion on royalties accrued more than 30 days in the past on account of the "Level Playing Field" provisions in its contracts with other credit reporting agencies. TransUnion replied that it believed the parties could amend Exhibit G consistent with the "Level Playing Field" provisions because the exclusion of the 2011 SPL was an oversight; correcting the oversight would simply return the parties to the status quo ante, and in any case, SPLs do not fall under the "Level Playing Field" provisions, as they are not royalty schedules.

88.    The inadvertent exclusion of the 2011 SPL from Exhibit G was not the only mistake in the ADLA. A scrivener's error appeared in the ADLA's schedule describing the volume tiers for Insurance Prescreen Score royalties: according to the agreement's plain text, royalties would be based on *annual* volumes; in fact, the parties intended royalties to be based on *monthly* volumes. TransUnion notified Fair Isaac of that mistake, which would have benefited TransUnion; after TransUnion realized the error, it calculated and paid its royalties for Insurance

Prescreen Scores as though the parties had not made the mistake. TransUnion also allowed Fair Isaac to correct the mistake through the 2015 royalty schedule.

89. Between June and December 2015, TransUnion and Fair Isaac engaged in negotiations concerning the 2011 SPL. As the negotiations dragged on, TransUnion feared that refusing to pay the additional amounts that Fair Isaac was demanding would have negative consequences for its business. TransUnion feared that Fair Isaac would retaliate by limiting TransUnion's access to its products and that refusing to pay Fair Isaac could harm its business relationship with its customer or its reputation in the credit scoring market. In particular, TransUnion understood that Fair Isaac would not grant TransUnion a new SPL for a different and unrelated customer unless TransUnion agreed to pay the amounts Fair Isaac was demanding.

90. Under the pressure of these serious business concerns, TransUnion paid Fair Isaac over ███████████ on or around December 31, 2015. In paying this amount, TransUnion notified Fair Isaac that it disagreed that it owed Fair Isaac any royalties, was paying the over ███ ███████ under protest, and was expressly reserving its legal rights.

## CLAIMS FOR RELIEF

### Count I: Sherman Act § 2: Unlawful Monopolization

91. TransUnion incorporates paragraphs 1 through 90 by reference.

92. The provision of credit scores constitutes a relevant product market in the United States.

93. The provision of credit scores in the business-to-business submarket constitutes a relevant product market in the United States.

94. The provision of credit scores in the business-to-consumer submarket constitutes a relevant product market in the United States.

95. Fair Isaac has monopoly power in the market for credit scores as a whole and the business-to-business submarket.

96. Through unlawful, interconnected, and mutually reinforcing anti-competitive acts, Fair Isaac has substantially foreclosed competition in the market for credit scores and the business-to-business submarket in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

97. Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices – including the royalties it requires TransUnion to pay for "Mortgage" and "Pre-Qualification" FICO scores – without a corresponding increase in demand, and to supracompetitive levels.

98. Fair Isaac could not have maintained its monopoly power in the market for credit scores or the business-to-business submarket if it were not for the anti-competitive contract terms it has imposed on the credit reporting agencies and its campaign of false and misleading statements about VantageScore. Fair Isaac's monopoly is not due to growth or development because of a superior product, business acumen, or historic accident.

99. Fair Isaac's monopolization has injured and will continue to injure competition in these markets.

100. Fair Isaac has acted with the specific intent of maintaining its monopoly in the market for credit scores and the business-to-business submarket.

101. Fair Isaac's exclusionary and anti-competitive acts affect interstate commerce and injure competition nationwide.

102. As a direct and proximate result of Fair Isaac's acts of monopolization and monopoly maintenance, TransUnion has suffered antitrust injury and damages, including lost

revenues and profits from sales of VantageScore and lower profits because of Fair Isaac's monopoly prices, as well as other damage to its business.

103.    TransUnion continues to suffer damage, and will continue to do so, if Fair Isaac does not cease its monopolistic and anti-competitive conduct.

**Count II: Sherman Act § 2: Unlawful Attempted Monopolization**

104.    TransUnion incorporates paragraphs 1 through 90 by reference.

105.    The provision of credit scores constitutes a relevant product market in the United States.

106.    The provision of credit scores in the business-to-business submarket constitutes a relevant product market in the United States.

107.    The provision of credit scores in the business-to-consumer submarket constitutes a relevant product market in the United States.

108.    Through unlawful, interconnected, and mutually reinforcing anti-competitive acts, Fair Isaac has leveraged its monopoly power in the business-to-business submarket in an attempt to monopolize the business-to-consumer submarket in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

109.    Fair Isaac's attempted monopolization has injured and will continue to injure competition in these markets.

110.    Fair Isaac has acted with the specific intent of creating a monopoly in the business-to-consumer submarket.

111.    Fair Isaac's exclusionary and anti-competitive acts affect interstate commerce and injure competition nationwide.

112.    As a direct and proximate result of Fair Isaac's attempted monopolization, TransUnion has suffered antitrust injury and damages, including lost revenues and profits from

sales of VantageScore and lower profits because of Fair Isaac's monopoly prices, as well as other damage to its business. TransUnion continues to suffer damage, and will continue to do so, if Fair Isaac does not cease its anti-competitive conduct.

### Count III: Violation Of Section 43(A) Of The Lanham Act

113. TransUnion incorporates paragraphs 1 through 42 and 65 through 77 by reference.

114. Fair Isaac has made false and misleading representations of fact in interstate commerce and in connection with goods or services in commercial advertising or promotion. Fair Isaac has misrepresented the nature and qualities of Fair Isaac's, TransUnion's, and VantageScore's goods, services, or commercial activities. TransUnion, as a distributer of VantageScore products, has been or is likely to be damaged by these acts.

115. Fair Isaac's false representations actually have confused and deceived, and have the tendency to confuse and deceive, a substantial number of lenders, businesses, and consumers concerning the characteristics of the VantageScore products and services sold by TransUnion in interstate commerce.

116. TransUnion has lost sales, profits, goodwill, and has suffered injury to its business reputation. TransUnion has been and will continue to be injured in its efforts to sell its products and services, including VantageScore. TransUnion has sustained and will continue to sustain damages, the nature and extent of which cannot presently be determined.

### Count IV: Unlawful Monopolization In Violation Of The Illinois Antitrust Act

117. TransUnion incorporates paragraphs 1 through 90 by reference.

118. The provision of credit scores constitutes a relevant product market in the United States.

119. The provision of credit scores in the business-to-business submarket constitutes a relevant product market in the United States.

34

120.    The provision of credit scores in the business-to-consumer submarket constitutes a relevant product market in the United States.

121.    Fair Isaac has unlawfully monopolized or attempted to monopolize the market for credit scores and the business-to-business submarket in violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/3(3), which makes it unlawful to "[e]stablish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this State for the purpose of excluding competition."

122.    Fair Isaac has monopoly power in the market for credit scores as a whole and the business-to-business submarket.

123.    Through unlawful, interconnected, and mutually reinforcing anti-competitive acts, Fair Isaac has substantially foreclosed competition in the market for credit scores and the business-to-business submarket.

124.    Fair Isaac has demonstrated its ability to control prices and exclude competition by raising prices – including the royalties it requires TransUnion to pay for "Mortgage" and "Pre-Qualification" FICO scores – without a corresponding increase in demand and to supracompetitive levels.

125.    Fair Isaac could not have maintained its monopoly power in the market for credit scores and business-to-business submarket but for the anti-competitive contract terms it has imposed on the credit reporting agencies and its campaign of false and misleading statements about VantageScore. Fair Isaac's monopoly is not due to growth or development as a consequence of a superior product, business acumen, or historic accident.

126.    Fair Isaac's monopolization has injured and will continue to injure competition in these markets.

127.    Fair Isaac has acted with the specific intent of maintaining its monopoly in the market for credit scores and the business-to-business submarket.

128.    Fair Isaac willfully used anti-competitive means to acquire and maintain its monopoly, including imposing contractual terms that restrict price competition among its distributors and hindering the development and sale of competitive products, with the purpose of substantially lessening competition or tending to create a monopoly.

129.    A substantial portion of the harm caused by Fair Isaac's monopolization occurred in Illinois, where TransUnion is located, and where TransUnion distributes millions of dollars' worth of FICO scores per year.

130.    As a direct and proximate result of Fair Isaac's monopolization, TransUnion has suffered damage to its business or property in an amount to be proven at trial, and because Fair Isaac acted willfully, trebled.

**Count V: Unlawful Practices In Violation Of California Unfair Competition Law**

131.    TransUnion incorporates paragraphs 1 through 90 by reference.

132.    The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, defines "unfair competition" to include, among other things, any "unlawful . . . business act or practice."

133.    TransUnion has engaged in "unlawful" business acts and practices as alleged herein in, including violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 43(A) of the Lanham Act, 15 U.S.C. § 1125(a).

134.    Fair Isaac used its monopoly power to coerce its distributors to accept anti-competitive contractual terms that prevent those distributors from developing or selling certain alternative products, implement a pricing scheme that effectively forecloses lenders from

adopting alternative credit scores, and enable Fair Isaac to extract monopoly prices from distributors and avoid discount competition among its distributors.

135.    Fair Isaac has engaged in deceptive and misleading advertising that has misled businesses and consumers about the nature and quality of its own products and VantageScore.

136.    A substantial portion of the harm caused by FICO's monopolization occurred in California, where Fair Isaac has been located since 2013, and where TransUnion distributes millions of dollars' worth of FICO scores every year.

137.    As a direct and proximate result of Fair Isaac's unlawful conduct, TransUnion has suffered injury to its business or property. TransUnion is entitled to injunctive relief and restitution in an amount to be proven at trial.

**Count VI: Unfair Practices In Violation Of California Unfair Competition Law**

138.    TransUnion incorporates paragraphs 1 through 90 by reference.

139.    The UCL defines "unfair competition" to include, among other things, any "unfair . . . business act or practice."

140.    Fair Isaac's acts and practices as alleged herein have been "unfair" under the UCL. Fair Isaac's conduct – for instance, its use of its monopoly power and its media campaign to sow fear, uncertainty, and doubt – has violated the policy and spirit of the antitrust laws (namely, the Sherman Act, 15 U.S.C. § 2) and significantly threatened and harmed competition in the market for credit scores. Furthermore, any utility from Fair Isaac's conduct does not outweigh the harm it causes to competitors, financial institutions, and consumers.

141.    A substantial portion of the harm caused by Fair Isaac's monopolization occurred in California, where Fair Isaac have been located since 2013, and where TransUnion sells distributes millions of dollars' worth of FICO scores every year.

142.     As a direct and proximate result of Fair Isaac's unlawful conduct, TransUnion has suffered injury to its business or property. TransUnion is entitled to injunctive relief and restitution in an amount to be proven at trial.

### Count VII: False Or Misleading Statements In Violation Of
### California False Advertising Law

143.     TransUnion incorporates paragraphs 1 through 41 and 65 through 77 by reference.

144.     The California False Advertising Law, Cal. Bus. & Prof. Code § 17500, prohibits statements made in connection with the sale or distribution of goods and services that are "untrue or misleading" and that are "known, or [] by the exercise of reasonable care should be known, to be untrue or misleading."

145.     Fair Isaac's statements as alleged herein have been false or misleading. In particular, Fair Isaac made false or misleading statements when it made the statements described in paragraphs 66-71.

146.     Fair Isaac knew or with reasonable care should have known that the statements alleged herein were false or misleading.

147.     These false and misleading statements confused and deceived or were likely to confuse and deceive a reasonable lender, business, and consumer concerning the characteristics of products and services sold by TransUnion and Fair Isaac.

148.     Fair Isaac's false or misleading statements as alleged herein were made to California residents, among others.

149.     Because TransUnion has been harmed – and is likely to continue to be harmed – by Fair Isaac's false statements and misrepresentations, TransUnion is entitled to restitution and injunctive relief.

## Count VIII: False Or Misleading Representations In Violation Of
## Illinois Deceptive Trade Practices Act

150.    TransUnion incorporates paragraphs 1 through 41 and 65 through 77 by reference.

151.    Under the Illinois Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2(a), (8), "[a] person engages in a deceptive trade practice when, in the course of his or her business . . . the person . . . disparages the goods, services, or business of another by false or misleading representation of fact."

152.    Fair Isaac willfully disparaged the services and business of TransUnion and VantageScore when it, among other things when it made the statements described in paragraphs 66-71.

153.    A substantial portion of the harm caused by Fair Isaac's misrepresentations occurred in Illinois, where TransUnion is located, and where TransUnion where TransUnion sells millions of dollars' worth of FICO scores per year.

154.    Because TransUnion has been harmed – and is likely to continue to be harmed – by Fair Isaac's misrepresentations, TransUnion is entitled to injunctive relief.

155.    Because Fair Isaac acted willfully, TransUnion is entitled to attorneys' fees.

## Count IX: Breach Of Contract

156.    TransUnion incorporates paragraphs 1 through 90 by reference.

157.    TransUnion and Fair Isaac are parties to the ADLA, which is a valid, binding contract.

158.    Under the ADLA, Fair Isaac owed TransUnion a duty of good faith and fair dealing.

159.    Under the ADLA, Fair Isaac has discretion to revise the royalty schedule once a year.

160.    Fair Isaac owes TransUnion a duty to exercise that discretion fairly and in good faith.

161.    Fair Isaac exercised its discretion unreasonably, in bad faith, and in a manner inconsistent with TransUnion's expectations by unilaterally imposing new royalty categories, contract terms, and definitions that were never bargained for through its royalty schedules.

162.    Further, Fair Isaac intentionally and in bad faith refused to negotiate with TransUnion to adopt workable contract terms and definitions with respect to the new royalty categories it imposed on TransUnion.

163.    Fair Isaac's actions amount to a breach of the covenant of good faith and fair dealing that is implied in all contracts.

164.    As a result, TransUnion has suffered, and will continue to suffer, damages.

**Count X: Unilateral Mistake**

165.    TransUnion incorporates TransUnion incorporates paragraphs 1 through 41, 43, and 78-90 by reference.

166.    At the time the parties executed the ADLA, TransUnion mistakenly believed that Exhibit G to the contract included the 2011 SPL.

167.    Fair Isaac knew or should have known at the time that Exhibit G did not include the 2011 SPL and that TransUnion intended the Exhibit to include the 2011 SPL.

168.    Had Exhibit G included the 2011 SPL, the parties would have continued to operate under the 2011 SPL, which called for a royalty rate that was substantially less than the standard rate.

169.    Because Exhibit G did not include the 2011 SPL, Fair Isaac insisted that TransUnion pay the standard rate for all FICO scores transmitted for use by its customer, from January 2015 to November 2015.

40

170.     TransUnion's damages due to its payment under protest according to Exhibit G's original terms include all amounts it has paid Fair Isaac over and above the royalties required by the 2011 SPL, including but not limited to the ████████ it agreed to pay in December 2015. The ADLA should be reformed to reflect the parties' intent to include the 2011 SPL in Exhibit G and, therefore, to reflect that the ADLA did not require TransUnion to make the disputed payment. TransUnion will prove the exact amount of its damages at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, TransUnion prays as follows:

171.     That judgment be entered in favor of TransUnion and against Fair Isaac with respect to these Counterclaims;

172.     That TransUnion be awarded damages sustained because of Fair Isaac's illegal activities and that such damages be trebled where permissible;

173.     That the Court enjoin the unlawful actions alleged herein;

174.     That the Court award TransUnion its attorneys' fees and all other costs reasonably incurred in defense of this action; and

175.     That the Court award such other relief as it deems just and proper.

## <u>JURY DEMAND</u>

Defendant demands trial by jury.

Date: February 12, 2018          Respectfully submitted,


By: */s/ J. David Duffy*
David Duffy – IL Bar #6242374
Patrick Morales-Doyle – IL Bar #6300364
Audrey D. Mense – IL Bar #6302524
THOMPSON COBURN LLP
55 East Monroe Street
37th Floor
Chicago, IL 60603
Tel: (312) 346-7500
dduffy@thompsoncoburn.com
pmoralesdoyle@thompsoncoburn.com
amense@thompsoncoburn.com

Mark Hansen (*pro hac vice*)
John Thorne (*pro hac vice*)
Rebecca Beynon (*pro hac vice*)
Leslie Pope (*pro hac vice*)
KELLOGG, HANSEN, TODD,
FIGEL AND FREDERICK P.L.L.C.
1615 M Street NW
Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com
jthorne@kellogghansen.com
rbeynon@kellogghansen.com
lpope@kellogghansen.com

*Attorneys for Defendant and*
*Counterclaim-Plaintiff Trans Union, LLC*

42

**CERTIFICATE OF SERVICE**

I hereby certify that on February 12, 2018, I electronically filed the foregoing Redacted Counterclaims with the Clerk of the Court using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record by electronic means.

*/s/ J. David Duffy*
IL Bar #6242374