**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| FAIR ISAAC CORPORATION,<br>*Plaintiff*,<br>v.<br><br>TRANS UNION LLC,<br>*Defendant*.<br><br>TRANS UNION LLC,<br>*Counterclaim-Plaintiff*,<br>v.<br><br>FAIR ISAAC CORPORATION,<br>*Counterclaim-Defendant*. | 1:17-cv-08318<br><br>Judge Sharon Johnson Coleman<br>Magistrate Judge Young B. Kim<br><br>**JURY DEMAND** |

## AMENDED COMPLAINT

Fair Isaac Corporation ("FICO") brings this amended complaint against Trans Union LLC ("TransUnion") for breach of contract, copyright infringement, conversion and unjust enrichment, along with violations of the Lanham Act, the Illinois Deceptive Trade Practices Act, the California Unfair Competition Law and the California False Advertising Law. As set forth in more detail below, TransUnion has failed to pay millions of dollars in royalties owed under the license agreements between the parties. Further, TransUnion has engaged in the unauthorized use of FICO's industry leading proprietary algorithms and scoring software used to generate consumer credit scores, in violation of the parties' license agreements, federal copyright law and common law. Through this intentional course of conduct, TransUnion has unjustly enriched itself, to the detriment of FICO, its business partner for over 30 years.

In addition to violating the parties' license agreements and engaging in the unauthorized use of FICO's property, TransUnion – through its false and misleading advertising campaign relating to "VantageScore," a credit score that competes with credit scores produced using FICO's algorithms and scoring software ("FICO Scores") – has violated the Lanham Act, the Illinois Deceptive Trade Practices Act, the California Unfair Competition Law and the California False Advertising Law. While TransUnion acts as a distributor of FICO® Scores under the parties' license agreements, TransUnion also promotes and distributes competing VantageScores – which are the product of a joint venture consisting of TransUnion and the other two credit bureaus. Because of its financial stake in the VantageScore joint venture, TransUnion has an incentive to promote VantageScores over FICO® Scores. But rather than compete on the merits, TransUnion has engaged in an unlawful campaign to disparage FICO, and make false and misleading claims regarding VantageScores, including false and misleading comparisons between VantageScores and FICO Scores. By engaging in this misinformation campaign, as set forth in detail below, TransUnion has violated the Lanham Act, the Illinois Deceptive Trade Practices Act, the California Unfair Competition Law and the California False Advertising Law.

## I. THE PARTIES

1. FICO is a Delaware corporation, with its principal place of business in San Jose, California.

2. TransUnion is a Delaware limited liability company, with its principal place of business in Chicago, Illinois.

## II. JURISDICTION

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a) based on FICO's copyright infringement (Count VI) and Lanham

Act (Count IX) claims. The Court has supplemental jurisdiction over FICO's state law claims pursuant to 28 U.S.C. § 1367.

4. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b). The Court has personal jurisdiction over TransUnion because TransUnion's principal place of business is in this district and some or all of the events giving rise to the claims occurred in this district.

## III. FACTUAL BACKGROUND

### A. Credit Scoring

5. The most important aspect of a consumer's financial profile is his or her credit score. FICO pioneered the credit score industry in the 1950s. FICO has developed proprietary algorithms and copyright-protected software, which – when applied to credit data from a credit bureau like Trans Union – can be used to produce a credit score.

6. A credit score reflects a consumer's creditworthiness and quantifies the risk that a consumer will fail to repay a credit obligation. Companies in various industries use credit scores for different purposes, including to evaluate applicants for new credit, to prescreen candidates for marketing programs, and to manage existing accounts.

7. A credit score is the product of two inputs: (1) aggregated credit data, which consists of a consumer's record of borrowing and repayment as reported to a particular credit bureau, such as TransUnion; and (2) a credit scoring algorithm. In general, a software program applies the algorithm to the aggregated credit data, which results in a credit score

### B. FICO Scores

8. FICO developed the first-ever credit scoring model in 1958. In 1985, FICO developed the first versions of its credit bureau-based credit scores, which were used to "prescreen" credit applicants. This was followed by later versions of credit scores developed by

FICO, which potential creditors used for loan origination, account management, and prescreening purposes.

9. FICO Scores are the industry leader and a fixture of consumer lending in the United States. To produce a FICO® Score, one of FICO's proprietary scoring algorithms (sometimes referred to as an "analytic") is applied to a consumer's aggregated credit data using FICO's copyright-protected software, producing a score typically in a range between 300 and 850. Under this model, consumers are rank-ordered according to the likelihood that they will repay their credit obligations. Higher FICO Scores correspond to lower levels of risk.

10. Each of the three major credit bureaus – TransUnion, Equifax and Experian – have different aggregated credit data for any individual consumer. Further, FICO has developed specific algorithms tailored to the aggregated credit data held by the three different credit bureaus. FICO has also developed specific software for each of the three major credit bureaus. For over 30 years, credit bureaus like TransUnion have benefited tremendously from FICO's innovation and have enjoyed significant commercial success through the distribution and sale of FICO® Scores generated using FICO's proprietary algorithms and software. For example, in 2016 alone, lenders and others purchased more than 11 billion FICO Scores.

11. Today, in addition to potential creditors, consumers themselves have the ability to receive their own FICO® Scores. For example, in 2016, through the FICO® Score Open Access program, more than 195 million consumer accounts in the United States received free access to a FICO Score through various financial institutions. Consumers also receive their FICO Scores when purchasing products through websites such as www.myfico.com.

12. The core FICO® Score, the most recent version of which is FICO® Score 9, remains to this day the most common FICO Score used by potential creditors.[1]  In addition to the core FICO Score, FICO has developed industry-specific scores such as FICO® Scores for auto loans ("FICO Auto Scores"), FICO® Scores for bankcards ("FICO Bankcard Scores"), FICO® Scores for mortgages ("FICO Mortgage Scores"), FICO® Scores for installment loans ("FICO Installment Scores"), and FICO® Scores for personal finance ("FICO Personal Finance Scores") (collectively, "FICO Industry Scores").[2]

13. In 1992, FICO developed proprietary scoring algorithms that calculated FICO Scores specific to the insurance industry ("FICO Insurance Scores").

14. So-called "end users" (*e.g.*, financial institutions or insurance companies) ("End Users" or "Subscribers") request and purchase FICO® Scores for the following four primary purposes: (a) account origination and approval; (b) account management for existing accounts; (c) prescreening potential customers for pre-approved credit or insurance solicitations; and (d) off-line archive scores used by creditors for various non-production purposes.  These four categories are discussed in more detail below.

C. **FICO's Partnership With TransUnion**

15. In 1989, FICO and TransUnion entered into a license agreement (hereinafter, "Classic Agreement").[3]  Under the Classic Agreement, FICO and TransUnion agreed to "jointly develop produce, market, service, and maintain services. . . utilizing Trans Union's proprietary credit information data base and its data processing facilities and [FICO's] proprietary credit scoring technology and its expertise in credit scoring software design."  Classic Agreement §

---

[1] Historically, the core FICO Score was referred to as the "Classic" score.
[2] Historically, the core FICO Score and FICO Industry Scores produced with TransUnion's aggregated credit data were referred to as "Empirica" scores.
[3] All references to the "Classic Agreement" include the amendments and addenda to the Classic Agreement.

1.03. The parties amended the Classic Agreement many times. Until 2015, the Classic Agreement governed TransUnion's use of both the core FICO® Score and the FICO® Industry Scores.

16. In addition, over the years, the parties entered into several agreements relating to other FICO® Scores, including, but not limited to: (a) a December 10, 1993 Prescreen Bankcard Revenue Score Agreement ("Revenue Agreement"); (b) an August 25, 1997 Agreement for Bankruptcy Score Service ("Bankruptcy Agreement"); and (c) a July 25, 2000 Agreement for Precision Credit Risk Score Services ("NextGen Agreement") (collectively, "Additional Score Agreements").[4]

17. Under the Classic Agreement and the Additional Score Agreements, FICO agreed that TransUnion could use or distribute FICO® Scores for certain limited purposes, primarily relating to: (a) on-line account origination; (b) off-line account management; (c) off-line prescreen services; and (d) off-line archive scores used by creditors for various non-production purposes.

18. In 1992, FICO entered into a license agreement with TransUnion specific to the FICO® Insurance Scores (the "Insurance Agreement").[5] The Insurance Agreement was amended by the parties, including through an amendment made effective September 30, 2005 ("Insurance Amendment"). Under the Insurance Agreement, FICO agreed that TransUnion could use or distribute FICO Insurance Scores for certain limited purposes, which generally tracked the permitted uses under the Classic Agreement but with certain variations to reflect the underwriting and management of insurance policies.

---

[4] All references to the "Additional Score Agreements" include the amendments and addenda to the Additional Score Agreements.
[5] All references to the "Insurance Agreement" include the amendments thereto.

19.     In 2015, the parties restated their overall relationship and superseded the Classic Agreement, the Additional Score Agreements, the Insurance Agreement, and most[6] of the amendments and addenda to those agreements by entering into the January 21, 2015 Analytic and Data License Agreement ("2015 Agreement").

20.     Under the Classic Agreement, the Additional Score Agreements, the Insurance Agreement and the 2015 Agreement, the parties agreed that TransUnion would bill and collect fees for these services from TransUnion's End Users, and, in turn, remit agreed-to royalty payments to FICO.  As part of its royalty obligation, TransUnion is required to submit monthly written reports reflecting the number of FICO® Scores (and the specific types of FICO Scores) for which TransUnion owes FICO royalties, by End User.  *See*, *e.g.*, Classic Agreement §§ 3.02(A)(7), (B)(3) & (C)(3); Insurance Agreement § 3.8; 2015 Agreement § 9.5.

21.     TransUnion is further required to keep and maintain records as necessary to allow FICO to verify or otherwise audit TransUnion's usage reports and fee collections.  *See*, *e.g.*, Classic Agreement §§ 3.02(A)(5), (B)(4) & (C)(4), 4.02; NextGen Agreement § 10.3; Revenue Agreement § 5.01; Bankruptcy Agreement § 10.3; Insurance Agreement § 3.7; 2015 Agreement §§ 9.6 & 9.15.

22.     Given that most of the revenue owed to FICO under the parties' agreements derives from the services TransUnion provides to its End Users, FICO relies on TransUnion to keep accurate books and records to ensure that FICO is receiving the amounts to which it is entitled under the parties' agreements, and that FICO can verify the same by conducting an examination of those books and records.

---

[6] Some amendments to the Classic Agreement were expressly preserved in Section 13 of the 2015 Agreement.

*On-Line Score Service*

23.     The first category of FICO® Score service provided by TransUnion is the distribution to creditors and others of FICO Scores generated on a real-time basis ("On-Line Score Service"). Creditors and others use FICO Scores delivered through the On-Line Score Service for various purposes, including to assist in deciding whether to approve or decline a consumer credit account application, and, if approved, the terms of service (*e.g.*, the interest rate).

*Account Review Score Service*

24.     A second category of FICO® Score service provided by TransUnion is the distribution of FICO Scores generated "off-line," which are used by creditors for purposes of managing existing credit accounts ("Account Review Score Service"). These scores are used by existing creditors for various purposes, including to assist in deciding potential changes in credit limits, credit reissue, and determining the types of collection action to apply to an account.

*Prescreen Score Service*

25.     A third category of FICO® Score service provided by TransUnion is the use of FICO Scores generated "off-line" to deliver a list of names to End Users for the purpose of making credit solicitations ("Prescreen Score Service"). In other words, End Users use the Prescreen Score Service to receive a list of consumers to target as part of a pre-approved credit solicitation campaign. As one example, a credit card provider may use the Prescreen Score Service to receive a list of consumers meeting various pre-defined criteria (*e.g.*, a FICO Score above a certain threshold) and then offer that group of consumers a pre-approved credit card.

*Archive Score Service*

26.     A fourth category of FICO® Score service provided by TransUnion is the distribution of FICO Scores generated "off-line" using archived credit data, which are used by

creditors for various non-production purposes ("Archive Score Service"). These scores are used by creditors on a depersonalized basis for limited permitted purposes, including the validation of the effectiveness of FICO Scores on a creditor's portfolio, comparisons of FICO Scores to other scores, evaluations of the value of FICO Scores as an internal component of custom models, and establishing FICO Score cut-offs and strategies as they relate to a creditor's portfolio.

*Prospect Database Use*

27.     Over time, End Users desired more sophisticated methods for identifying target groups of consumers for pre-approved credit solicitations when receiving a list of names through the Prescreen Score Service. As part of this evolution, FICO and TransUnion entered into a July 21, 2000 addendum ("Prospect Database Addendum"), which permitted TransUnion to sell to End Users the right to maintain a database consisting of, among other data, certain types of FICO® Scores, which could be "used only for modeling and analysis in connection with the End User's prescreen solicitations executed to acquire new accounts" ("Prospect Database"). Rather than pay a royalty for each FICO Score generated or delivered – as with the On-Line Score Service and Account Review Score Service[7] – the royalty for FICO Scores sold to an End User for use in a Prospect Database is a fixed amount paid on an annual basis for each type of FICO Score. In Exhibit 1 to the Prospect Database Addendum, the parties agreed that TransUnion would pay an annual royalty for each type of FICO Score included in each Prospect Database.

28.     The Prospect Database Addendum modified only certain expressly identified agreements, including the Classic Agreement, the Revenue Agreement, the Bankruptcy Agreement and the NextGen Agreement. *See* Prospect Database Addendum § 1. The Prospect Database Addendum did not amend the Insurance Agreement. Consistent with the express

---

[7] While TransUnion is generally required to pay royalties for each FICO Score calculated as part of its On-Line Score Service and Account Review Score Service, for the Prescreen Score Service, TransUnion pays royalties only where a prospective consumer is actually solicited by an End User.

language identifying the amended agreements, Exhibit 1 to the Prospect Database Addendum did not include the Insurance Score in its royalty fee schedule. Thus, while the Prospect Database Addendum permitted TransUnion to provide FICO® Scores generated under the Classic Agreement and Additional Score Agreements to End Users for purposes of maintaining a Prospect Database, the addendum did not permit the use of FICO® Insurance Scores as part of a Prospect Database.

29.     Prospect Databases are extremely valuable to End Users. Through the use of Prospect Databases, End Users can gain additional access to and use of large amounts of data (including FICO® Scores), in order to create a much more refined and targeted set of criteria for prescreen lists, and in order to better identify customers to target in marketing campaigns. Prescreen lists generated through the use of Prospect Databases are significantly enhanced, as compared to prescreen lists generated without the benefit of the analytical use of a Prospect Database. Put simply, Prospect Databases permit End Users to conduct more effective and cost-efficient mass marketing campaigns.

30.     In March 2010, the parties executed an amendment that modified the definition of Prospect Database ("March 2010 Amendment"). This modification was made at the specific request of TransUnion and based upon TransUnion's representation that the definition would more accurately reflect the types of prescreening analytical uses made by TransUnion's End Users. Specifically, TransUnion represented to FICO that the only two categories of prescreening analytical uses were as described (and expressly defined) in Sections 2.4.1 and 2.4.2 of the March 2010 Amendment and TransUnion was not permitting End Users to use FICO® Scores for any other analytical purposes related to prescreening strategies. The Prospect

Database provisions of the March 2010 Amendment were further amended by the parties in May 2010 ("May 2010 Amendment").

31.     In order to protect FICO's proprietary algorithms and scoring software, the March 2010 Amendment made clear that TransUnion could provide FICO® Scores for analytical purposes related to an End User's prescreening strategies only as outlined in Sections 2.4.1 or 2.4.2 of the Amendment or as otherwise permitted under the parties' agreements.  Any other analytical use was prohibited.  Specifically, TransUnion covenanted as follows:

> TransUnion agrees that it ***shall not, and shall not authorize its agents to, use or make any Fair Isaac Scores available to End Users for use, for analytical purpose srelated [sic] to an End User's prescreening strategies except, as described under Section 2.4.1 or 2.4.2 above…or as otherwise expressly permitted under the Scoring Agreements or in this Section 2.4.3***.

March 2010 Amendment § 2.4.3, as further amended by the May 2010 Amendment (emphasis added).[8]

32.     The 2015 Agreement's provisions track Sections 2.4.1, 2.4.2 and 2.4.3 of the March 2010 Amendment with respect to the definition of Prospect Database and the prohibition against TransUnion making FICO® Scores available to End Users for analytical purposes in connection with prescreening other than as expressly permitted under Section 9 of the 2015 Agreement.  2015 Agreement § 9.11.

### D.     End User and Reseller Agreements

33.     As noted above, in general, TransUnion distributes FICO® Scores directly to End Users.

34.     Under the Classic Agreement, Additional Score Agreements, Insurance Agreement and 2015 Agreement, when distributing FICO® Scores to End Users, TransUnion is

---

[8] References in Section 2.4.3 to the PreScore Agreement have been omitted because that agreement governs only FICO Scores (including FICO Scores in Prospect Databases) sold directly by FICO to End Users and for which FICO collects fees directly from the End Users.

required to enter into written agreements with those End Users that contain certain minimum terms and conditions restricting the use of FICO Scores ("End User Agreements"). *See*, *e.g.*, 2015 Agreement, Exhibit C (Minimum End User Agreement Terms); Insurance Amendment, Exhibit D (Fair Isaac Insurance Risk Score Subscriber Agreements).

35. In addition to the distribution of FICO® Scores directly to End Users, TransUnion also has certain rights to distribute FICO Scores indirectly through "Resellers," which are essentially distributors of FICO Scores to multiple End Users.

36. With respect to Resellers, the Classic Agreement, Additional Score Agreements, Insurance Agreement and 2015 Agreement generally required that TransUnion's agreements with Resellers ("Reseller Agreements") contain certain terms, consistent with the restrictions on TransUnion's use and the overall understanding and relationship between FICO and TransUnion. *See*, *e.g.*, March 2010 Amendment, § 2.2 and Exhibit A; Insurance Agreement, § 3.13 and Exhibit H; 2015 Agreement § 11.2. The restrictions required for Reseller Agreements were generally more stringent as compared to those required for End User Agreements. For example:

      a. Prior to 2015, for the FICO® Insurance Score, TransUnion was required to receive advance written consent from FICO for any distribution of FICO Insurance Scores to Resellers. Insurance Agreement §§ 3.13, 3.9.1.

      b. Under the 2015 Agreement, with certain exceptions, TransUnion could not distribute FICO® Scores to Resellers for the Prescreen Score Service. 2015 Agreement § 11.2.

### E. FICO's Copyright-Protected Software Used To Produce FICO Scores

37. As noted above, a FICO® Score – whether it is produced as part of (a) the On-Line Score Service; (b) the Account Review Score Service; (c) the Prescreen Score Service; (d) the Archive Score Service; (e) a Prospect Database; or (f) otherwise – is generated by applying a FICO scoring algorithm to a credit bureau's aggregated credit data using a scoring software module (collectively, "Software Modules").

38.     The Software Modules are computer programs that are prepared based on detailed, highly proprietary instructions, referred to by the parties as "Structured Specifications." FICO has prepared the Structured Specifications for all Software Modules. Early on, TransUnion wrote the source code for the Software Modules based on FICO's Structured Specifications. Presently, and at least since 2008, FICO has written the source code for the Software Modules based on FICO's Structured Specifications.

39.     Under the May 1, 2008 Scoring Software Addendum to the Classic Agreement (hereinafter, "Scoring Software Addendum"), the parties agreed that FICO held sole ownership of the Software Modules developed under that agreement, including, but not limited to, all intellectual property rights.

40.     In the 2015 Agreement, when the parties restated the terms of their overall relationship, they agreed that FICO solely owned all intellectual property rights in the Software Modules, including Software Modules developed prior to 2015 and Software Modules to be developed in the future.

41.     Over the years, FICO has invested millions in the Software Modules, designing and developing Software Modules specific to the three major credit bureaus (including TransUnion) and specific to different categories of FICO® Scores. The Software Modules are highly proprietary and extremely valuable business assets of FICO.

42.     In order to protect its investment, FICO made clear in the Scoring Software Addendum that TransUnion could use FICO's Scoring Software "solely as permitted under the [Classic] Agreement." Scoring Software Addendum § 2.03; *see also id.* § 2.05 ("TU shall operate the Scoring Software solely as permitted by the [Classic] Agreement and this [Scoring

Software] Addendum."). Any other use was prohibited. The 2015 Agreement contains similar provisions. *See*, *e.g.*, 2015 Agreement §§ 8.1-8.2.

43. FICO has applied for and received federal copyright registrations for the Software Modules as follows:

| Software Module | Copyright Registration Number |
|---|---|
| Scoring Software - FICO Score 8 based on TransUnion Data | TX 8-425-137 |
| Scoring Software - FICO Bankcard Score 8 based on TransUnion Data | TX 8-425-130 |
| Scoring Software - FICO Auto Score 8 based on TransUnion Data | TX 8-425-132 |
| Scoring Software - FICO Mortgage Score 8 based on TransUnion Data | TX 8-425-134 |
| Scoring Software - FICO Score 9 based on TransUnion Data | TX 8-423-776 |
| Scoring Software - FICO Bankcard Score 9 based on TransUnion Data | TX 8-423-782 |
| Scoring Software - FICO Auto Score 9 based on TransUnion Data | TX 8-423-780 |
| Scoring Software - FICO Auto Score 9 XT based on TU CreditVision Data | TX 8-423-992 |
| Scoring Software - FICO Score 95 based on TransUnion Data | TXu 2-054-760 |
| Scoring Software - FICO Score 98 based on TransUnion Data | TXu 2-054-796 |
| Scoring Software - FICO Score 4 based on TransUnion Data | TXu 2-054-766 |
| Scoring Software - FICO Insurance Risk Score based on TransUnion Data | TXu 2-055-040 |
| Scoring Software - FICO Score NG1 based on TransUnion Data | TXu 2-054-770 |
| Scoring Software - FICO Score NG2 based on TransUnion Data | TXu 2-054-790 |
| Scoring Software - FICO Bankruptcy Risk Score 1.0 based on TransUnion Data | TXu 2-054-768 |
| Scoring Software - FICO Bankruptcy Risk Score 2.0 based on TransUnion Data | TXu 2-054-763 |
| Scoring Software - FICO Bankcard Revenue Score 3.0 based on TransUnion Data | TXu 2-054-795 |

### F.    FICO's 2015 Audit

44. Under the Classic Agreement, the Additional Score Agreements, the Insurance Agreement and the 2015 Agreement, FICO has the right to engage an independent certified auditor to conduct an examination of TransUnion's records, including its use of FICO® Scores and compliance with the terms of the parties' agreements.

45.     In 2015, FICO engaged an independent certified auditor ("Auditor") to review TransUnion's compliance with the parties' agreements ("2015 Audit").

46.     The 2015 Audit was performed in accordance with the Statement on Standards for Consulting Services issued by the American Institute of Public Accountants ("AICPA").

47.     Prior to the commencement of the 2015 Audit, in a letter agreement dated March 6, 2015 ("Audit Scope Letter"), FICO and TransUnion agreed on specific data that TransUnion would make available to the Auditor.  The minimum data TransUnion agreed to make available included a twelve-month sample of data from its production systems.  However, despite the clear terms of the Audit Scope Letter, TransUnion informed the Auditor at the outset of the 2015 Audit that, with respect to its production systems that track the batch (or "off-line") distribution of FICO® Scores, TransUnion had retained ***only one month*** of the data it had agreed to retain for inspection.

48.     In October 2015, the Auditor issued its findings, which were subject to several scope limitations due to incomplete or missing data.

49.     Nevertheless, despite the incomplete or missing data, FICO learned through the 2015 Audit that, since at least 2011, TransUnion has significantly underreported the number of FICO® Scores it has used or distributed through the (a) On-Line Score Service; (b) Account Review Score Service; (c) Archive Score Service; and (d) Prescreen Score Service, resulting in a substantial underpayment of royalty amounts required under the parties' agreements.

50.     Further, FICO learned that, since at least 2011, TransUnion has systematically underreported to FICO the number of Prospect Databases that include FICO® Scores, resulting in an underpayment of the annual royalty required for each type of FICO Score used in each Prospect Database, as required under the parties' agreements.

15

51.     In total, according to the 2015 Audit, TransUnion owes FICO millions of dollars in additional royalty payments and fees, for the 2011-13 time period alone.

### G.     TransUnion's Failure To Maintain Proper Records And To Provide Accurate Reporting

52.     TransUnion is required to adhere to certain recordkeeping requirements under the Classic Agreement, the Additional Score Agreements, the Insurance Agreement and the 2015 Agreement.  *See*, *e.g.*, Classic Agreement §§ 3.02(A)(5), (B)(4) & (C)(4), 4.02; NextGen Agreement § 10.3; Revenue Agreement § 5.01; Bankruptcy Agreement § 10.3; Insurance Agreement § 3.7; 2015 Agreement §§ 9.6 & 9.15.

53.     Specifically, TransUnion is required to keep and maintain records as necessary to allow FICO to adequately audit or otherwise verify that the royalty fees TransUnion remits to FICO are consistent with TransUnion's obligations under the parties' agreements.

54.     In addition, TransUnion is required to submit to FICO written monthly reports ("Monthly Usage Summary Reports") that document, in detail, the number of FICO® Scores (and the specific types of FICO Scores) for which TransUnion owes FICO royalties, by End User.  This further allows FICO to verify the accuracy of the royalty fee amounts TransUnion remits to FICO every month. *See*, *e.g.*, Classic Agreement § 3.02(A)(7), (B)(3) & (C)(3); Insurance Agreement § 3.8; Prospect Database Addendum § 2.3; 2015 Agreement § 9.5.

55.     TransUnion's transparency and FICO's ability to verify the royalty fees is essential because FICO relies on TransUnion to remit the proper amounts owed under the parties' agreements.  Given that these revenues derive primarily from TransUnion's distribution of FICO® Scores to End Users without the operational or other involvement of FICO, FICO currently has no means to independently verify TransUnion's compliance with the parties' agreements outside TransUnion's books and records.

56.     During the course of the 2015 Audit, FICO discovered that TransUnion's recordkeeping was woefully deficient.  FICO further learned that the Monthly Usage Summary Reports TransUnion submitted to FICO – which FICO relied upon to verify the accuracy of the royalties TransUnion remitted – were grossly inaccurate.

### H.     TransUnion's Failure To Remit Royalties As Required Under The Parties' Agreements

57.     Despite the significant benefits TransUnion has enjoyed through its partnership with FICO, TransUnion has engaged in a course of conduct designed to deny FICO royalties rightfully owed to it under the parties' agreements.

58.     Initially, since at least 2011, TransUnion has systematically underpaid royalties owed to FICO for FICO$^®$ Scores generated for the On-Line Score Service, the Account Review Score Service, the Archive Score Service, and the Prescreen Score Service.

59.     TransUnion has also significantly underpaid royalties owed to FICO for FICO$^®$ Scores used in Prospect Databases.  For example, during the 2011-13 time period, TransUnion reported to FICO that Subscribers were using a total of two types of FICO Scores in only two Prospect Databases.  But in reality, TransUnion Subscribers maintained at least fifteen types of FICO Scores in at least fifteen Prospect Databases during that time period, resulting in a significant underpayment to FICO.  This conduct has continued through the present.

60.     This was not an oversight.  TransUnion knew full well these Prospect Databases existed.  Indeed, *TransUnion was sending its Subscribers invoices charging the Subscribers for the use of these Prospect Databases*.  As noted above, these Prospect Databases are extremely valuable to TransUnion's Subscribers.  Subscribers apply analytical tools to, and make other valuable analytical use of, the data contained in the Prospect Databases in order to modify and refine prescreening criteria, and in order to come up with an enhanced and much more

highly correlated target consumer base (as compared to prescreen lists generated without the benefit of analytical use of a Prospect Database). The result is significantly more effective and cost-efficient marketing campaigns.

61. When FICO confronted TransUnion regarding these Prospect Databases, TransUnion claimed the databases fell outside the definitions of "Prospect Database" set forth in Sections 2.4.1 and 2.4.2. While FICO disagreed with TransUnion's position, even if correct, TransUnion's contention is unavailing. In Section 2.4.3, the parties ***expressly*** agreed that TransUnion was prohibited from providing FICO® Scores to End Users for analytical purposes outside the permitted uses in Sections 2.4.1 and 2.4.2, or as otherwise expressly permitted under the parties' agreements. *See also* 2015 Agreement § 9.11. FICO insisted on Section 2.4.3 in the March 2010 Amendment (and Section 9.11 in the 2015 Agreement) to foreclose precisely this type of gamesmanship. Thus, even if TransUnion's usage fell outside the definitions in Sections 2.4.1 or 2.4.2 – in the alternative, if necessary – TransUnion's conduct is unauthorized and violates Section 2.4.3 of the Classic Agreement and Section 9.11 of the 2015 Agreement.

62. In engaging in this course of conduct, TransUnion used the Software Modules.

63. On information and belief, TransUnion has failed to remit millions of dollars in unpaid royalties for the categories of use described above.

**I.  TransUnion's Unauthorized Use Of FICO Scores And/Or Score Changes As Part Of TransUnion's "Triggers" Processes**

64. Consistent with its failure to remit royalties owed for (a) the On-Line Score Service; (b) the Account Review Score Service; (c) the Archive Score Service; (d) the Prescreen Score Service; and (e) Prospect Databases – along with its unauthorized use of FICO® Scores – TransUnion has also engaged in the unauthorized use of FICO Scores as part of an activity known as "Triggers."

65.     Under Section 1 of the May 2010 Amendment, the parties defined "Triggers" as "monitoring the daily changes of a population of consumers for certain consumer credit file (or other data such as consumer scores) attributes or changes (collectively, the "Selection Triggering Criteria") and then periodically (e.g., daily, weekly, etc.) providing the Subscriber with scores and/or other information on those Consumers whose attributes or changes match or otherwise meet the Selection Triggering Criteria."  Section 1 of the 2015 Agreement contains an equivalent definition of "Triggers".

66.     Under Section 2.3 of the May 2010 Amendment, FICO and TransUnion agreed that:

> ***Without the prior written approval of Fair Isaac, Trans Union shall not use Fair Isaac Scores and/or Fair Isaac Score changes for any other purpose related to Trans Union's Triggers processes, including as part of the Selection Triggering Criteria in Trans Union's Triggers processes provided to Subscribers***, except that Trans Union shall have the right to use Scores in Trans Union's Internal Testing and Processing performed for efficiency in the append process described above.

2015 Agreement § 9.9 (emphasis added). Section 9.9 of the 2015 Agreement contains an equivalent prohibition on TransUnion's use of FICO® Scores and/or FICO Score changes as part of TransUnion's Triggers process.

67.     TransUnion has used FICO® Scores and/or FICO Score changes as part of TransUnion's Triggers process, in direct violation of the parties' agreements.

68.     Specifically, TransUnion has used FICO Scores and/or changes in FICO Scores as "Selection Triggering Criteria" in its "Triggers processes provided to Subscribers," including, but not limited to, in services provided to a TransUnion Subscriber (hereinafter, "Subscriber A").

69.     Following the 2015 Audit, FICO discovered that TransUnion had included the use of FICO® Scores as part of Subscriber A's Selection Triggering Criteria despite the clear prohibition against doing so.

19

70.     Initially, TransUnion repeatedly denied this use.     Ultimately, however, TransUnion admitted it had permitted Subscriber A to use FICO® Scores and/or changes in FICO Scores as part of Subscriber A's "Selection Triggering Criteria."

71.     In engaging in this course of conduct, TransUnion used the Software Modules, including by copying the code.

72.     Here again, TransUnion's conduct has enriched itself and its Subscribers, to the detriment of FICO.

**J.      Unauthorized Distribution Of FICO Scores To Resellers**

73.     As noted above, under the parties' agreements, TransUnion could distribute FICO® Scores to Resellers for only certain expressly authorized purposes, which were generally more restrictive as compared to authorized purposes for TransUnion's distribution directly to End Users.

74.     TransUnion has violated the restrictions on its distribution of FICO® Scores to Resellers in numerous ways.

75.     TransUnion has, among other things:

        a.      Failed to obtain FICO's advance written consent prior to distributing FICO® Insurance Scores to Resellers; and

        b.      Distributed FICO® Scores to Resellers for the Prescreen Score Service.

**K.      Dispute Resolution Process**

76.     The Classic Agreement, Additional Score Agreements and Insurance Agreement provide specific procedures for the parties to follow in the event of a dispute.  *See* May 14, 2010 Scoring Agreement Amendment ("May 2010 Amendment") at §§ 2.7 & 2.7.1.   Specifically, in the event the parties' respective Market and Accounting Teams cannot resolve a dispute, the parties are required to escalate the dispute to the Policy Committee.  *Id.* at § 2.7.  If the Policy

Committee is unable to resolve the dispute, then the parties are obligated to refer the dispute to their respective Chief Executive Officers ("CEOs"). Section 2.7.1 of the May 2010 Amendment requires the CEOs to prepare and exchange memoranda "stating the issues in dispute and each other's relative position on the merits, summarizing the negotiations which have taken place and attaching relevant documents." The CEOs are also required to meet in person or by phone call as soon as practicable, but in no event later than 14 days after the matter has been referred to them.[9] *Id.* § 2.7.1.

77. On September 6, 2017, FICO's CEO sent TransUnion's CEO a memorandum outlining all the outstanding issues in dispute between the parties, as required by the terms of the May 2010 Amendment. Specifically, FICO's CEO raised the Auditor's findings that, since 2011, TransUnion had underreported FICO® Scores delivered to End Users and the number of Prospect Databases using FICO Scores. FICO's CEO also raised the issue of TransUnion using FICO Scores and/or FICO Score changes for purposes related to TransUnion's Triggers processes. After outlining the parties' negotiations to date, FICO's CEO requested that TransUnion's CEO make himself available to discuss the outstanding dispute between the parties and proposed a conference call on September 15, 2017.

78. Counsel for TransUnion's CEO contacted FICO's CEO on September 7, 2017, in response to the September 6, 2017 memo. TransUnion's CEO and FICO's CEO then had a telephone call on September 21, 2017 to discuss the dispute, as required under the May 2010 Amendment. TransUnion, however, never sent FICO a written response to the September 6, 2017 memo, as required under the May 2010 Amendment.

---

[9] The 2015 Agreement also contains a dispute resolution provision but only requires the parties to escalate a dispute to the Policy Committee, not to the parties' CEOs. 2015 Agreement § 18.3.

79. FICO has fully performed under the dispute resolution procedures of the May 2010 Amendment and the 2015 Agreement, and is authorized to file the instant suit.

## L. TransUnion's False And Misleading Advertising And Public Statements Relating To VantageScore

80. In addition to violating the parties' license agreements and engaging in the unauthorized use of FICO® Scores and the Software Modules, TransUnion has also engaged in a public campaign to mislead consumers and business customers and disparage FICO and FICO® Scores, including false and misleading advertisements regarding VantageScore, a credit score that competes with FICO; false and misleading statements regarding FICO® Scores; and false and misleading comparisons between VantageScores and FICO® Scores.

81. In approximately 2006, TransUnion, together with the other two credit bureaus, Equifax and Experian, created a joint venture known as VantageScore Solutions, LLC ("VantageScore Solutions" or "VantageScore"). VantageScore Solutions developed a credit score to compete with FICO® Scores, calculated using the "VantageScore model" and referred to commercially as "VantageScore." TransUnion acts as a distributor of VantageScores, and makes promotional statements regarding VantageScore to prospective customers and others on its website and in other advertising channels in interstate commerce.

82. FICO competes with TransUnion – in TransUnion's roles as a distributor of VantageScores – in selling and distributing credit scores to: (a) financial institutions and other businesses (sometimes referred to as the "business-to-business" market segment); and (b) consumers (sometimes referred to as the "business-to-consumer" market segment).

83. The business-to-business market segment has existed for many years, while the business-to-consumer market segment developed more recently. In the business-to-business market segment, FICO Scores are used in over 90 percent of all U.S. consumer credit lending

decisions. In the business-to-consumer market segment, however, FICO Scores have significantly less market share.

84. TransUnion's false and misleading advertising campaign has taken various forms, targeting both the business-to-business market segment and the business-to-consumer market segment, and deceiving and misleading participants in both market segments. Indeed, the public statements that TransUnion challenges in its Counterclaims were all made by FICO in order to correct the market confusion created by the false and misleading advertising campaign conducted by TransUnion and VantageScore Solutions. In short, rather than compete on the merits, TransUnion has instead engaged in a misinformation campaign, and, in the process, violated federal and state law.

85. As one example of TransUnion's blatant misconduct, in January 2017, TransUnion entered into a consent decree with the Consumer Financial Protection Bureau ("CFPB"), agreeing to pay approximately $17 million to settle the CFPB's allegations that TransUnion had violated the Dodd-Frank Wall Street Reform and Consumer Financial Protection Act by deceiving consumers in its marketing of VantageScore and other TransUnion credit products ("Consent Decree").[10]

86. The Consent Decree came after a nearly three-year investigation by the CFPB into TransUnion and its marketing practices. In its January 3, 2017 press release, the CFPB stated, "Although TransUnion has marketed VantageScores to lenders and other commercial users, ***VantageScores are not typically used for credit decisions***." (emphasis added). More specifically, the CFPB stated: "In their advertising, TransUnion…***falsely represented that the credit scores they marketed and provided to consumers [VantageScores] were the same scores***

---

[10] The Consent Decree also related to TransUnion's misleading conduct concerning costly recurring payments for credit-related products.

*lenders typically use to make credit decisions*. In fact, the **scores sold by TransUnion…were not typically used by lenders to make those decisions**." (emphasis added)

87.     In entering the Consent Decree, the CFPB made numerous findings of fact based on its three-year investigation.   For example, the CFPB found that "[TransUnion's] advertisements implicitly represent that the VantageScore credit score that [TransUnion and its related entities] offer is the same score that 'lenders' or 'landlords' typically use to determine creditworthiness," although "[i]n reality, the credit score model used by any individual lender or other commercial user is highly unlikely to be the TransUnion VantageScore."   Consent Decree ¶¶ 17, 19.   The CFPB further found that "[i]n many cases, there are significant and meaningful differences between the VantageScore credit scores marketed and sold to consumers and the variety of credit scores used by lenders."   *Id.* ¶ 23.   "As a result, the [Vantage Scores] marketed and sold to consumers often present an inaccurate picture of how lenders, the vast majority of which use other scores and data providers, assess consumer creditworthiness."   *Id.* ¶ 24.

88.     Despite the Consent Decree, TransUnion continues to engage in marketing similar to the advertisements the CFPB found to be false and misleading and in violation of the law.

89.     For example, on or around March 7, 2018, TransUnion sent an e-mail with a link to the following two advertisements[11]:

---

[11] The advertisements the CFPB found unlawful included statements such as "Make sure you know your Credit Score when looking for a car.  Lenders typically will check your credit before buying and financing a car."  Consent Decree ¶ 18.



90.     For consumers who follow the links, TransUnion offers a credit score based on the VantageScore 3.0 model, not the FICO Scores that are the actual basis for most credit card and auto lending decisions.

91.     In encouraging consumers to "Run your credit check before the bank does," with a link that reads "Show Me My Score & Report Now," a reasonable consumer would believe they are obtaining the same score their lender would obtain and rely upon in deciding whether to extend them credit – just as the CFPB found in connection with similar advertisements. Similarly, in encouraging consumers to "Kick the tires on your credit before the [car] dealer does," with a link that reads "Show Me My Score & Report Now," a reasonable consumer would believe they are obtaining the same score their lender would obtain and rely upon in deciding whether to extend them credit.  In this way, TransUnion is misleading consumers into believing

that the VantageScore credit score they will receive is the one used by lenders in deciding whether to approve a consumer's credit application, when in fact it is not.

92.     That impression is false and misleading and would have a material impact on a consumer's choices.  As the CFPB found, the credit score used by any individual lender or other commercial user for the purpose of deciding whether to extend credit is "highly unlikely" to be VantageScore.  Consent Decree ¶ 17.  Making matters worse for consumers, there are often significant and meaningful differences between the VantageScores TransUnion markets and sells to consumers and FICO® Scores.  According to the CFPB's Consent Decree, a VantageScore "often present[s] an inaccurate picture of how lenders, the vast majority of which use other scores and data providers, assess consumer creditworthiness."  *Id.* ¶ 24.  Similarly, a study by the CFPB found that 27% of consumers had "economically meaningful" differences between their FICO Score and VantageScores, even after adjusting for distributional differences.  *See* CFPB, *Analysis of Differences between Consumer- and Creditor-Purchased Credit Scores*, September 2012, *available at* https://files.consumerfinance.gov/f/201209_Analysis_Differences_Consumer_ Credit.pdf.

93.     As another example of TransUnion misleading customers into believing they are obtaining a FICO Score, but then providing a VantageScore, on or about May 19, 2017, TransUnion published a blog post at https://www.transunion.com/article/how-is-my-fico-score-calculated-and-how-can-i-improve-it titled "How Is My FICO Score Calculated And How Can I Improve It."  As the title of the blog post suggests, throughout the article, TransUnion explained how FICO Scores are calculated and provided steps a consumer can take to improve his or her FICO Score.  At the end of the article, TransUnion included a link that read "See Yours Now," which directed consumers to an offer to purchase a TransUnion credit report ***with a***

***VantageScore credit score***.  As with the advertisements discussed above, a reasonable consumer would believe they are obtaining a FICO Score – not a VantageScore – given both the title and substance of the blog post, along with the "See Yours Now" link.

94.     As another example of TransUnion's false and misleading advertisements, TransUnion has frequently claimed that thousands of lenders use VantageScore in deciding whether to extend credit, notwithstanding the CFPB's findings.  For example, on its website, TransUnion claims:  "More than 2,400 lenders and 20 of top 25 financial institutions used VantageScore credit scores in 2015-2016" and "[m]ore than 8 billion VantageScore credit scores were pulled between July 1, 2015 and June 30, 2016."  TRANSUNION, https://www.transunion .com/partners/product/credit-score-vantagescore (last visited Apr. 17, 2018).  In a more recent blog post on its website, TransUnion claimed that "2700 traditional lenders…use them [VantageScores]."  Joe Mellman, *Inclusivity Matters: Score Choice Should Extend to Mortgage Market*, TRANSUNION (Mar. 23, 2018), https://www.transunion.com/blog/inclusivity -matters-score-choice-should-extend-to-mortgage-market (last visited Apr. 17, 2018).  TransUnion has made similar claims in the press.  According to a December 2017 article in the Financial Times, TransUnion claimed VantageScore was used by more than 2,400 lenders.  *Available at* https://www.ft.com/content/2222880c-cfa5-11e7-9dbb-291a884dd8c6 (last visited Apr. 17, 2018). .

95.     TransUnion's claims are false and misleading.  TransUnion's statements leave the false and misleading impression that over 2,400 financial institutions use VantageScores ***in deciding whether to approve or decline credit applications***.  TransUnion's statements also leave the impression that 8 billion VantageScores were "pulled" by prospective lenders in connection with actual lending decisions.  In reality, on information and belief, many of these

VantageScores are "pushed" onto prospective lenders by TransUnion, VantageScore Solutions and the other two credit bureaus—*i.e.*, the VantageScores are not solicited or requested and are provided for no charge. Further, in most instances, the lenders do not use the VantageScores for purposes of making an actual credit determination. As set forth in the Consent Decree, the CFPB's three-year investigation determined that the credit score used by any individual lender or other commercial user is "highly unlikely" to be a VantageScore. Consent Decree ¶ 17. Consistent with the CFPB's findings, according to a study commissioned by FICO, FICO Scores are used in over 90 percent of all U.S. consumer credit lending decisions in determining whether to approve a credit application. TransUnion's false and misleading claims about the extent to which lenders rely upon VantageScores for credit decisions are likely to and actually have created misleading impressions.

96. In addition to misleading businesses and consumers regarding the extent to which creditors use VantageScore in making credit decisions, TransUnion has also misled consumers into believing that the VantageScore model "scores" more consumers by incorporating so-called "alternative data." For example, on its website, TransUnion claims that "by considering at least 24 months of credit history (including utilities, rent and telco), the VantageScore 3.0 model can generate scores for 27–30 million previously unscorable consumers." TRANSUNION, https://www.transunion.com/product/vantagescore (last visited Apr. 17, 2018). On another part of its website, TransUnion trumpets VantageScores' "ability to score up to 35 million more adults as compared to traditional scoring models" and claims that the VantageScore model is able to accomplish this by using "industry-leading analytics to parse credit files differently than other, older models do," citing as an example the model's use of "rent, utility and telecom data

when it is present in a consumer's file."  *Id.* at https://www.transunion.com/ partners/product/ credit-score-vantagescore.

97.     VantageScore Solutions has made similar claims.  Here is an example from the VantageScore website:

> By using a broader and deeper set of credit file data and more advanced modeling techniques, the VantageScore model can provide credit scores for 30-35 million* consumers who are invisible to conventional credit scoring models.

VANTAGESCORE, https://www.vantagescore.com/scores-more-people (last visited Apr. 17, 2018).

98.     As another example, in its VantageScore 3.0 White Paper, VantageScore stated, "***alternative data*** is included if it is available on the credit file, ultimately expanding ***a whole new universe*** of potential customers for lenders." (emphasis added).  *VantageScore 3.0*, WHITE PAPER SERIES, Dec. 20, 2013, at 1, *available at* https://www.vantagescore.com/images/resources /VantageScore3-0_WhitePaper.pdf (last visited Apr. 17, 2018).

99.     Similarly, a recent Fox Business article reported that "VantageScore has said it can score about 30 million more people than FICO."  Brittany De Lea, *Credit Score Changes in Mortgage Market Could Increase Homeownership Opportunities*, FOXBUSINESS (Jan. 9, 2018), https://www.foxbusiness.com/markets/credit-score-changes-in-mortgage-market-could-increase-homeownership-opportunities (last visited Apr. 17, 2018).  In explaining ***how*** VantageScore is able to accomplish this, the article goes on to quote Jeff Richardson, VantageScore's Vice President of Marketing and Communications as saying, "We score those people. ***We look deeper into their credit file***." *Id.*  (emphasis added).

100.     These advertisements and statements are false and misleading.  VantageScores are based on information available from the three credit bureaus:  TransUnion, Equifax and Experian.  FICO® Scores are ***based on the same data***.  Contrary to the suggestion of the statements in Paragraphs 97-99, FICO Scores have always used phone and utility data, and the

current version of the FICO® Score (FICO Score 9) uses rental data. Further, traditional credit bureau files generally contain only limited telecom, utility and rental data, so the suggestion that such data is the reason for VantageScore's ability to score up to 35 million more consumers is even more misleading. In short, VantageScore does not score more consumers because its model looks at "rent, utility and telecom data" or a "broader and deeper set of credit file data." VantageScore simply reduces minimum scoring criteria, despite the documented unreliability of credit scores calculated based on sparse and/or stale credit data. Moreover, contrary to TransUnion's public statements, there are no "industry-leading analytics" that can produce a reliable credit score based solely on credit bureau data where the credit file is sparse or consists solely of stale credit data.

101. To be clear, the VantageScore model will produce a credit score for some consumers who would not receive a credit score based on the FICO Score model. The FICO Score model will not generate a credit score for a consumer unless the consumer's credit report meets certain minimum scoring criteria, which include at least one credit report "trade line" (*i.e.*, a credit account) that is at least six months old and at least one credit report trade line that has been reported to the credit bureaus within the past six months. In contrast, the VantageScore model will produce a credit score for a consumer even if the consumer does not have a credit report trade line that is at least six months old, or has not had a credit report trade line reported to the credit bureaus within the past six months, and, in certain circumstances, even if the consumer has no credit report trade line at all. In short, VantageScore scores more consumers through the near elimination of minimum scoring criteria, not – as TransUnion suggests – through the use of "alternative data."

102. FICO's minimum credit scoring criteria are not arbitrary. To the contrary, FICO's minimum scoring criteria are the product of decades of research conducted by FICO, which has consistently demonstrated that credit scores calculated based on sparse and/or stale credit data are not reliable indicators of credit risk. FICO's minimum scoring criteria play a critical role in ensuring the robustness and accuracy of FICO's credit scoring system, and, by extension, the soundness of lending decisions based on FICO® Scores. In contrast, the near elimination of minimum scoring criteria decreases the reliability of VantageScore.

103. Moreover – contrary to the suggestion in TransUnion's Counterclaims[12] – VantageScore's reduction of minimum scoring criteria can **harm** consumers. While "the ability to score more people" is a message designed to sound advantageous to businesses and more inclusive of consumers, on information and belief, many of the VantageScores generated for consumers with no FICO® Scores are too low for those consumers to obtain credit. Millions of consumers without current credit access who have negative items in their credit files will be assigned VantageScores that could effectively lock them out of credit access because the score produced is based on a static file, reflecting only a time of financial hardship, and does not account for new and positive changes in the consumer's financial circumstances. The lower VantageScores could disqualify these consumers from manual or other alternative underwriting procedures for which they would otherwise be eligible if they had not received a score at all. By not assigning a credit score where there is insufficient data to ensure the reliability of the score, the FICO model permits such consumers to obtain credit through manual or other alternative underwriting procedures, rather than freezing them out of credit access through a low (and unreliable) credit score.

---

[12] *See*, *e.g.*, Counterclaims ¶¶ 38-40.

104.    TransUnion's statements regarding VantageScore's incorporation of alternative data are likely to and actually have created misleading impressions.  For example, a February 2018 third-party blog post stated – incorrectly – that "[u]nlike FICO, VantageScore considers recurring payments such as phone bills, utilities, etc." David Lord, *What is VantageScore and How Will it Change the Housing Market?*, CREDIT.COM (Feb. 9, 2018), http://blog.credit.com/ 2018/02/what-is-vantagescore-and-how-will-it-change-the-housing-market-181147/ (last visited Apr. 17, 2018).  Furthering the harm, VantageScore Solutions then republished the post on its website, where it remains available today.  David Lord, *How VantageScore Could Affect  the Housing Market*, VANTAGSCORE (Feb. 21, 2018), https://www.vantagescore.com/news-story/263/how-vantagescore-could-affect-housing-market (last visited Apr. 17, 2018).  Similarly, a college professor – identified as an expert – stated in a recent blog post:  "Vantage includes payments that FICO does not within the score, such as rent, utilities, and phone."  John S. Kiernan, *Vantage Score vs. FICO Score: What's the Difference?*, WALLETHUB BLOG (Apr. 6, 2018), https://wallethub.com/edu/vantage-score-vs-fico-score  /36859/#mitchell-franklin (last visited Apr. 17, 2018).  Again, contrary to the suggestion of the blog posts, FICO Scores do take rental, telecom and other utility information into account when present in the consumer's credit file.

105.    TransUnion has also made false and misleading claims suggesting that VantageScores are "more predictive" than FICO Scores—a key attribute of a credit score that is central to how lenders choose credit scores.  Here are examples from its website:

- "When combined with TransUnion's insight and support, you get a credit-risk solution that's more predictive, more consistent and more stable than older models." TRANSUNION, https://www.transunion.com/product/vantagescore (last visited Apr. 17, 2018).

- "The [VantageScore 3.0] model generates consumer credit scores that are more predictive, more consistent and more stable by using industry-leading analytics to parse credit files differently than other, older models do." *Id.* at https://www.transunion.com/partners/product/credit-score-vantagescore.

- "[VantageScore 3.0] offers up to a 25% predictive lift over earlier models for sought-after prime and near-prime consumers." *Id.* at https://www.transunion.com/product/vantagescore.

Indeed, TransUnion has gone so far as to claim that VantageScore "typically outperforms other credit scoring models *across all account and industry types and industry segments*" claiming that VantageScore "provides up to a 25 percent performance increase among prime and near-prime consumers – those whom lenders traditionally target" and including charts that purportedly reflect the "performance improvement" over other scoring models. *VantageScore* (2013), https://www.transunion.com/resources/transunion/doc/products/resources/product-vantagescore-as.pdf (emphasis added). Given the predominance of FICO Scores in the marketplace, these statements are and will be perceived as specific claims of superiority over FICO Scores.

106. And these advertisements are false and misleading. FICO Scores are highly predictive indicators of consumer creditworthiness. Claims that VantageScores are more predictive, outperform FICO Scores or achieve performance improvements as advertised by TransUnion are false and misleading. Further, on information and belief, TransUnion does not have test results, studies or analysis to support the claims in Paragraph 105.

107. TransUnion's claims are particularly misleading insofar as TransUnion's statements suggest greater predictiveness with respect to previously unscored consumers. For example, on its website, TransUnion boasts that VantageScore 3.0 provides "[m]ore predictive credit-risk scoring for sought-after borrowers and millions of previously unscored consumers." TRANSUNION, https://www.transunion.com/product/vantagescore (last visited Apr. 17, 2018). Most consumers and commercial lenders would understand the reference to "unscored

33

consumers" as consumers who do not have a FICO Score, given the prevalence of FICO Scores in the market. And such consumers do not have a FICO Score because these consumers do not meet one of FICO's minimum scoring criteria, *e.g.*, a credit line reported to the credit bureau in the last six months. For such consumers, a VantageScore is not "more predictive," as TransUnion's claims. To the contrary, research results have consistently shown that scoring models that rely solely on sparse or old credit data—as the VantageScore model does for a significant number of consumers—do a poor job of forecasting the likelihood a consumer will satisfy his or her credit obligations in the future. In addition, here again, on information and belief, TransUnion does not have test results, studies or analysis to support this claim.

### COUNT I: BREACH OF CONTRACT – FAILURE TO PAY ROYALTIES

108. The allegations in paragraphs 1-79 are incorporated as if set forth fully herein.

109. FICO has valid and enforceable contracts with TransUnion. FICO has performed its obligations under the parties' agreements.

110. TransUnion was contractually obligated to pay FICO royalties for all FICO® Scores included in Prospect Databases. TransUnion was also contractually obligated to pay royalties for all other uses of FICO Scores pursuant to the Classic Agreement, the Additional Score Agreements, the Insurance Agreement, and the 2015 Agreement.

111. TransUnion breached these obligations by systematically violating and circumventing its contractual obligations by, among other things, failing to remit royalty payments, as required under the parties' agreements.

112. As a result, FICO has suffered, and will continue to suffer, damages.

### COUNT II: BREACH OF CONTRACT – UNAUTHORIZED USE AND DISTRIBUTION OF FICO SCORES

113. The allegations in paragraphs 1-79 are incorporated as if set forth fully herein.

114.     FICO has valid and enforceable contracts with TransUnion.  FICO has performed its obligations under the parties' agreements.

115.     TransUnion was contractually obligated to use and distribute FICO® Scores only as authorized by the parties' agreements, including, but not limited to, the Classic Agreement, the Additional Score Agreements, the Insurance Agreement, the Prospect Database Addendum, and the 2015 Agreement.

116.     TransUnion intentionally breached these obligations, including, but not limited to, the following conduct:

a.     TransUnion provided FICO® Scores to End Users and/or Resellers for purposes not authorized under the parties' agreements; and

b.     TransUnion used FICO® Scores and/or FICO Score changes as part of TransUnion's Trigger processes.

117.     Pleading further, and in the alternative if necessary, TransUnion further intentionally breached these obligations by providing FICO® Scores to Resellers and/or End Users for analytical use as part of the End User's prescreening strategies (a) outside the Prospect Database definitions in Sections 2.4.1 and 2.4.2 of the Prospect Database Addendum and Section 9.11 of the 2015 Agreement; and/or (b) otherwise without express authorization under the parties' agreements.

118.     As a result, FICO has suffered, and will continue to suffer, damages.

**COUNT III:  BREACH OF CONTRACT – UNAUTHORIZED USE OF SOFTWARE**

119.     The allegations in paragraphs 1-79 are incorporated as if set forth fully herein.

120.     FICO has valid and enforceable contracts with TransUnion.  FICO has performed its obligations under the parties' agreements.

121.     Under the Classic Agreement, the Additional Score Agreements, the Insurance Agreement, the Scoring Software Addendum, and the 2015 Agreement, TransUnion was permitted to use the Software Modules only as expressly authorized in the parties' agreements.

122.     TransUnion breached these obligations by using the Software Modules in ways that were not authorized under the parties' agreements, including, but not limited to, the following conduct:

a.     TransUnion used the Software Modules to provide FICO® Scores to Resellers for purposes not authorized under the parties' agreements; and

b.     TransUnion used the Software Modules to calculate FICO® Scores and/or FICO Score changes used in TransUnion's Trigger processes, specifically, as "Selection Triggering Criteria" in "Triggers processes provided to Subscribers."

123.     Pleading further, and in the alternative if necessary, TransUnion further breached these obligations by using the Software Modules to provide FICO® Scores to Resellers and/or End Users for analytical use as part of the End User's prescreening strategies (a) outside the Prospect Database definitions in Sections 2.4.1 and 2.4.2 of the Prospect Database Addendum and Section 9.11 of the 2015 Agreement; and/or (b) otherwise without express authorization under the parties' agreements.

124.     As a result, FICO has suffered, and will continue to suffer, damages.

**COUNT IV:  BREACH OF CONTRACT – RECORDKEEPING PROVISIONS**

125.     The allegations in paragraphs 1-79 are incorporated as if set forth fully herein.

126.     FICO has valid and enforceable contracts with TransUnion.  FICO has performed its obligations under the parties' agreements.

127.     TransUnion was contractually obligated to keep and maintain sales and distribution records as necessary to allow FICO to verify or otherwise audit TransUnion's usage reports and fee collections, pursuant to the Classic Agreement, the Prospect Database

Addendum, the Additional Score Agreements, the Insurance Agreement, and the 2015 Agreement.

128.     TransUnion breached this obligation and others by failing to keep or maintain such records.

129.     As a result, FICO has suffered, and will continue to suffer, damages.

## COUNT V:  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

130.     The allegations in paragraphs 1-79 are incorporated as if set forth fully herein.

131.     Under the agreements set forth above, TransUnion owed FICO a duty of good faith and fair dealing.

132.     TransUnion breached the implied duty of good faith and fair dealing by intentionally and knowingly making numerous false representations to FICO in bad faith, including, but not limited to, the following:

            a.     In or about May 2009, TransUnion told FICO that it was not using FICO® Insurance Scores in providing Prospect Database services to End Users.

            b.     During the parties' negotiations surrounding the March 2010 Amendment, TransUnion represented to FICO that it was not permitting End Users to use FICO® Scores for analytical purposes relating to End User prescreening strategies, except as set forth in the definitional Sections 2.4.1 and 2.4.2 in the March 2010 Amendment.

133.     Further, TransUnion intentionally and in bad faith failed to remit royalty amounts owed to FICO.

134.     Further, TransUnion intentionally and in bad faith repeatedly engaged in the unauthorized use of FICO® Scores and the Software Modules.

135.     Further, TransUnion intentionally and in bad faith failed to keep and maintain records as necessary to allow FICO to verify or otherwise audit TransUnion's usage reports and fee collections.

136.   As a result, FICO has suffered, and will continue to suffer, damages.

## COUNT VI:  COPYRIGHT INFRINGEMENT

137.   The allegations in paragraphs 1-79 are incorporated as if set forth fully herein.

138.   The Software Modules are the subject of valid, registered copyrights from the Copyright Office.

139.   FICO is the sole owner of all right, title, and interest in and to the copyrights in the Software Modules.

140.   TransUnion has infringed FICO's copyrights by, among other things, making unauthorized copies of the Software Modules, including protectable elements thereof, in using and/or deploying the Software Modules to produce FICO® Scores in ways that were not authorized under the parties' agreements (including, but not limited to, the Classic Agreement, the Additional Scores Agreements, the Insurance Agreement and the 2015 Agreement) – through, without limitation, the following conduct:

a.   TransUnion used and/or deployed the Software Modules to provide FICO® Scores to Resellers for purposes not authorized under the parties' agreements; and

b.   TransUnion used and/or deployed the Software Modules to calculate FICO® Scores and/or FICO Score changes used in TransUnion's Trigger processes.

141.   Pleading further, and in the alternative if necessary, TransUnion has further infringed FICO's copyrights by using and/or deploying the Software Modules to provide FICO® Scores to Resellers and/or End Users for analytical use as part of the End User's prescreening strategies (a) outside the Prospect Database definitions in Sections 2.4.1 and 2.4.2 of the Prospect Database Addendum and Section 9.11 of the 2015 Agreement; and/or (b) otherwise without express authorization under the parties' agreements.

142.   Each of these uses exceeded the scope of TransUnion's rights to use the Software Modules under the parties' agreements.

143.     As a result of TransUnion's infringement, FICO has suffered, and will continue to suffer, substantial injury, loss, and damages to its ownership rights in the copyrighted Software Modules, and TransUnion has unlawfully derived, and will continue to derive, income and profits from the infringing acts.

**COUNT VII:  CONVERSION OF FICO SCORES AND SOFTWARE MODULES**

144.     The allegations in paragraphs 1-79 are incorporated as if set forth fully herein.

145.     TransUnion's unauthorized use of FICO® Scores – including, but not limited to, the provision of FICO Scores to Resellers and/or End Users for analytical use as part of the End User's prescreening strategies and use of FICO® Scores and/or FICO Score changes as part of TransUnion's Trigger processes, outside the permitted uses set forth in the Classic Agreement, the Additional Score Agreements, the Insurance Agreement and the 2015 Agreement – constitutes conversion on the part of TransUnion.

146.     TransUnion's provision of FICO® Scores to Resellers for purposes not authorized under the parties' agreements, constitutes conversion on the part of TransUnion.

147.     TransUnion's unauthorized use of the Software Modules, outside the permitted uses set forth in the Classic Agreement, the Additional Score Agreements, the Insurance Agreement, the Scoring Software Addendum and the 2015 Agreement, constitutes conversion on the part of TransUnion.

148.     As a result, FICO has suffered, and will continue to suffer, damages.

149.     At all times, TransUnion has acted in bad faith, oppressively and maliciously toward FICO, with intent to injure FICO, thereby entitling FICO to punitive damages against TransUnion.

**COUNT VIII: UNJUST ENRICHMENT**

150.    The allegations in paragraphs 1-14, 23-26, 29, 33, 35, 37-38, 41, 43, 58-60, 62-64, 68, 70-72, and 75, are incorporated as if set forth fully herein.

151.    Pleading in the alternative, if necessary, to Counts II and III, by using FICO® Scores and the Software Modules in unauthorized ways, TransUnion has received the benefit of the use of FICO Scores and the Software Modules, thereby deriving substantial income and profits.

152.    TransUnion accepted these benefits but has failed to provide sufficient compensation to FICO for the same.

153.    TransUnion has been unjustly enriched by this conduct, to the detriment of FICO

154.    As a result, FICO has suffered, and will continue to suffer, damages.

**COUNT IX: VIOLATION OF SECTION 43(A) OF THE LANHAM ACT**

155.    The allegations in paragraphs 80-107 are incorporated as if set forth fully herein.

156.    TransUnion has made false and misleading representations of fact in interstate commerce in connection with the advertising and promotion of its credit score services. TransUnion has misrepresented the nature of the VantageScores it distributes and the FICO® Scores with which it competes, and has falsely compared VantageScores and FICO® Scores. FICO, as a provider of FICO® Scores, has been and is likely to be damaged by these statements, including by a loss of goodwill associated with its FICO® Scores.

157.    TransUnion's false statements actually have deceived, and are likely to deceive, a substantial number of consumers and business-to-business customers concerning the characteristics of VantageScores distributed by TransUnion and FICO® Scores sold in interstate commerce. These deceptions are material to the decisions of consumers and business-to-business customers make in obtaining credit scores.

158.    FICO has lost sales, profits, goodwill and has suffered injury to its business reputation.  FICO has and will continue to be injured in its ability to offer and sell FICO® Scores. FICO has been damaged by TransUnion's false advertising, the amount of which cannot presently be determined.

## COUNT X:  VIOLATION OF THE ILLINOIS DECEPTIVE TRADE PRACTICES ACT

159.    The allegations in paragraphs 80-107 are incorporated as if set forth fully herein.

160.    Under the Illinois Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2(a), (8), "[a] person engages in a deceptive trade practice when, in the course of his or her business . . . the person . . . disparages the goods, services, or business of another by false or misleading representation of fact."

161.    TransUnion willfully disparaged the goods, services and business of FICO when it, among other things, made the statements described in paragraphs 89-107.  TransUnion made these materially false and misleading statements with the intent that they be relied upon by consumers.

162.    A substantial portion of the harm caused by TransUnion's misrepresentations occurred in Illinois, where TransUnion is located, and where FICO engages in the sale and distribution of products and services worth millions each year.  Illinois consumers of FICO's products and services will be deceived by TransUnion's false and misleading statements.

163.    Because FICO has been harmed – and is likely to continue to be harmed – by TransUnion's misrepresentations, FICO is entitled to injunctive relief.

164.    Because TransUnion acted willfully, FICO is entitled to attorneys' fees.

## COUNT XI:  VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

165.    The allegations in paragraphs 80-107 are incorporated as if set forth fully herein.

166.    The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §
17200, defines "unfair competition" to include, among other things, any "unlawful . . . business
act or practice" or "unfair…business act or practice."

167.    TransUnion has engaged in "unlawful" and "unfair" business acts and practices as
alleged herein in, including violation of Section 43(A) of the Lanham Act, 15 U.S.C. § 1125(a).

168.    TransUnion has engaged in deceptive and misleading advertising that has misled
businesses and consumers about the nature and quality of VantageScores and FICO® Scores.

169.    A substantial portion of the harm caused by TransUnion's conduct occurred in
California, where FICO has been located since 1956.  California consumers of FICO's products
and services will be deceived by TransUnion's false and misleading statements.

170.    As a direct and proximate result of TransUnion's unlawful conduct, FICO has
suffered injury to its business or property.  FICO is entitled to injunctive relief and restitution in
an amount to be proven at trial.

**COUNT XII:  VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW**

171.    The allegations in paragraphs 80-107 are incorporated as if set forth fully herein.

172.    The California False Advertising Law, Cal. Bus. & Prof. Code § 17500, prohibits
statements made in connection with the sale or distribution of goods and services that are "untrue
or misleading" and that are "known, or [] by the exercise of reasonable care should be known, to
be untrue or misleading."

173.    TransUnion's statements as alleged in paragraphs 89-107 above have been false
or misleading.

174.    TransUnion knew or with reasonable care should have known that the statements
alleged in paragraphs 89-107 were false or misleading.

175.    These false and misleading statements confused and deceived or were likely to confuse and deceive consumers and business-to-business customers concerning the characteristics of products and services sold by TransUnion and FICO, including VantageScores and FICO® Scores.

176.    TransUnion's false or misleading statements as alleged herein were made to California residents, among others.

177.    Because FICO has been harmed – and is likely to continue to be harmed – by TransUnion's false statements and misrepresentations, FICO is entitled to restitution and injunctive relief.

## PRAYER FOR RELIEF

178.    Based on TransUnion's breaches of the license agreements, violations of federal

copyright law, violations of common law, violations of the federal Lanham Act and violations of

Illinois and California statutory law, FICO is entitled to:

a.    a monetary award in an amount to be determined at trial, including, but not limited to, the following:

(i)    Unpaid royalties;

(ii)    Disgorgement of TransUnion's profits from its unauthorized use of FICO® Scores and the Software Modules;

(iii)    Costs associated with FICO's audit;

(iv)    Disgorgement of TransUnion's profits from the sale and distribution of VantageScores;

(v)    Restitution;

(vi)    FICO's damages;

(vii)    Punitive damages based on TransUnion's bad faith, oppressive and malicious conduct toward FICO;

(viii)    Attorney's fees and all other costs reasonably incurred in this action; and

(ix)    Interest, including, but not limited to, pre-judgment interest, statutory interest and contractual interest pursuant to the parties' respective agreements cited herein (*e.g.*, without limitation, the NextGen Agreement § 13.8; Bankruptcy Agreement § 7.7.4; 2015 Agreement § 9.4).

b.    any other legal or equitable relief that the Court may find appropriate, including, but not limited to, preliminary and permanent injunctive relief enjoining TransUnion from making unauthorized copies of the Software Modules or otherwise directly or indirectly infringing any of FICO's copyrighted works pursuant to 17 U.S.C. § 502, and an order from the Court requiring the impoundment and destruction of all unauthorized copies of the Software Modules pursuant to 17 U.S.C. § 503; and preliminary and permanent injunctive relief enjoining TransUnion from engaging in false and deceptive advertising practices relating to its sale and distribution of VantageScores.

## CONCLUSION

179.    As set forth above, TransUnion has failed to pay FICO millions of dollars in royalties owed to FICO.  Further, TransUnion has engaged in the unauthorized use of FICO® Scores and the Software Modules, unjustly enriching itself to the detriment of FICO.  Further, TransUnion has engaged in a campaign of false and misleading public statements regarding VantageScores and FICO Scores, which has benefited TransUnion and damaged FICO.  Based on this conduct, FICO is entitled to unpaid royalties, its damages, its audit costs, disgorgement of TransUnion's profits realized from its wrongful conduct, punitive damages, interest, attorney's fees and any other legal or equitable relief that the Court may find appropriate.


Dated:  April 17, 2018                    Respectfully submitted,


                                          _/s/  Michael A. Olsen_____
                                          Michael A. Olsen
                                          J. Gregory Deis
                                          Natalie F. Wayne
                                          MAYER BROWN LLP
                                          71 South Wacker Drive
                                          Chicago, IL  60606
                                          (312) 782-0600
                                          molsen@mayerbrown.com
                                          gdeis@mayerbrown.com
                                          nwayne@mayerbrown.com

                                          *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2018, I caused a true and correct copy of the foregoing document to be filed electronically.  Notice of the filing will be sent to all counsel of record by operation of the Court's electronic filing system.

Dated: April 17, 2018                                          By:     /s/  Natalie F. Wayne_____
                                                                            Attorney for Fair Isaac Corporation