IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| FAIR ISAAC CORPORATION,<br><br>*Plaintiff*,<br><br>v.<br><br>TRANS UNION LLC,<br><br>*Defendant*. | Case No. 1:17-cv-08318<br><br>Hon. Sharon Johnson Coleman<br>Magistrate Judge Young B. Kim |
| TRANS UNION LLC,<br><br>*Counterclaim-Plaintiff*,<br><br>v.<br><br>FAIR ISAAC CORPORATION,<br><br>*Counterclaim-Defendant*. | |

**TRANSUNION'S MOTION FOR LEAVE TO SERVE WRITTEN DISCOVERY
REGARDING FICO'S INTERFERENCE WITH ANTITRUST COUNTERCLAIMS**

On September 20, on a call with representatives of a subsidiary of TransUnion, TransUnion of Canada, Inc., FICO announced that it was ending its 25-year relationship with TransUnion under which TransUnion distributes FICO Scores in Canada. This is a valuable business for both parties. FICO told the TransUnion of Canada, Inc., representatives that its only reason for suddenly ending TransUnion's distribution of FICO Scores in Canada is the pendency of TransUnion's antitrust claims in this case challenging FICO's anticompetitive conduct in the United States. *See* Counterclaims, ECF No. 35. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ On October 18, FICO confirmed

1

that TransUnion's antitrust claims were the basis for its decision, ▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬

Pursuant to Rule 26 and this Court's procedures, TransUnion seeks leave to serve four document requests, attached hereto as Exhibit A, regarding FICO's threats. FICO's attempt to punish TransUnion for pursuing the U.S. antitrust claims is relevant to those antitrust claims and may be independently actionable anticompetitive conduct.

TransUnion's proposed requests could not have been served in July when TransUnion served its first set of document requests, because FICO's threats began afterward. Responsive documents are likely to be mostly or exclusively within the United States. The four individuals who are most likely to have responsive documents are FICO employees in the United States that TransUnion had already identified as custodians.

## BACKGROUND

TransUnion has distributed FICO Scores in Canada for 25 years. *See* Dias Decl. ¶ 3.[1] In 1993, TransUnion's Canadian subsidiary, TransUnion of Canada, Inc., entered into a contract with FICO to develop and distribute a FICO Score for the Canadian market. *Id*. ¶¶ 1, 5, 7. ▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

---

[1] Citations to "Dias Decl." refer to the Declaration of Christopher Dias, Vice President of Shared Services for TransUnion of Canada, Inc. Citations to "Skinner Decl." refer to the Declaration of Todd Skinner, TransUnion's Regional President for Canada, Latin America, and the Caribbean.

2

███████ FICO's principal negotiators were Nathan Jones ███████ and Jon Vinovich ███████. *See id.* ¶¶ 9-10.

During a Friday afternoon conference call on September 20, FICO abruptly announced that it had decided to end all contract negotiations with TransUnion's Canadian subsidiary because of TransUnion's antitrust claims against FICO in the United States. *Id.* ¶¶ 14-15. Mr. Vinovich said the decision to break off contract negotiations because of TransUnion's antitrust claims was made at the "highest levels" of FICO's leadership in the United States, including the Office of the General Counsel. *Id.* ¶ 15. ███████

On September 27, the President of TransUnion of Canada, Inc., Todd Skinner, spoke with Sally Taylor, another FICO executive ███████. Skinner Decl. ¶¶ 1, 5. Ms. Taylor confirmed that FICO's decision to end contract negotiations with TransUnion was made by FICO's legal team in the United States and was based on this case. *Id.* ¶ 5. Ms. Taylor described FICO's decision as a "legal decision" and "not a business decision." *Id.*

███████

3

██████████████████████████████████████████████████████████████

████████████████████████████████████

On October 18, TransUnion received a response from Mr. Vinovich's boss, James Woodward, who is a Deputy General Counsel of FICO ████████████████████. Dias Decl. ¶ 21. Mr. Woodward ██████████████████████ reiterated that FICO ended contract negotiations with TransUnion for the Canadian market because of TransUnion's antitrust claims against FICO in the United States. *Id.* ¶ 21. ████████████████ ████████████████████████████████

## ARGUMENT

**I. TransUnion's Proposed Discovery Is Relevant to its Antitrust Claims**

FICO has been explicit that it is threatening TransUnion's business in Canada because TransUnion challenged the exclusive dealing arrangements and anticompetitive pricing practices that FICO uses to further its monopoly in the United States in this case. *See supra* pp. 2-4; Dias Decl. ¶¶ 15, 21; Skinner Decl. ¶ 5; *Fair Isaac Corp. v. TransUnion, LLC*, No. 17-CV-8318, 2019 WL 1382068, at *2 (N.D. Ill. Mar. 27, 2019) (ruling TransUnion "adequately pled actual and attempted monopolization" because "TransUnion alleges that FICO engages in practices that are intended to drive out competition," including using "exclusive contracts" with all the major suppliers of credit scores and using "prices to maintain monopoly power").

Discovery of FICO's internal documents will confirm that FICO is threatening TransUnion's business in Canada for the purpose of punishing TransUnion or coercing TransUnion to accept its exclusive dealing arrangements and anticompetitive pricing practices in the United States. *See* Counterclaims ¶¶ 42-60, ECF No. 35; *Fair Isaac Corp.*, 2019 WL 1382068, at *2. Discovery will also show that FICO understands that ending its relationship

4

with TransUnion in Canada is likely to hurt FICO's bottom line. As FICO's former CFO explained to analysts in June 2019, the marginal cost to FICO of TransUnion (or another credit reporting agency) generating an extra FICO Score is zero, and the royalty FICO receives for that score is "100% margin to the company." *Fair Isaac Corp at William Blair Growth Stock Conference – Final*, FD Wire (June 5, 2019).[3] Cutting off the distribution of FICO Scores to TransUnion's customers in Canada will cost FICO millions of dollars in royalties that are all profit and only makes sense because of the larger (hoped-for) benefit of suppressing antitrust enforcement in the United States.

Because the purpose of FICO's threats to TransUnion's business in Canada is to punish TransUnion or coerce TransUnion into accepting FICO's anticompetitive conduct in the market for credit scores in United States, they reinforce and support all of the anticompetitive conduct TransUnion described in its Counterclaims in January 2018. *See*, *e.g.*, Counterclaims ¶¶ 42-60, ECF No. 35. When a defendant terminates a contract to discipline or coerce a plaintiff that challenges its anticompetitive practices – as FICO has done here – the termination serves to reinforce and support those practices by announcing to the plaintiff (and all similarly situated firms) that the defendant will retaliate against anyone that challenges those practices. For example, in *Insight Equity v. Transitions Optical, Inc.*, 252 F. Supp. 3d 382, 394 (D. Del. 2017), the district court found that the plaintiff's expert had a "valid theory" that the defendant's termination of a 13-year supply contract with the plaintiff, which had dared to challenge the

---

[3] FICO's former CFO has also said that, for FICO's scores business, "virtually every dollar that comes incrementally has 100% margin." *Fair Isaac Corp at Morgan Stanley Technology, Media & Telecom Conference – Final*, FD Wire (Mar. 1, 2018). While FICO has "some fixed costs in that business to manage it and run it and distribute the score and refresh it, and so on . . . for the most part, there's no cost of goods associated with that royalty stream that comes." *Id*.

5

defendant's monopoly by selling rival products, "reinforced [the defendant's] exclusive contracts, describing it as a 'synergistic exclusionary effect.'"

Furthermore, evidence of FICO's reasons for making these threats will be probative of FICO's anticompetitive motives in the market for credit scores, *see*, *e.g.*, *Gen. Motors Corp. v. Johnson Matthey, Inc.*, 887 F. Supp. 1240, 1246 (E.D. Wis. 1995) (ordering discovery of the defendant's lobbying efforts, an "otherwise protected activity," for the "purpose of establishing [the defendant's] motives in engaging in the anticompetitive conduct at issue"), and relevant to the remedy this Court will fashion to correct FICO's antitrust violations, *see*, *e.g.*, *FTC v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2019 WL 2206013, at *135 (N.D. Cal. May 21, 2019) (enjoining the defendant from "discriminating or retaliating in any way" against suppliers and customers seeking to enforce limits on monopoly pricing).[4]

Finally, FICO's conduct could be independently actionable under Section 2 of the Sherman Act, 15 U.S.C. § 2. When a monopolist terminates a longstanding, profitable relationship as "part of a larger anticompetitive enterprise," and the monopolist's conduct is "irrational but for its anticompetitive effect," the monopolist may violate Section 2. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.). Because ending its relationship with TransUnion in Canada will cost FICO millions in high-margin royalty revenues, it is "irrational but for its anticompetitive effect" in the United States. *Id.*

---

[4] *See also*, *e.g.*, *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 163 & n.68 (D.D.C. 2002) (enjoining the defendant from retaliating against a group of manufacturers in light of its "history of retaliation and threats of retaliation against other industry participants").

II. **Because TransUnion's Proposed Discovery Concerns Previously Identified FICO Custodians, the Burden in FICO Is Minimal**

TransUnion believes that the four individuals most likely to have responsive documents concerning FICO's threats to TransUnion's business in Canada are Nathan Jones, Jon Vinovich, James Woodward and Mark Scadina. Messers. Jones and Vinovich are FICO executives that spent over a year negotiating a new contract with TransUnion's Canadian subsidiary before abruptly calling an end to negotiations on September 20. Mr. Woodward is Mr. Vinovich's boss and the author of FICO's October 18 letter to TransUnion confirming that FICO is ending is distribution relationship with TransUnion of Canada, Inc. because of TransUnion's antitrust claims in this case. Mr. Scadina is FICO's General Counsel. Two FICO executives independently represented to TransUnion that Mr. Scadina's office made the decision to terminate FICO's relationship with TransUnion in Canada because of this case.

All four executives were identified as individuals with information relevant to this case before September 20 and are located in the United States. FICO identified Messrs. Jones, Vinovich, and Woodward as "persons likely to have discoverable information" in its amended initial discovery responses in April and produced an e-mail from Mr. Scadina in August. And TransUnion identified Messrs. Jones, Vinovich, Woodward, and Scadina as potential document custodians in a letter to FICO in August. *See* Ltr. from L. Pope to M. Provance at 4 (Aug. 21, 2019) ("TransUnion expects that FICO's proposed custodians will include, among others . . . James Woodward, Nathan Jones, . . . Jon Vinovich, . . . and Mark Scadina."). █

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████

Because all of these custodians were previously identified and TransUnion's four document requests are narrowly tailored, TransUnion believes that the incremental burden on FICO of responding to these requests will be minimal.

### III. FICO Has No Legitimate Basis for Objecting to This Discovery

TransUnion anticipates that FICO will object to TransUnion's proposed discovery as futile because the relevant decisions were made by attorneys whose communications are likely to be privileged, and because FICO has valid "business justifications" for its conduct. Neither objection has merit.

First, TransUnion believes that there will be many non-privileged communications reflecting FICO's strategic reasons for threating TransUnion's business in Canada. TransUnion is aware of at least two non-lawyers – Mr. Jones and Ms. Taylor – that may have been involved in crafting FICO's strategy, and there are likely others. Moreover, if FICO's lawyers were singlehandedly responsible for making the significant business decision to terminate FICO's profitable relationship with TransUnion in Canada, those lawyers were acting in their capacity as business executives, rather than legal counselors, in making that decision and, therefore, their communications are not privileged. *See*, *e.g.*, *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, Civ. No. 06-4112 (ADM/JSM), 2009 WL 10677479, at *19-20 (D. Minn. Mar. 23, 2009) (holding e-mails sent by FICO's General Counsel concerning "ongoing negotiations between Fair Isaac and a potential business partner" were not protected by privilege).

Second, FICO's executives made clear to TransUnion in late September and early October that FICO was threatening TransUnion's business in Canada because of this case. TransUnion anticipates that discovery will confirm that FICO made these threats to punish or coerce TransUnion for challenging FICO's anticompetitive conduct in the United States and that all other justifications FICO may raise are pre-textual or *post hoc*. If FICO contends that it has a

8

valid "business justification" for its conduct other than attempting to punish or coerce TransUnion, whether FICO has a valid "business justification" for its conduct will be a disputed question of fact for the jury to decide. *See JamSports & Entm't, LLC v. Paradama Prods., Inc.*, 336 F. Supp. 2d 824, 843 (N.D. Ill. 2004) (whether alleged monopolist had a valid business justification for its conduct was a question of fact for the jury). But FICO's assertion of this defense is not a reason to deny discovery.

## CONCLUSION

For the reasons stated above, this Court should grant TransUnion leave to serve the discovery requests attached hereto as Exhibit A.

Dated: November 1, 2019

Respectfully submitted,

By: /s/ *J. David Duffy*
J. David Duffy, #6242374
Audrey Mense, #6302524
Thompson Coburn LLP
55 East Monroe Street, 37th Floor
Chicago, Illinois 60603
(312) 346-7500
dduffy@thompsoncoburn.com
amense@thompsoncoburn.com

Mark Hansen, *pro hac vice*
John Thorne, #6181458
Rebecca Beynon, *pro hac vice*
Leslie Pope, *pro hac vice*
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
mhansen@kellogghansen.com
jthorne@kellogghansen.com
rbeynon@kellogghansen.com
lpope@kellogghansen.com

*Attorneys for TransUnion LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2019, I caused a true and correct copy of the foregoing document to be filed electronically. Notice of the filing will be sent to all counsel of record by operation of the Court's electronic filing system.

By:   /s/ J. David Duffy

Attorney for Trans Union LLC