**PUBLIC REDACTED VERSION**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| FAIR ISAAC CORPORATION, | |
| *Plaintiff,* | |
| v. | |
| TRANS UNION LLC, | Case No. 1:17-cv-08318 |
| *Defendant.* | |
| | Hon. Sharon Johnson Coleman |
| TRANS UNION LLC, | Magistrate Judge Young B. Kim |
| *Counterclaim-Plaintiff,* | |
| v. | |
| FAIR ISAAC CORPORATION, | |
| *Counterclaim-Defendant* | |

**FAIR ISAAC CORPORATION'S RESPONSE IN OPPOSITION TO TRANSUNION'S
<u>MOTION FOR LEAVE TO SERVE WRITTEN DISCOVERY</u>**

**INTRODUCTION**

With discovery in this case already well underway, TransUnion seeks to muddy the waters by serving additional written discovery requests about the termination of agreements with TransUnion of Canada, Inc. ("TU Canada") for the license and distribution of FICO Scores in Canada ("Canada Scoring Agreement"). TransUnion's motion and supporting declarations omit some very important facts. The negotiations to replace the Canada Scoring Agreement— ███████ ████████████████████████████████████████████████████—only reached impasse earlier this year after ████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████. Jones Decl. ¶¶ 14-18 & Ex. 1 (10/18/19 Ltr. from J. Woodward).[1] Now, according to TransUnion, FICO's decision *not* to deal with TU Canada on those "anticompetitive" terms in Canada is *also* anticompetitive. TransUnion's inconsistent and changing theories are indicative of the lawyer-driven nature of its antitrust counterclaims, which are designed to distract from what this case is fundamentally about: TransUnion's widespread breaches of the parties' agreements and massive underreporting of the royalties it owes to FICO.

These issues aside, TransUnion's motion should be denied because it does not seek discovery relevant to TransUnion's existing antitrust claims, which are expressly limited to FICO's alleged contracting practices, and their alleged impact and effects, in the United States. Rather, as TransUnion admits, Mot. at 6, it seeks discovery about the termination of the Canada Scoring Agreement in order to fish for grounds to assert a *new* potential claim against FICO based on a "refusal to deal" theory of antitrust liability. As detailed below, there are several reasons why that

---

[1] The Declaration of Nathan Jones, FICO's Vice President of Business Operations, is submitted herewith.

claim would fail.  But if TransUnion wishes to sue FICO for an alleged refusal to deal, then it must

seek leave to amend its complaint so that the legal sufficiency of its allegations can be evaluated

by Judge Coleman *before* discovery proceeds.   Under the pleading standards established by

*Twombly*, there is a clearly defined order of operations: complaint, plausibility, discovery.

TransUnion cannot skip the first two steps and proceed straight to the third.

### BACKGROUND OF RELEVANT FACTS

As TransUnion admits, the Canada Scoring Agreement governed the license of FICO credit

scoring analytics to TU Canada to facilitate TU Canada's distribution of FICO Scores in "the

Canadian market."  Mot. at 2.  ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████. Jones Decl. ¶¶ 2-4. ████████████████████████████████████

███████████████████████████. *Id.* ¶ 5.  ██████████████████████████████

████████████████████████████. *Id.* ¶ 6.[2]

The economic terms of the Canada Scoring Agreement, which was established in the

1990s, had not been updated for many years.  Jones Decl. ¶ 10.  In May 2018, ████████████

█████████████████████████████████████████████████████████████████████████

███████████████████████████████████. *See* Dias Decl. Ex. 1.[3]  FICO and TU Canada

then engaged in negotiations for a potential new scoring agreement to replace the Canada Scoring

---

[2]  Although it is not material to TransUnion's motion, TransUnion mischaracterizes the Canada Scoring Agreement as a contract between "FICO" and TU Canada.  *E.g.*, Mot. at 2.  ████████████████████████████████████████████████████████████████████████████████████████████████████████. Jones Decl. ¶ 3.  Thus, when FICO gave written notice of its intent to let the Canada Scoring Agreement expire in May 2018, it referred to "t█████████████████████████████████████████████████" Dias Decl. (ECF No. 148) Ex. 1.

[3]  The parties subsequently agreed to a ██████████ termination date to provide for an orderly transition period for FICO and its affiliates, TU Canada, and end-users.  Dias Decl. ¶ 22; Jones Decl. ¶ 20.

Agreement.  Jones Decl. ¶ 11.  █████████████████████████████████████

█████████ *Id.* ████████████████████████████████ *Id.* ¶ 12.

████████████████████████████████████████████████████████████

████, TU Canada informed FICO that ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████.  *Id.* ¶ 14 & Ex. 1.  Thus, what TU Canada proposed for the new Canadian scoring

agreement was substantially similar to the structure of the U.S. scoring agreement between FICO

and TransUnion—████████████████████████—that TransUnion is currently *suing*

FICO about in this litigation.  *Id.* ¶¶ 15-16.  TransUnion calls this structure a "pricing scheme" by

FICO to "unlawfully leverage its monopoly power and foreclose competition."  TU Counterclaims

(ECF No. 35) ¶¶ 50-58.  In particular, TransUnion attacks the "Level Playing Field" clause in the

U.S. scoring agreement as purportedly allowing FICO "to extract monopoly prices."  *Id.* ¶ 60.

TransUnion claims that the "Level Playing Field" clause has "reduced incentives to develop

innovative methods of distributing credit scores" and has had an "exclusionary effect."  TU MTD Opp.

(ECF No. 71) at 4, 11.  And TransUnion says that FICO should pay damages in excess of "ten million

dollars" (pre-trebling) to compensate it for these supposed injuries.  TU Counterclaims ¶ 7.

To be clear, FICO believes that these allegations are baseless, and discovery will show them

to be without merit.  But having been dragged into protracted litigation by TransUnion once already

over the "Level Playing Field" provision (among other terms) in a license agreement, FICO is not

inclined to litigate the same dispute one day in Canada.  ██████████████████████████

████████████████████████████████████.  Jones Decl. ¶¶ 17-18.

Also, the Canada Scoring Agreement's termination is not "likely to hurt FICO's bottom line."

Mot. at 5.  ██████████████████████████████████████████████████.  Jones

Decl. ¶ 22. . *Id.* ¶ 23.

## ARGUMENT

### I. TransUnion Improperly Seeks Discovery For Unasserted Claims

It is well-established that "attempt[ing] to discover evidence . . . for unasserted claims is improper." *Am. Roller Co. v. Foster-Adams Leasing, LLP*, 2006 WL 1371441, at *3 (N.D. Ill. May 16, 2006). *See also Maui Jim, Inc. v. SmartBuy Guru Enter.*, 386 F. Supp. 3d 926, 948 (N.D. Ill. 2019) ("We see no reason to allow this claim to go to discovery only so that SBG may conduct a 'fishing expedition' that may result in a viable antitrust claim." (quoting *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 766 (7th Cir. 2015))); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2018 WL 6048262, at *5 (N.D. Ill. Nov. 19, 2018). TransUnion admits that this is the purpose of its proposed discovery requests, asserting that the termination of the Canada Scoring Agreement with TU Canada "could be independently actionable under Section 2 of the Sherman Act" as a so-called "refusal to deal." Mot. at 6.

Even if TransUnion had sought leave to assert such a claim, which it has not done, a refusal to deal claim is "at or near the outer boundary of § 2 liability." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 399 (2004). *See also Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1025 (7th Cir. 2017) ("Even monopolists are almost never required to assist their competitors."). There are multiple reasons why TransUnion or TU Canada likely could not assert any type of antitrust claim based on the Canada Scoring Agreement:

4

a.        Under the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a, there is no antitrust liability for conduct—including conduct undertaken or based in the United States—that affects only foreign commerce.  Thus, even if TransUnion could show that FICO's dealings with TU Canada were "anticompetitive," the "Sherman Act does not prevent them from entering into a business arrangement, however anticompetitive, as long as those arrangements adversely affect only foreign markets." *Commercial St. Express LLC v. Sara Lee Corp.*, 2008 WL 5377815, at *3 (N.D. Ill. Dec. 18, 2008) (citing *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004)).  Here, the Canada Scoring Agreement governed the distribution of FICO Scores in Canada, to Canadian end-users, by TU Canada (a Canadian entity).  *See supra*, p. 2; Jones Decl.  ¶¶ 2-6; Dias Decl. ¶¶ 3-5.  Thus, the FTAIA likely would bar any attempt to bring claims against FICO based on the termination of the Canada Scoring Agreement.

Other decisions make clear that the mere fact that FICO is a U.S. business is of no significance under the FTAIA, which exempts all "conduct that lacks the requisite domestic effect, 'even where the anti-trust conduct originates in the United States or involves American-owned entities operating abroad.'" *United Phosphorus, Ltd. v. Angus Chem. Co.*, 131 F. Supp. 2d 1003, 1009 (N.D. Ill. 2001) (quoting *Optimum, S.A. v. Legent Corp.*, 926 F. Supp. 530, 532 (W.D. Pa. 1996)), *aff'd*, 322 F.3d 942 (7th Cir. 2003) (en banc), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) (en banc).[4]  Nor is TransUnion's bare (and unpleaded) allegation that the termination of the Canada Scoring Agreement was intended to harm it in the United States is sufficient: under the FTAIA, "a plaintiff's showing of domestic effects

---

[4] In *Minn-Chem*, the Seventh Circuit held that the FTAIA does not establish a jurisdictional limit, but rather sets forth an element of an antitrust claim, overruling its prior decision in *United Phosphorous*.  683 F.3d at 852-53.  *Minn-Chem* did not otherwise alter the substantive application of the FTAIA—and, in fact, it reinforces the above analysis.  *See id.* at 854 ("Where the FTAIA does apply, it 'remov[es] from the Sherman Act's reach . . . commercial activities taking place abroad, unless those activities adversely affect . . . imports to the United States." (alterations in original) (quoting *Empagran*, 542 U.S. at 161)).

must include a demonstration of 'antitrust injury to the market or to competition in general, not merely injury to individuals or individual firms.'" *Id.* (quoting *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 815 (9th Cir. 1988)).

     **b.**     In addition, a "refusal to deal" claim must plausibly allege that a monopoly firm's decision not to deal with (and thereby assist) a rival "was irrational but for its anticompetitive effects[.]" *Viamedia, Inc. v. Comcast Corp.*, 218 F. Supp. 3d 674, 698 (N.D. Ill. 2016) (St. Eve, J.). Here, the purported refusal to deal does not even involve TransUnion, the entity who would assert such a claim. It involves TU Canada, a non-party. And FICO's decision not to enter into a new scoring agreement with TU Canada on terms that were substantially similar to the terms that TransUnion claims are anticompetitive in the U.S. agreement, and for which TransUnion is seeking millions of dollars in damages, among other relief, is not plausibly irrational.

     There is no basis for TransUnion's repeated assertions (*see* Mot. at 3, 4, 7) that the non-renewal of the Canada Scoring Agreement with TU Canada was only motivated by FICO's sour grapes over "TransUnion's antitrust claims against FICO in the United States" as opposed to other business considerations and ████████████████████████████████████████

████████████. *See* Jones Decl. ¶¶ 14-19. Importantly, however, even if the Court were to accept TransUnion's unfounded narrative at face value, it *still* would not support a plausible antitrust claim. *See, e.g.*, *House of Mat'ls, Inc. v. Simplicity Pattern Co.*, 298 F.2d 867, 871 (2d Cir. 1962) ("Appellee does not cite, and we have not found any case in which a 'refusal to deal' based on a customer's prosecution of a suit against a manufacturer has been held to constitute an unreasonable restraint of trade."); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 2019 WL 4751940, at *8 (N.D. Cal. Sept. 30, 2019) (finding that defendants were "justified" in

6

discontinuing their business relationship with competitor where it was "undisputed that Defendants only refused to deal with Orion after Orion began threatening litigation").[5]

Moreover, terminating the Canada Scoring Agreement allows ███████████ ███████████████. Jones Decl. ¶¶ 22-23. "[R]eplac[ing] an intermediary with a direct relationship . . . is a prototypical valid business purpose" that offers "potentially improved efficiency." *Viamedia*, 218 F. Supp. 3d at 699 (record citations omitted). Between this principle, the FTAIA, and the general rule against "forcing a company to deal with its rival," it is very unlikely that TransUnion could allege a potentially viable antitrust claim against FICO based on the termination or non-renewal of the Canada Scoring Agreement. *Id.*

Given the serious questions raised above about the viability of TransUnion's theory, at the very least TransUnion should seek leave to amend its counterclaims so that Judge Coleman can rule on the sufficiency of its allegations *before* discovery proceeds.[6] Indeed, the pleading standards established in *Twombly* require that "[s]ome threshold of plausibility must be crossed at the outset"

---

[5] *See also Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1358 (Fed. Cir. 1999) ("Courts have recognized that '[t]he relationship between a manufacturer and its customer should be reasonably harmonious; and the bringing of a lawsuit by the customer may provide a sound business reason for the manufacturer to terminate their relations.'" (quoting *House of Mat'ls*, 693 F.2d at 889-90)); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 890 (9th Cir. 1982) ("Thus Capitol's acknowledged purpose of avoiding future litigation whose costs exceeded the benefits from doing business with appellants qualified as a legitimate business reason for refusing to deal."); *Borough of Lansdale v. PP & L, Inc.*, 2007 WL 2597503, at *15 (E.D. Pa. Sept. 4, 2007) (finding "a legitimate business reason for PPL not to renew the Power Supply Agreements as the contentious litigation between the Boroughs and PPL was already ongoing at the time PPL decided not to renew the contract"); *High Tech Commc'ns v. Panasonic Co.*, 1995 WL 65133, at *2 (E.D. La. Feb. 15, 1995) (rejecting claim that "allege[d] that the defendant violated the antitrust laws by terminating all sales to High Tech for the dual purpose of retaliating against the plaintiff for commencing this lawsuit," because "even if the plaintiff has accurately characterized the defendant's intent in its decision to terminate sales to the High Tech, plaintiff's second amended complaint fails to state a cause of action"); *Reborn Enters., Inc. v. Fine Child, Inc.*, 590 F. Supp. 1423, 1443 (S.D.N.Y. 1984) ("MacLaren's present decision not to do business with Reborn because they are involved in litigation is a unilateral decision . . . [that] would constitute a legitimate business reason for refusing to deal"), *aff'd*, 754 F.2d 1072 (2d Cir. 1985). TransUnion does not cite any persuasive authority to the contrary.

[6] In the event that TransUnion seeks leave to amend its counterclaims, FICO reserves the right to oppose the motion, or to move for dismissal, on any appropriate grounds in addition to those set forth herein.

before a claim—particularly an antitrust claim—can proceed to the "inevitably costly and protracted discovery phase." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (quoting *Asahi Glass Co. v. Pentech Pharms., Inc.*, 289 F. Supp. 2d 986, 995 (N.D. Ill. 2003)).

## II.    The Proposed Discovery Is Not Relevant To TransUnion's Existing Counterclaims

TransUnion likewise fails to show that the discovery sought is relevant to its existing antitrust counterclaims. *See Am. Roller Co.*, 2006 WL 1371441, at *3 (the Advisory Committee Notes to Fed. R. Civ. P. 26(b)(1) make clear that the district court "has the authority to confine discovery to the claims and defenses asserted in the pleadings").

While admitting that the proposed discovery is intended to support a new, unpleaded claim for refusal to deal, Mot. at 6, TransUnion also asserts, inconsistently, that the discovery will "reinforce and support" its claim that FICO's practices in the U.S. are "exclusionary." *Id*. at 5-6. However, TransUnion's existing claim is based on allegations of conduct and effects on competition that are expressly limited to the United States. *See, e.g.*, TU Counterclaims ¶ 21 ("The restraints on competition contained in Fair Isaac's contracts relate to the provision of credit scores to financial institutions and consumers throughout the United States."). In addition, as Judge Coleman found, the gravamen of TransUnion's antitrust claim is that certain provisions in the U.S. scoring agreement between FICO and TransUnion (including the "Level Playing Field" provision) are "exclusive dealing." *See* MTD Mem. Op. (ECF No. 96) at 4. Exclusive dealing and refusal to deal are two different theories of antitrust liability. *See Viamedia*, 218 F. Supp. 2d at 699. Indeed, when opposing FICO's motion to dismiss, TransUnion represented expressly that "***TransUnion does not challenge any 'refusal to deal.'***" TU MTD Op. at 1 (emphasis added).

TransUnion's new theory that FICO's decision *not* to deal with TU Canada on similar terms in Canada was also anticompetitive is not just outside the scope of TransUnion's existing antitrust allegations—the two are incompatible. Put simply, it cannot be anticompetitive for FICO

8

to enter into a scoring agreement with TransUnion in the U.S. on terms that (according to TransUnion) allegedly are illegal "exclusive dealing," but at the same time be anticompetitive for FICO *not* to enter into a similar arrangement with TU Canada in Canada.

Any suggestion by TransUnion that discovery into termination of the Canada Scoring Agreement will uncover evidence of "retaliation" by FICO is similarly flawed. *See* Mot. at 6. There is no theory of "retaliation" pled in TransUnion's allegations, much less any mention of TU Canada. Regardless, an alleged "retaliatory" refusal to deal with TU Canada based on TransUnion's antitrust suit would still be evaluated as a refusal to deal claim. *See supra*, pp. 6-7. As noted above, TransUnion has not asserted such a claim in this litigation and in fact has expressly represented that its allegations *do not* assert any type of refusal to deal theory.

## III. The Burden Of Responding To The Proposed Discovery Is Not "Minimal"

TransUnion offers assurances that the "incremental burden" associated with expanding the scope of discovery to include the relationship between FICO and its affiliates and TU Canada and the Canada Scoring Agreement would be "minimal." Mot. at 7. FICO disagrees.

The proposed requests seek "[a]ll documents" regarding termination of the Canada Scoring Agreement, and five years of related financial information. *See* Mot. Ex. A. At a minimum, TransUnion is proposing that FICO run additional search terms and collect and review more documents[7] from the files of at least four proposed FICO document custodians (Nathan Jones, Jon Vinovich, James Woodward, and Mark Scadina), three of whom (all but Mr. Jones) are in-house legal counsel. In its motion, TransUnion also promises a fight about whether in-house counsel's communications regarding the Canada Scoring Agreement are privileged. *See id*. at 8. To be sure,

---

[7] To the extent that TransUnion's proposed discovery requests seek communications from the period August 2019 to the present, the custodial collections that FICO completed in July of this year do not include this period, and thus, FICO would have to re-collect documents from any designated custodians.

FICO disputes any suggestion that its lawyers were "acting in their capacity as business executives" when providing advice on the matter. *Id.* Even assuming that lawyers were involved in FICO's decisions regarding the Canada Scoring Agreement, or even heavily involved, that is nothing remarkable—nor does it mean that advice they provided was not primarily legal.[8] An inevitable dispute over the privileged nature of communications involving FICO's in-house counsel would impose significant burden on both the parties and the Court's own resources.

Separately, FICO has already collected documents from proposed custodians and is working diligently to meet the January 24, 2020 deadline set by Judge Coleman to substantially complete document productions. *See* ECF No. 137. TransUnion's current proposal for ESI search terms would require FICO to review nearly 500,000 documents from five custodians alone. *See* Ex. 1 (11/20/19 Email from N. Wayne). And TransUnion has since proposed that FICO review documents from at least *26* custodians, all to fulfill TransUnion's *existing* discovery requests. *See* Ex. 2 (11/6/19 Ltr. from L. Pope). Given the rapidly approaching deadline to substantially complete productions and the existing scope of discovery in this case, the parties should be having discussions about how to *narrow* the burdens of discovery, not expand them.

At a minimum, FICO should not be subjected to these discovery burdens until TransUnion has been granted leave to amend and has demonstrated that its theory of antitrust liability premised on the termination of the Canada Scoring Agreement is plausible.

---

[8] It is unclear why TransUnion cites *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 2009 WL 10677479 (D. Minn. Mar. 23, 2009). That decision addressed the privileged nature of communications involving FICO's in-house counsel on completely unrelated subjects, from litigation between the parties that is now more than ten years old. Moreover, the court sustained FICO's privilege objections to all but one of the documents at issue, finding that they "either only pertained to legal matters or the legal advice predominated over the business matters at issue in the communication." *Id.* at *20.

## IV.    In The Alternative, FICO Should Be Permitted To Serve Reciprocal Discovery

If the Court is inclined to allow the discovery requested by TransUnion regarding the Canada Scoring Agreement (although for all the reasons set forth above, it should not), the discovery on this issue should be a two-way street.  *See, e.g.*, *In re Folding Carton Antitrust Litig.*, 76 F.R.D. 420, 427 (N.D. Ill. 1977).  FICO should be permitted to serve a comparable number of targeted discovery requests to TransUnion on relevant issues, *e.g.*, why TU Canada proposed to include a "███████████" provision in a Canadian scoring agreement if such a provision is, according to TransUnion, illegal and anticompetitive.

## CONCLUSION

For the foregoing reasons, TransUnion's motion should be denied.


Dated:  November 21, 2019                    Respectfully submitted,

                                             /s/ *J. Gregory Deis*
                                             Michael A. Olsen
                                             J. Gregory Deis
                                             Matthew D. Provance
                                             Natalie F. Wayne
                                             Mayer Brown LLP
                                             71 South Wacker Drive
                                             Chicago, IL 60606-4637
                                             (312) 782-0600
                                             (312) 701-7711—Facsimile
                                             Email: molsen@mayerbrown.com
                                             Email: gdeis@mayerbrown.com
                                             Email: mprovance@mayerbrown.com
                                             Email: nwayne@mayerbrown.com

                                             *Attorneys for Plaintiff/Counterclaim-*
                                             *Defendant Fair Isaac Corporation*

11

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2019, I caused a true and correct copy of the foregoing document to be filed electronically. Notice of the filing will be sent to all counsel of record by operation of the Court's electronic filing system.

Dated: November 21, 2019

_____/s/ J. Gregory Deis_____
*Attorney for Fair Isaac Corporation*
